DECISION
I. Travel of the Case.
On March 14, 1991 the Court rendered its decision in this case denying the motion of each of the defendants herein that they be granted a new trial on the ground of newly discovered evidence. The decision was appealed to the Supreme Court on March 15, 1991.
On March 26, 1991 the defendants filed with the Supreme Court a document entitled "Defendants Unopposed Motion for Certain Discovery and the Issuance of Certain Subpoenas." The relief sought was an order authorizing the defendants to conduct additional discovery and the issuance of deposition subpoenas. The basis of the motion was that "Molly Raymond, an important prosecution witness at Defendants' trial and the wife of Richard Raymond . . . told Glocester police officer Bryan Merchant that key elements of Richard Raymond's trial testimony were false and that she now wanted to testify truthfully about events which led to the conviction of the Defendants."
Accordingly, the defendants sought the permission of the Supreme Court to examine four individuals under oath: Molly Raymond, Gerald Prendergast, Bryan Merchant and Dennis Drake. During a proceeding before this Court on May 1, 1991, the defendants represented that the Supreme Court "retained jurisdiction of the appeal and ordered a review of the discovery issues raised by the defendants here in the trial court."
The Supreme Court spoke with more precision with respect to the motion then before it. In its order of remand, it said:
 "The defendants' motion, addressed to this court, for discovery and the issuance of subpoenas, as prayed, is denied as procedurally inappropriate. The papers in this case are remanded to the Superior Court in order that defendants may file such motions in aid of further discovery herein as they deem necessary. Pending completion of such discovery efforts in the Superior Court, appellate proceedings in this matter are stayed."
Ordinarily, the composition of a motion does not bear mentioning. In this case, while the text of the motion to the Supreme Court is confined to the boundaries necessary to state the case, there is substantial extension by the inclusion of argument designated as footnote 2. The arguments there set out are a verbatim reproduction of those presented to this Court on October 24, 1988 with the filing of "Defendants' Motion for a New Trial, or, in the alternative, for an Evidentiary Hearing on Newly Discovered and Newly Available Evidence." The value and purpose of repeating these arguments to the Supreme Court in footnote 2 are dubious at best. This Court considered and disposed of those arguments in its decision of March 14, 1991. Its decision is now subject to appellate review. For whatever reasons they were again presented to the Supreme Court they form no basis for this Court, having already decided the issue, to consider them anew or to grant the remanded motion.
The textual allegations contained in the motion did require consideration, however, and to that end the Court conducted a hearing on April 1, 1991. The defendants were then authorized to depose J. Joseph Nugent, Dennis Drake, Bryan Merchant, Molly Raymond, Jaime Hainsworth, Kyle Glasko and Gerald Prendergast and the matter was continued to May 1, 1991 with the reception of those depositions by the Court in the interim. Instead of complying with the terms of the Court's order, the defendants chose not to depose Merchant, Hainsworth and Glasko and, without authorization, deposed Deborah Lister and Wayne M. Sacco. As a consequence, the Court ordered on May 2, 1991 that no depositions be taken by the prosecution or the defense without the permission of the Court.
At the May 1 hearing the defense outlined in general terms the points upon which it was relying to persuade the Court to grant the remanded motion for discovery. These points went well beyond the single allegation of the remanded motion that "key elements of Richard Raymond's trial testimony were false" and that Molly Raymond "now wanted to testify truthfully." In the main, the defense representations at the hearing found their origin now in the state's pretrial investigative file of this indictment voluntarily made available to the defendants by Assistant Attorney General Robert Craven. The defendants also asserted that the prosecutor at the defendants' trial, J. Joseph Nugent, after receipt of the Court's March 14 decision, made "a telephone call [to Craven] in which he indicated that [trial witness Robert] Knight lied." [Id. 4]
In light of the defense's asseverations, the Court directed the following to counsel:
 "Miss Schiff, I have decided that what I am going to do here is to require you to put this in memorandum form by may 17, attach all supporting documentation to it and I will permit Mr. Craven until May 31 to respond. Provide me with everything that you think I ought to look at. I have all the depositions you submitted last Friday. I have read them all and you may submit Miss Lister's memorandum about Molly Raymond, the statement and any other documentation that you feel is necessary. . . ."
 [Id. 13]
The defendants responded on May 21, 1991 to the Court's direction by filing "Defendants' Petition for Leave to Conduct Certain Discovery and for the Issuance of Certain Subpoenas" (the petition). Subsequent filings by the defendants, which will necessarily be referred to by the Court, contain much which is identical in purported factual presentation or argumentation as is found in the petition. Since such is the case, the Court's decision will relate to the matters as presented in the petition except with respect to Nugent and Sheila M. Haworth. The arguments which the defendants make about Nugent span not only Item 9 on pages 7-9 of the petition, but their motion for a new trial of November 5, 1991 as well. Because the defendants have expanded their arguments as they pertain to Nugent beyond the petition, the Court considers them as a unit immediately following its analyses and conclusions in respect to Haworth.
This decision will entail consideration by the Court of testimony given at the defendants' trial, exhibits then received into evidence and testimony adduced at deposition and in open court. In instances where the Court draws from the trial, the reference is made to the trial transcript as "TT" followed by the volume and page, and to an exhibit as "Ex." together with the exhibit number and, where appropriate, to a page in the exhibit. Deposition testimony is noted as "DT" followed by the date, in abbreviated form, on which the witness testified, and the page where the testimony is located. The same format is adhered to with respect to any testimony which has been taken in open court, the citation being "CT." Testimony taken at a hearing conducted by appointees of the attorney general on November 24, 1986 is referenced simply by that date and the applicable page.
II. Introduction.
There is some irony in the fact that the Court's decision of March 14, 1991 denying the defendants' motion for a new trial on the ground of newly discovered evidence, rather than bringing the matter to a close in this tribunal, was the springboard for the present round of hearings and argumentation wherein additional discovery is sought and a renewed effort is made for a new trial. Almost immediately, the decision was the basis for two telephone calls. One of the calls was placed by Molly Raymond. The other was made by Nugent to the attorney general's office.
On the day the decision was filed, Nugent was no longer a member of the attorney general's department and defendants' trial counsel had been replaced by present counsel. As a courtesy to both trial counsel, the Court directed that each was to receive a copy of the decision. Having read a portion of the decision Nugent called Craven, then representing the attorney general in this proceeding, and made comments about Robert Knight, a significant witness at trial. As this decision will chronicle, that telephone call had its ramifications.
A newspaper report published the day after the filing of the decision prompted Molly Raymond to speak that very day to Patrolman Bryan W. Merchant of the Glocester police department. He memorialized the telephone conversation on the same day. His memorandum became a part of the March 26 motion which the defendants filed with the supreme court and speaks for itself. Nevertheless, the defendants place their own characterization upon it. Because any trial witness may later offer to tell the truth on matters about which the witness had not previously testified, and in the light of Molly Raymond's trial testimony, the Court does not read the Merchant memorandum as containing any offer by her to recant her own testimony as the defendants asserted to the supreme court.
Her telephone call resulted in an investigation of the matter by R.I. State Police Corporal Gerald A. Prendergast. He filed reports dated March 18, 1991 and March 22, 1991 which the defendants attached to their supreme court motion.
At its session of April 1, 1991, the Court was provided with a transcript of a tape recorded conversation which Prendergast had with Dennis Drake on March 22, 1991 and another Prendergast report dated March 28, 1991.
III. The Telephone Calls. A. The Molly Raymond Telephone Call. 1. The product of the investigation into the telephone call.
The results of Prendergast's efforts following up on Molly Raymond's conversation with Merchant on March 15, 1991 are before the Court in the documents just referred to. Those documents and defense counsel's representations caused the Court to order that Dennis Drake, Molly Raymond and Corporal Prendergast be subject to examination under oath. Drake's deposition was taken on April 12, 1991; Raymond and Prendergast were deposed on April 18, 1991.
Almost a year later, on March 9, 1992, Prendergast took an unsworn statement from Haworth. The statement led to both Prendergast and Haworth being examined by the Court and counsel on April 6, 1992.
The Court has no doubt that both Merchant and Prendergast reproduced, as accurately as their memories allowed, what was said to each of them either by Drake or Molly Raymond.
 a. Drake's statements.
The statements which Drake made to Prendergast on March 22, 1991 are so far removed from anyone who has personal knowledge of the facts of the Ronci burglary and the events which followed as to carry no evidentiary value with the Court. Undoubtedly, with the foresight of his training and experience as a state police detective, Prendergast was aware that Drake's information was third-hand knowledge, and was hoping for something more immediate. Drake's entire tape recorded conversation is epitomized in this assertion by Prendergast to Drake, "If she would give me a statement that [her husband Richard] Raymond did the break, they'll get a new trial." Elongated to an extreme, the conversation entailed no more than Drake telling Prendergast that Molly Raymond told him her husband did the Ronci break, and Prendergast exhorting Drake to persuade Molly Raymond to make the statement herself to him. Even if Molly Raymond were to accede to Drake's request, a new trial for the defendants would not, as Prendergast said, follow. The defendants, it should be recalled here, were not convicted of breaking and entering.
What sparse information Drake conveyed third-hand to Prendergast was neutralized when Drake testified under oath. His testimony at deposition was that his talk with Prendergast was without any factual foundation and was manufactured for the purpose of revenge against his girlfriend, Molly Raymond. He adds nothing to this case that the Court has not heard before, has discussed, and has dismissed.
 b. Molly Raymond's statements.
Merchant, in his report of March 15, 1991, informs the Court what Molly Raymond conveyed to him telephonically on that day. It is a brief memorialization essentially without specifics. She averred that she had "a guilty conscience about the whole case and that it was time she spoke with someone and told the whole truth about the case and about her ex-husband." Prendergast's report of March 18, 1991, repeating Merchant's report, goes on to say that he spoke with Raymond on March 16, 1991. He catalogues eleven items as "the types of statements made by Molly Raymond during the conversation." A repetition here of three of them illustrates the tenuous value of what she said to Prendergast that day. "They don't deserve to go to jail for what little they did," certainly a non sequitur even if it were competent, but compounded as a contradiction to what Prendergast states she told him earlier, "she didn't want to see Lt. Binns and Chief Tooher go to jail for something they didn't do." To italicize the uselessness of these expressions Haworth, presented by the defendants as a truthful person, told the Court that when she had a conversation in 1988 or 1989 about the defendants going to jail, Molly Raymond told her that the defendants "were getting what they deserved." [CT: 4/6/92, 94]
Also typical of her other statements is this: "Not everything that was told in the trial was the truth," a circumstance at trial, to be sure, but a circumstance recognized and dealt with by the jury's verdicts. If, as is reported, Molly Raymond has been suffering from pangs of conscience since the trial she certainly has had ample time and opportunity to unburden herself.
What better occasion presented itself to her than when she was being examined by the defendants at her deposition? Yet, at its core, that deposition is a ventilation of a lack of recollection of anything she may have said to Merchant and Prendergast with the intimation that when she telephoned Merchant she was intoxicated. She went so far as to testify that she did not remember calling the Glocester police department. She reiterated what she had told the jury more than once at the trial; [TT: V.3, 534, 536 and 552] that her husband did not break into the Ronci home. [DT: 4/18/91, 18]
From the emphases placed upon Molly Raymond in these post-trial proceedings — previously because of her untrustworthiness as a trial witness flowing from her alleged fraudulent behavior in other matters and presently in the defendants' willingness to embrace her as a person to be believed because she has a guilty conscience — a stranger to the trial might get the impression that she was critical to the state's case. In truth, from the Court's view, had she never appeared the verdicts would have been no different.
It does not appear that she came to the trial to assist her husband, nor that she would have come at all. She had been separated from Richard Raymond for over a year and had to be subpoenaed. These facts are reasonably indicative that she was not inclined to abet any interests Richard Raymond may have had had she just been left alone by the prosecution. Her determination not to testify and the state's insistence are reflected in her statement to Prendergast on March 16 "that Jimmy Williams came to her a few times and threatened her that they would force her to testify against her will." Of course, it was not Williams who could force her to testify, and it was not he who was doing the threatening. Williams had neither of those powers, but the attorney general did. The state made good on its threat and, as she had told Prendergast, forced "her to testify against her will."
It can be said to a moral certainty that Molly Raymond's testimony formed no basis for the defendants' convictions for conspiracy and obstruction of justice. Because she could not, she did not testify regarding the conduct of the defendants while they were in the Ronci home with Knight. It is quite evident, however, that the state sought to have her corroborate the testimony given by Knight and Williams that when they looked inside the Raymond vehicle it did not contain the items later found therein. That attempt fell far short of the state's objective. The few questions asked of her on this subject best illustrate the Court's conclusion:
 "Q While you were inside the car, did you have a chance to look inside of the car, in the front seat, in the back seat?
 A Yes.
 Q Let me show you State's Exhibit 19 and ask you if you recognize any of the items that are shown on the photograph that are in the hands of the individual sitting down?
 A No, I don't."
 [TT: V.2, 511]
That testimony tells us that she had the opportunity while she was in the automobile to look both in the front and the back. The testimony leaves it completely to speculation whether she took the opportunity and did look in front and back. The fact that she did not recognize the items in exhibit 19 did not assist the state. The items in that exhibit were found later that morning on the floor behind the front seat. They were a statue and a coin case both covered by a multi-colored blanket. If she did not look behind the seat as she sat at the driver's wheel, she would not be able to recognize the items shown to her. The answer which the state had been looking for, but did not get, was that she in fact looked in the front and the back of the front seat. The prosecution presumably concluded that the point was made, but if the guilt or innocence of the defendants hung on those responses alone a judgment of acquittal would have been in order.
This analysis induces the conclusion that the competent evidence which underlay the defendants' convictions for conspiracy and obstruction of justice came from the testimony of Knight, Williams and the defendants themselves. Having her testimony in mind, neither the lawless picture of her drawn by the defendants nor their aspiration for her repentance entitle the defendants to more discovery or a new trial on those counts.
The same holds true with respect to defendant Tooher's conviction on the count which charged him with filing a false document. She gave no testimony at all relating to that count.
Compared with the testimony of Williams and Richard Raymond, whatever contribution she made to the conviction of defendant Binns on the count of assault and battery can only be characterized as infinitesimal. As it turned out, the dominant result of her appearance as a witness was the revelation of the discussions leading to the execution of the general release and the circumstances which surrounded the execution of the release itself. On a lesser plane was her testimony about her husband's arrest; whether there was a warrant for his arrest; her attempt to keep control of his automobile and her efforts to retrieve it later from police custody. Against that background, her allusion implicating the defendant Binns appears incidental. Her sole reference to defendant Binns' assault was that he had told her that he and her husband had fallen down the police station stairs, that he was angry and hit her husband in the leg with the nightstick. [TT: V.3, 542] Such testimony differed markedly from what her husband and Williams told the jury. It can be fairly said that the defendants recognized the difference. They considered whatever importance her testimony had by confining their cross-examination to the general release.
 c. The effect of statements by Molly Raymond and Drake.
Neither Drake's statements to Prendergast nor his deposition testimony provides the defendants with any basis for further discovery or for a new trial. He is a complete stranger to any event which might be pointed to as the cause of either defendant's conviction for any crime. He has no legitimacy as a witness apart from Molly Raymond.
In spite of defendants' relentless attempts to magnify the part she played in their convictions, the fact is that Molly Raymond's appearance as a witness at the trial was not critical to the indictment. If it was not her intoxication which caused her to call Merchant, the reason is open to speculation. Assuming she was in a state of sobriety when she talked with Prendergast on the very next day, her conversation produced but a series of nonentities. For her to be the generator of their new trial, the defendants must present evidence which is more definitive. The likelihood of that occurrence appears to be chimerical. Apart from the point that nothing has been submitted indicative of testimony as yet unspecified which is to be adopted as truthful and presumably to be elicited from Molly Raymond, the Court has not been provided with any expectation that she is prepared to add to her trial testimony or to recant any of it. On the contrary, Prendergast made it plain that she never supplied him with any definite or useful information. He testified, "We advised her that the Attorney General's Office advised us that she, [sic] that she may be granted immunity in exchange for the truth, for true testimony, and/or the statute of limitations had run out on any other charges." [DT: 4/18/91, 17] If Molly Raymond had any fear of criminal responsibility should she "tell the truth" in this case, she could not have received any greater protection than what was being offered. From all that the defendants have reported, she has not said anything which might cause another jury to come to not guilty verdicts. It seems quite odd to the Court that the defendants impetrate her with legal protections to tell the truth and, at the same time, tell the Court that she cannot be considered to have told the truth at the trial in view of her supposed participation in conducting fraudulent claims, "schemes" and "scams." If the defendants are sincere in their argument and her character has been such as to make her an incredible witness in the past, they owe it to the Court to provide the circumstances which lead them to believe that she will tell the truth today.
What the defendants refuse to acknowledge is that what little Molly Raymond had to say at the trial may have been the truth.
 d. Molly Raymond's testimony about the assault upon herhusband.
Although it has nothing to do with Molly Raymond's conversations with Merchant and Prendergast, the Court takes the occasion here to discuss representations made by the defendants which are without foundation. It does so because the misstatements concern the assault upon her husband, a matter to which the Court has recently adverted. The defendants state on page 2 of their petition:
 "* * * Mrs. Raymond has now told investigators that she did not witness the Defendant Binns strike her husband, Richard Raymond, during his arrest at the Raymond's trailer. Contrary to her statements to Department of Attorney General Investigator Deborah Lister and to her trial testimony (Tr. 507), Mrs. Raymond now confirms that Defendant Binns was not one of the officers who seized her husband and placed him in a police cruiser. Instead, she now states that Defendant Binns was speaking to her throughout the seizure and removal of her husband from the trailer." (Footnote omitted.)
The short answer to the defendants' first contention, implicit in the Court's late reference to her trial testimony about defendant Binns' assault upon her husband, is that Molly Raymond never testified at trial that she witnessed defendant Binns assault Richard Raymond "during his arrest at the Raymond's trailer." The defendants further complicate the matter in two respects. First, their reference to her testimony as reported on page 507 says nothing about the defendant Binns being "one of the officers who seized her husband and placed him in a police cruiser." Second, the defendants fail to identify who the investigators are to whom Molly Raymond made the purported statements.
It is important to stress that her trial testimony is devoid of even an inference that defendant Binns struck her husband either during or after his arrest. The emphasis is provided because the inferred recantation relates to the defendant's conduct during an arrest. An examination of her testimony discloses that it is impossible to say which officer effectuated Richard Raymond's arrest. But even assuming it was the defendant Binns, he had a right to use such force as was necessary to make the arrest including striking the arrestee if it was a necessity. The charge of assault preferred against the defendant in this indictment was not based upon the use of excessive force in arresting Raymond.
Her testimony of the events from the time of the entry of the officers into the Raymond trailer to their exit with Richard Raymond in handcuffs is reported at pages 504 through 508 in volume two of the trial transcript. She identified Williams and the defendant being present with three or four other officers. She did not know Knight. The trial record establishes that five police officers were in and around the Raymond trailer to carry out the arrest: the defendant, Williams, Knight, and State Troopers Alvin Pontarelli and Gary Treml. She saw her husband thrown on the bed and then on the floor. An officer had a gun to his head and one to his side. He was handcuffed behind his back and taken to the cruiser. She said that the defendant Binns was there when her husband was being taken out of the trailer, but said, "I don't think he had him by the cuffs, though." Her testimony does not permit the inference that the defendant threw her husband on the bed, or on the floor, or put a gun to his head or side. Her testimony at page 506 indicates it was an unidentified officer. In his testimony Knight said, "I believe it was Trooper Pontarelli that found him in the bedroom area, and he was arrested and handcuffed and then taken out of the trailer." [TT: V.2, 246] Trooper Pontarelli testified that he "located Richard Raymond in the bedroom behind, [sic] hiding behind a door." When he entered the bedroom, Pontarelli was alone. Defendant Binns followed him afterwards. [Id. 387]
At trial, the defendants were in possession of a verbatim statement which Molly Raymond gave to Attorney General Investigator Deborah Lister on May 17, 1986. The Court makes this reference in the event that Lister was the investigator to whom Molly Raymond had said "that she did not witness Defendant Binns strike her husband . . . during his arrest at the Raymond's trailer." In that eventuality, the defendants use a statement made by Molly Raymond in isolation and out of context. Her answers to Lister's questions on the subject follow:
 "Q At any time did your son see Lt. Binns?
 A Yes, he saw him when he followed his father to the cruiser and he saw him hitting his father on the back and everything with the nightstick and then the child started to kick Binns in the leg and when he did Bruce knocked him down and stepped on him.
 Q Did your son tell you this?
 A That's what my son had told me. I did not see this myself."
These responses must be read together with others in which she told Lister that before her husband was put in the cruiser, "There was a couple of cops that were wacking [sic] him around [but] I don't remember which ones."
When these statements are read in conjunction with the entirety of her trial testimony, it becomes quite evident why none of her testimony before the jury accused defendant Binns, as a matter of her own observation, of assaulting her husband.
 B. The Nugent Telephone Call.
Upon his receipt of this Court's decision on March 14, 1991 Nugent, the trial prosecutor, spoke with Craven by telephone. During her appearance before the Court on April 1, 1991, defense counsel related that in that conversation Nugent asserted that Knight lied. Defense counsel was thereupon authorized to take Nugent's deposition for the exploration of that conversation. Nugent's examination was conducted on April 12, 1991. The major part of the deposition consisted of inquiries into areas entirely outside the scope of the discussion which Nugent had with Craven.
At the deposition Nugent was asked, "[D]id you tell Mr. Craven that Robert Knight lied or words to that effect?" to which Nugent answered, "No, not really." [DT: 4/12/91, 5] He explained that he could not recall what he said to Craven but that he "did mention something about Robert Knight" after having read about 30 pages of the decision "because of a portion of the opinion that struck him." [Id]
The brief testimony elicited from Nugent at the deposition failed to bring to light what had been said about Knight. The proceeding did at least present the possibility that his memory might be assisted if he had the opportunity to locate and re-read that portion of the Court's decision which prompted his telephone call in the first place.
The fruitlessness of Nugent's April examination led the Court to request him to appear before it so that the matter might be further pursued. He did so and gave sworn testimony on October 11, 1991. The search for his copy of the March 14 decision, which he had annotated, proved unproductive, and insofar as its refreshment of his memory, nothing had changed.
At the October 11 hearing the Court sought to set the theme by framing the issue as: "if Knight lied, what did he lie about?" [CT: 10/11/91, 4] The Court went on to suggest that the examination should have some focus "to determine what [Nugent] meant by `No, not really.'" [Id. 5]
Nugent did explain the basis for that deposition answer. He testified that he read the Court's exposition upon the defendants' contention that Knight could not have visited inside the Chepachet barracks after securing the vehicle on the barracks' parking lot. He went on to say:
 "[I] called Bob Craven, and I said words to the effect that `The way this reads, Knight lied.' But then I read further in the decision and I realized that the author was playing the devil's advocate and I recalled, a lot of the facts came back to me. And I called Bob Craven back a second time the same night, and I said words to the effect, `Strike that, I don't think Knight lied.'"
 * * *
 "And I don't have to tell you, I did not put Knight on the stand — [sic] I did not put Knight on the stand as the State's witness knowing that he was a liar. I knew he had many inconsistencies in his testimony which I expected would be exploited favorably by the defense, but I never believed for a moment that he was a liar."
 * * *
 "I most certainly had a second conversation that night with Bob Craven in which I said to him that a further reading of the decision had caused me to believe that I had jumped the gun and that I had rashly said on the telephone to him that it — [sic] `The way it reads here, that Knight must have lied.'"
 [Id. 7-9]
On November 4, 1991, Craven testified. His recollection of the details was scanty beyond Nugent's having said that "he had read a portion of the opinion and that Knight lied and then he ended the conversation." [CT: 11/4/91, 4] Some days later, said Craven, Nugent called back to say that "he finished reading the opinion and that he jumped to a conclusion . . . something to the affect [sic] that it appeared as though the Judge was characterizing the testimony as maybe leading the Judge to the conclusion that Knight had not been truthful." [Id. 11-12] It was established during the court proceeding that Craven had met with the attorney general and three police officers on March 18, 1991 during which meeting he informed them of Nugent's remark. Similar information was passed on to defense counsel and a fourth police officer on April 1, 1991.
Whether he and Nugent ever conversed after the first telephone call was a question which defendants raised in the course of Craven's appearance on the witness stand. Craven confirmed the second telephone call but placed its occurrence on a day other than March 14. He said, "[M]y recollection was that it did not happen later that day [March 14]. It could have, but it seems to me that it was some days later that he called me back, whether it was the next day or the day after the next day, but in any event, he called me back. . . ." [Id. 11]
Craven could not recall whether Nugent's second call was mentioned to the officers and defense counsel. It was not disputed by him that he may not have mentioned it. The Court accordingly accepts as fact what the defendants have represented would be the testimony of the four officers: that Craven did not relate to any of them that he and Nugent spoke a second time.
The defendants think it a rather significant omission. The Court considers the omission devoid of any sinister implications. Craven met with the attorney general and the three police officers on Monday, March 18. He was unable to tell the Court whether the second call came to him on the Friday before that Monday meeting or after the meeting was held. It should be obvious that if the call was received by Craven after the meeting he could not possibly tell the attendees about it. In the final analysis, however, it really does not matter when Craven heard from Nugent again. When the Court views his testimony as a whole, it gives the impression that he considered his responsibility as a prosecutor discharged by disclosing Nugent's comment that "Knight lied." In that regard, he was correct. It would have changed nothing if he had told the officers, the attorney general and defense counsel, "Nugent called me back and told me he had jumped to a hasty conclusion." This case would be in precisely the same posture as it is now: seeking to resolve the import of Nugent's initial statement which he later said was a precipitate conclusion. Though the defendants seem to eye Craven's lack of communication with suspicion, the Court considers it of no consequence believing as it does that, as Nugent and Craven testified, there was a second telephone call from the former to the latter.
Undoubtedly, both Craven and Nugent have a subjective view about what was communicated and when it was communicated. But even accepting the fact advanced by defendants that Nugent spoke the words "Knight lied" presents no basis for further inquiry of Knight. The Court is persuaded that such a statement — subsequently disavowed by him to his listener — is but Nugent's impulsive response to the analysis of an issue by the Court in the course of its 1991 decision. Anyone reading pages 17-20 of that decision might come to the same hasty conclusion. Even if Nugent were to have testified that his contemporary belief was that Knight was not a truthful witness at the trial, it would be no reason for a new trial — let alone any further discovery of Knight. The Court has no doubt that Nugent presented Knight before the jury believing him to be a truthful witness. From that point on, Knight's credibility was in the jury's hands. Whether Nugent had any second thoughts about Knight's veracity post-verdict is immaterial. Such a post-trial opinion is simply an invasion of the jury's prerogative. On the other hand, it would be highly material, of course, if his prosecution of the defendants was tainted by misconduct to such a degree that they were deprived of a fair trial. This is a matter which the defendants have raised and which the Court discusses in section V, infra.
IV. Newly-Discovered Evidence Concerning Sheila Haworth. A. Introduction.
At the threshold of this decision the Court forewarned that submissions of the defendants following their May 1991 petition for discovery are rife with verbatim repetitions of purported facts and arguments made thereon. Illustrative of this bent is item III G. on page 11 of their petition which they present as "newly-discovered evidence concerning Sheila Haworth." The contentions there made will be found verbatim, together with a newly-added sentence, on page 15 of Attachment A to their motion for a new trial filed on November 5, 1991, and on page 17 of the memorandum filed on November 27, 1991 in support of the motion. In each of the instances, she is the last of the individuals whom the defendants claim possess newly discovered evidence which call for her being deposed. In spite of her position in the order of the defendants' presentation, she is brought to the forefront of the Court's decision because Prendergast's investigation endows her with the same prominence as Dennis Drake and Molly Raymond.
This is not Haworth's first appearance in this post-trial proceeding. Her purpose now is in part the same as when she was introduced previously: as a witness to the Raymonds' "fraudulent pattern of conduct" in their lives. Her own role in that kind of conduct is discussed by the Court in section IV of its 1991 decision beginning at page 96. There appears to be no reason why what Haworth has to say now about the same subject, as well as the new matter presented, could not have been said pre-1991. The defendants considered her sufficiently important during their effort to obtain a new trial on the ground of newly discovered evidence in 1988 that they included her communications with the Federal Bureau of Investigation as part of their case. All of her alleged additional information, especially her conversation with Molly Raymond on July 1, 1984, is information she possessed in 1988. In 1988 she was living in the Woonsocket area and available for diligent pursuit by the defendants. Yet the defendants have not endeavored to explain why her present contribution was not then disclosed.
The breadth of Haworth's knowledge lately revealed is set out in her interview with Prendergast on March 9, 1992, and her appearance before the Court on April 6, 1992. Supplementing the interview and court testimony are records which the defendants obtained from the Federal Bureau of Investigation. Those records were given to the Court by the defendants as a part of their original 1988 motion for a new trial. Some of that material reappears as exhibit B to the supplemented motion for a new trial filed by the defendants on March 23, 1992.
 B. Haworth's Interview on March 9, 1992.
The March 9 interview conducted by Prendergast was in question and answer form. It is almost entirely the product of his leading questions. In his appearance before the Court on April 6, 1992, he testified that he had interviewed Sheila Haworth a week before his examination of her on March 9. The following represents the sum and substance of the questions and answers comprising the March 9 unsworn examination. The extensive quotations are included for accuracy in presentation and are Haworth's words, more often than not incorporating necessarily a leading question.
She was born on March 8, 1965 and during 1978, at age 13, she began to live with Richard and Molly Raymond. While making her home with them, the Raymonds made their living through "varying amounts of settlements all over the place . . . insurance cases" which were "all insurance setups and scams." Richard Raymond, whom she called "Bo," "was involved in breaks and thefts of stuff . . . anything he could get his hands into."
In a period during which Haworth was living in Connecticut, Molly Raymond called her one day and told her that Richard Raymond had been arrested the previous night "for breaking and entering [and] that [he] had stole [sic] a statue and some other stuff." She remembered Molly making that statement on the phone, the "date being the next day [after the break], July 1st." Molly told her "that stuff was taken out of the house [but] all I [Haworth] can remember is a statue; for some reason it just stuck with me." Either Molly or Richard took "the stolen stuff" to Molly's mother's house and Glocester police officers "found it in the car."
"Bo had apparently got beat up by one of the cops . . . Binns I guess it was. That's what [Molly] said. In that initial communication on July 1st, [Molly] said that they were going to sue. [Molly] said she had a good lawsuit. And when these people talk about lawsuits, they really follow through, it's just not talk; they do it. You know, I've seen them do it in three or four different cases and they were all insurance fraud-type things. That's their style of doing things; they don't know any ways of getting money besides that. In other words, in making up stories and lies. That's basically Molly's whole life."
"Three or four days after [July 1], maybe even a week, [Molly told her] Jimmy Williams came to Molly and Richard and told him that he'd take care of everything, that they had nothing to worry about; Bo wasn't going to go to jail or anything. That's when the lawsuit was pushed along a little further."
"On one or two occasions [Haworth] had conversations with Richard Raymond in regards to this." From what Molly told her "the whole lawsuit and the Glocester police officers being accused of planting evidence was all a lie."
The Raymonds' claim that he received a back injury from the police beating was untrue. Richard Raymond "just had an operation not too long before this all happened, because he had a bad back."
"The whole Glocester police incident case was a fraud from the beginning, set up as a result of them being caught for the break. . . . Richard had to cover his tracks. . . . It was just that they got caught by the Glocester cops so they figured revenge was outlined."
She knew neither Chief Tooher nor Bruce Binns and stated, "It was all to get back at the Chief and Bruce Binns."
She told Prendergast that four or five months prior to this interview Molly was at her house and stole jewelry from her. Describing the kind of person Molly is, she said, "She's a thief, she's a drug addict, she's a liar."
No one ever approached her in regard to this case. Around March 1991 "was the first time I ever heard of anything about this, and it all started with Roland Desper. . . . No one's ever, ever [sic] asked me anything before."
She never came forward and told anyone about what she knew about the break, about Richard doing the break and about the lying in the lawsuit. She explained, "I just didn't want to get involved. I just had a baby, you know. I just wanted to stay away from them people." Now she wanted the truth to be known and did not want to get into trouble for anything that she knew. She told Prendergast that she was doing this "to clear two police officers that were wrongly accused and . . . doing it as a citizen . . . a law-abiding citizen would do the same thing."
This statement needs no explicative examination for it to be concluded that the statement tells the Court barely anything at all on the basis on Haworth's personal knowledge. In the main, what she says which may be deemed to have any potentially relevant value is no more than her recollection of conversations had with Molly Raymond supplemented by speaking with Richard Raymond "on one or two occasions." What Haworth says suffers from being preponderantly hearsay. Insofar as probative value is concerned, it is the same kind of testimony which the defendants have previously offered through Gina Raymond, Richard Bressan and James Lancia; testimony which the Court has rejected. Notwithstanding its conclusion at that time that the putative newly discovered evidence would probably not change the verdict at a new trial the Court, in rejecting their testimony as untruthful, did so upon an analysis of what the credibility of their testimony would be if the defendants were granted a new trial. Put another way, the Court, having assumed that the threshold predicates for a new trial had been met, examined what the three had said in order to arrive at a judgment whether they were believable to warrant a new trial. The Court accords Haworth's evidence the same kind of assessment. The Court does so in the context of her testimony given before the Court on April 6, 1992.
 C. Haworth's Court Testimony.
She told the Court that she was born on March 8, 1965 and began to live with the Raymonds in 1978. Her father had died that year and her "mother kind of fell apart and all us kids kind of went our separate ways. . . . Molly had been a lifelong friend. I grew up with her and her sisters in Burrillville since I was really little and after [her mother] just took off with her boyfriend, I went and found Molly and stayed with Molly." [CT: 4/6/92, 21] Molly is about nine years older than she. She attended school periodically to the ninth grade but did not finish the grade.
From either October 1983 or February 1984 she ceased living with the Raymonds and moved to the state of New York. Either in February 1984 or April 1984 she went to live with her sister in Norwich, Connecticut. In September 1984 she returned to the state of New York. She was living in Rhode Island in 1989 when Molly moved down from Maine in September of that year and lived with Haworth until January 6, 1990. She continued her relationship and met with Molly between 1983 and 1989 while they were living apart.
The Court inquired into her statement to Prendergast that the Raymonds made a living by "varying amounts of [insurance] settlements all over the place" none of which, as far as she knew, were legitimate insurance claims but were "insurance setups or scams." She provided the Court not with "varying amounts," but with two such instances at neither of which was she present. From one of the occurrences, Molly Raymond received $30,000 for injuries received from a fall in an Almac's store in Woonsocket. In the other, Richard Raymond engaged in an insurance fraud at Wrentham State School. She believed that he worked there. The extent of her knowledge of this incident she expressed as follows, "All I know, he said he made money off it. That is all. I don't know how it happened, or where it happened, or anything about it." [Id. 53] She was asked what she meant by "all over the place" and her response was, "In different places." When pressed on the point, it became "Almac's and Wrentham." [Id. 54] Both of those events are considered by the Court in the 1991 decision.
She also testified that the Raymonds had jobs. When it was pointed out to her that, since the Raymonds worked, her statement to Prendergast that "They don't know any ways of getting money besides" [insurance fraud] was not true, she asserted, "Working was just a front for that girl." [Id. 55]
With regard to her knowledge of Richard Raymond's back injury, her testimony was:
 "Q. Was that back condition, for which he underwent surgery, have anything to do with any one of those scams?
 A. Probably, no doubt in my mind it probably was, yes." [Id. 57]
Prendergast had asked her, "Were they also stealing stuff at that period of time that you lived with them?" to which she replied, "Not so much — [sic] Bo, yes." The Court, seeking an explanation of that answer, was told:
 "A Not so much Molly, that it was Bo mainly breaking in to houses, hijacking trucks.
 Q Tell us what you know about Molly stealing?
 A She is more like a — [sic] she went into a store and stole something, not breaking into houses and — [sic] I mean very probably had partaken in some of them. I don't know.
 Q You don't know?
 A Not for a fact, no, but I know —
 Q You don't know if she shoplifted anywhere?
 A In stores, yes.
 Q Well, that is what I'm talking about. Tell me about it?
 A Well, goes and steal food, clothes or —
 Q Tell me what?
 A I can't name specific dates, but I mean —
 Q Is it something that happened regularly?
 A Yeah.
 Q Well, I am not clear what you meant when asked the question — were they also stealing stuff at that period of time that you lived with them? You said, not so much —
 A Not so much Molly.
 Q Not so much Molly?
 A Right, right.
 Q I understand your testimony to be now that she was stealing stuff regularly?
 A Not — [sic] when he asked me the question, I did not think that he meant stores. I thought meant [sic] breaking and entering. I thought he meant off of other people. I did not know he meant stores."
 [Id. 57-58]
Delving into her statement to Prendergast about the lawsuits she saw the Raymonds do "in three or four different cases" in addition to the one filed against the defendants resulted in this:
 "Q You mentioned other lawsuits in your interview with the State Police, what other lawsuits do you know about?
 A The one with Roland Desper, the one with Molly.
 Q I am talking about lawsuits now. I am not talking about insurance scams now?
 A Oh, yeah, okay.
 Q Excuse me, you told me at one point they had gotten money from the lawsuit from this case?
 A Right.
 Q What other lawsuits do you know of?
 A Oh, just — just ones they sue their landlords, but it would not be like a lawsuit. It would be a settlement type sort of thing.
 Q Did you know of other lawsuits brought by Richard Raymond in order to collect money from an insurance company on the basis of something that did not happen?
 A I'm not aware of it.
 Q How about Molly Raymond, did she ever bring a lawsuit that was a false claim?
 A I don't — I'm not aware of that." (Emphasis added.)
 [Id. 82-83]
This brief juxtaposition of her responses to Prendergast's leading questions with her court testimony relating to those questions, if the Court were to go no further, at the very least reveals an individual who is careless, if not cavalier, in asserting facts with a propensity to inflate them as well. The Court has had the benefit of observing her demeanor while she was answering the Court's questions but even one without that advantage must be struck by her indifference to accuracy in two other areas now to be recounted which, except for what they tell us about her reliability as a witness, might otherwise be considered inconsequential. The first regarded her familiarity with the defendants. The other her peripatetic life.
At her March 9 examination, less than a month before her court appearance, she was able to answer one of Prendergast's leading questions even before it was completed:
 "Q And it was all to get back at the Chief and —
 A The Chief and Binns.
 Q Bruce Binns?
 A Yup.
 Q Do you know the Chief Tooher, or Bruce Binns?
 A I don't know either one of them, no."
One of her responses while she was testifying on the morning of April 6 was, "Oh, I told him [Prendergast] that just about a week and one half ago Molly was telling me that Mr. Binns is not the one that beat up Bo. Bruce Binns was not the one that beat up Richard — in fact only cuffed him." (Emphasis added.) [Id. 65]
During the afternoon session only a few hours later, she denied that she had ever heard of "Richard Tooher" or "Bruce Binns" or had ever even heard Bruce Binns' name. [Id. 80] There is no doubt that she understood the difference between knowing who a person is and simply having heard of the person. She had no difficulty in testifying that she did not know who James Williams is but had heard of him. [Id. 34] In later testimony she made it quite clear that Molly Raymond mentioned defendant Binns' name on July 1, 1984 and that when she used the word "Chief" in speaking with Prendergast she was referring to defendant Tooher. See Id.
104-106.
In seeking to learn of her living arrangements for certain periods, the Court was given this testimony:
 "Q Other than East School Street, did you live with the Raymonds anywhere else?
 A Yes.
 Q During the year 1983?
 A Yes, on Sayles Avenue.
 Q Anywhere else?
 A No, that is it.
 Q You lived with them for how long a period of time in 1983?
 A A good part of the year, about I would say ten months and then me and my brother got an apartment.
 Q In 1984, did you live with the Raymonds at all?
 A Yeah, they were still living on Sayles Avenue in the beginning of '84.
 Q How long did you live with them at that time in 1984?
 A Um, not long, about a month and a half. Then me and my brother Andrew got an apartment by ourselves.
 Q Is it fair for me to consider that you may have left in February of 1984? You said a month and one half?
 A Yes, yeah.
 Q Did you stay in Woonsocket?
 A No. I moved to — I moved to New York State."
Up to this point she has testified that she and her brother got an apartment together at two different times: in 1983, after living with the Raymonds for ten months, and in 1984, after living with the Raymonds for about a month and a half. If such testimony creates a germ of a doubt in a factfinder's mind about the reliability of or care exercised in her recollection of facts, the doubt is crystallized as she continued her testimony without any acknowledgment of error or mistake:
 "Q When did you do that?
 A About February — no, it was October of '83 that I moved to New York State.
 Q October of 1983?
 A Yes, I remember that well because my brother got married on October 15 and then I moved the very next day to New York State with my mother.
 Q I understand you to say that you moved to New York in October, 1983?
 A Yes.
 Q But that you were living with the Raymonds for about a month and one-half in 1984?
 A No, nope. It was right before I moved to New York State that I moved out of Molly's house.
 Q All right. Let me see if I can clarify. Did you live with the Raymonds at all in 1984?
 A No.
 Q When is the last time you ever lived with the Raymonds?
 A In October of '83.
 Q Which is the time you went to New York?
 A Yes.
 Q How long did you stay in New York State?
 A Till the end of February of '84.
 Q Where did you go?
 A I moved with my sister to — Norwich, Connecticut.
 Q So November, rather February 1984, you were living in Norwich?
 A Yes."
 (Emphasis added.)
 [Id. 25-27]
Here one hears a witness blithely abandoning her testimony that she and her brother moved into an apartment by "remember[ing] . . . well," because of her brother's marriage, that she and her mother moved to New York. And instead of moving to an apartment with her brother in February 1984, she moved to Norwich, Connecticut with her sister. It is not the only instance in which she related facts while assuring the Court that she remembered them well. This kind of demeanor, exuding as it does a disregard for a punctilious presentation of facts, is sufficient to undermine a factfinder's confidence in the reliability of any witness' testimony.
The defendants were aware of this testimony when they submitted their supplemental memorandum on June 12, 1992. Little wonder, then, that they included in that submission, as footnote 10, this statement: "Defendants submit that Ms. Haworth's testimony contains inconsistensies and gaps." The Court is inclined to believe that the defendants view Haworth's credibility as more subject to attack than for mere "inconsistencies and gaps" because they continue the footnote with this venture at justification:
 "However, Defendants further submit that her testimony before this Court should be considered in light of this witness's age at the time of the events involved (Ms. Haworth was born in 1965); the remoteness of the events testified to; her lack of bias or interest in the outcome of the proceedings; her admitted friendship with Molly Raymond; and her candor about her own drug abuse and related problems."
Such considerations are generally valid in determining credibility. In cases where deception or untruthfulness outweigh them, they of course lose their effect. Other evidence received by the Court from Haworth must be given attention in order to resolve the issue of her trustworthiness as a witness. The first area of concern pertains to her conversations with Molly Raymond in July 1984.
In the course of testifying to the criminal activities in which Richard Raymond had engaged, she mentioned "the statue." There follows here testimony about "the statue," the Court ignoring the fact that although the spoken word was "statue" the word was transcribed as "statute."
 "Q What statue are you talking about?
 A That Richard had stolen out of this jewelry guy's house in Glocester.
 Q Where did you get that information?
 A I got that the very next day from Molly Raymond.
 Q What day was that?
 A July 1st of 1984.
 Q Were you at their house?
 A No, I was not. I was living in Norwich, Connecticut.
 Q How did that conversation come about?
 A Well, that morning of July 1st, I was waiting for the mail and waiting for the check — I remember that well — we were getting ready for the 4th of July party and was downstairs waiting for the mailman and the next door neighbor tells me that I have a phone call, a girlfriend in Rhode Island. I went upstairs and I started talking to her and how the baby was and everything, because only three months old then [sic] and she says Bo was in the hospital and I says what happened? And she says, well, he was arrested last night for breaking into this guy's house and I said did he do it? Yeah, but we got this beat, he ain't going to jail. I says oh, whatever, you know and she was telling me all of this stuff they got out of there and about a statue that she fell in love with this statue [sic] and she didn't want to sell it, but Bo got in big and selling it [sic] and got to get rid of it and can't have it hanging around, so I guess the cops found it before she got a chance to keep it, sell it, or whatever she was going to do with it. So, you know they found it.
 Q What check were you waiting for on July 1?
 A My welfare check, you know.
 Q 1984?
 A Yes.
 Q Is that a check you expected the 1st of every month?
 A Yes.
 Q Did you expect one in June of 1984?
 A Yup. But I remember it was July.
 Q How about May?
 A Absolutely.
 Q Well, you were — were you receiving a check on the 1st of the month of every month?
 A Yes, I was.
 Q Of 1984?
 A I was.
 Q And you remember the conversation occurred on July 1 of 1984?
 A I do.
 Q The reason you remember it is because —
 A We were getting together for 4th of July party with my brother and I told them that I would buy everything for the picnic because I was getting my check.
 * * *
 Q Tell me what Molly Raymond said when you were told there was a telephone call. You answered?
 A I answered the phone.
 Q You spoke to Molly?
 A Yes, right.
 Q What did she say about Mr. Raymond being in the hospital?
 A She told me he had broken into this place the previous night.
 Q Please?
 A Broken in this jewelry guy's house to see what they could get and then that he got beat up. At that time she did not say who it was, but just got beat up. She said he was in the hospital. And I says, yeah, you know and she was just telling me that statue and stuff but then —
 Q What did she say?
 THE WITNESS: About the statue?
 THE COURT: Yes, he — she told me — tell me her words, as best you can remember them?
 A Oh, all right.
 Q Since you remember July 1, 1984.
 A He broke into the house —
 Q Yes.
 A — stole a bunch of stuff. She put it this way — the rest was garbage, except the statue. That is how I remember the statue so much. It was really nice and she wanted to keep the statue, but in fact Bo would not let her because he already had a buyer for all of this stuff anyways. She told me that, you know, apparently could not keep the statue [sic]. The cops recovered everything but we continued our conversation anyways. I told her I would be down next week anyways because my brother was living in Burrillville so I told her I would be down and we will talk." (Emphases added.)
 [Id. 65-69]
From July 1, 1984 to the day she had her interview with Prendergast, she and Molly Raymond talked about this break "fifty, sixty, seventy times." [Id. 75]
There is a considerable substantive difference between what Haworth related to Prendergast about the date of July 1, 1984 and what she told the Court. It must not be forgotten that March 9, 1992 was not the first time Haworth told her recollections to Prendergast. He had a preliminary interview with her a week before, on March 2, 1992. With his lengthy experience as a state police detective, it is highly improbable that anything of significance said on March 2 was omitted in the March 9 recorded statement. Most certainly, if she had told Prendergast how she remembered the date of July 1, 1984 so well after eight years, it would not have eluded his format of leading questions. Only twenty-eight days elapsed and she was again recalling — this time for the Court — here conversations with Molly Raymond. On March 9 she said that Molly told her that Richard "had stole a statue and some other stuff." She did not recall the "other stuff" and gave no reason for being able to remember the statue. She said, "[f]or some reason, it [the statue] just stuck with me." It is very obvious to the Court that in the intervening 28 days to her court appearance she managed to develop a recollection seemingly more conducive to credibility. This is all the more true about her court testimony concerning her recollection of the date of July 1, 1984. None of that recollection is reflected on March 9, 1992. It is fair to say that what one might call recollection on March 9 is no recollection at all but the echo of Prendergast's leading questions. As examples: "Q. And that was during 1984? A. Yup." * * * "Q. And that was the night — the following morning from when Richard Raymond was arrested by the Glocester Police? A. Right." * * * "Q. Do you remember that date being the next day [afterRaymond's arrest]. correct? A. Yes. Q. July 1st? A. July 1st."
(Emphases added.) It is no surprise, except to the most gullible, perhaps, that when she appeared on April 6 she was prepared to tell the Court both how it was that she remembered that July 1, 1984 was the date on which Molly called her and why she "remember[ed] the statue so much."
On March 19, 1992, ten days after his examination of Haworth, Prendergast prepared a report within which he referred to his March 9 meeting with her. It is designated as exhibit D to the defendants' filing on March 23, 1992. Two recitations in that report bear comment.
On page 5 of the report, this sentence appears: "Sheila Haworth was questioned at length as to whether or not she recalled this being July 1st, at which time she stated `Positively,' that is when she was told by Molly Raymond." Although the report quotes Haworth directly, no such response appears anywhere in the examination. Indeed, even a cursory glance at her recorded statement in its entirety fails to disclose any questioning about the date involved beyond the leading questions which the Court has just underscored.
On page 4 of the report, Prendergast sets out this observation:
 "It would be impossible for Molly Raymond and/or Richard Raymond to know about the articles recovered from their vehicle during an inventory search at the State Police Chepachet barracks by Lt. Binns and Patrolman Hainsworth; the only way the Raymonds, Molly or Richard, would know that the articles were recovered and that they were stolen in a housebreak, would be if they had firsthand knowledge that the housebreak at the Ronci residence had occurred, that the articles in fact were in their possession in the rear of the vehicle they operated, and since Sheila Haworth stated that she received the call during the morning to noontime hour on 7/1/84, which outlined the break at the residence for which Richard had been caught, and a description of the articles taken by Richard Raymond in the break, it would then be impossible for Chief Tooher and Lt. Binns to have placed those articles in the Raymond vehicle." (Emphasis added.)
The validity of this hypothesis depends upon whether Haworth's testimony to the Court concerning the statue is true. An analysis of that testimony, together with other evidence she has given, is in the offing. The Court has emphasized the clause in the quoted deduction made by Prendergast because it is at the heart of his absolution of the defendants. The clause is a conclusion he has drawn having so decided, as the defendants represent in their filing on March 23, 1992, after "hav[ing] interviewed Ms. Haworth and find[ing] her a credible witness. . . ." Looking to her court testimony, it is an inference which may flow from Molly Raymond's statement to her that the statue "was really nice and she wanted to keep [it], . . ." In either event, if Molly Raymond saw the statue before it was found in her husband's car, it could not have been the defendants who put it there.
Before considering factors which bear upon Haworth's credibility, however, assertions in the quoted passage deserve notice. First, while the Court is aware that Prendergast's frame of reference is July 1, 1984, it is still a fact that the articles found in the Raymond automobile were individually identified in the course of the trial in 1986. If there was no discussion of a statue between Molly Raymond and Haworth on July 1, 1984, their talkative relationship would undoubtedly engender, either during or after the trial, talk about the trial including the testimony relating to the discovered articles. Second, contrary to Prendergast's representation, nothing in the recorded interview with Haworth includes, as a part of the Raymond-Haworth conversation of July 1, 1984, any "description of articles taken by Richard Raymond in the break." Haworth does state that "stuff was taken out of the house" but identifies a single item: a statue. What the other "stuff" consisted of was disclosed at the trial, at least one of which items is significant for this purpose.
 D. Haworth's Credibility regarding the "Newly DiscoveredEvidence." 1. The Raymond conversation about a statue.
It is beyond dispute that the Ronci dwelling house was the scene of a burglary from which an automobile registered to Richard Raymond was seen departing in the vicinity of 9:45 p.m. on June 30, 1984. Within hours, Raymond was arrested for the crime. According to Knight, he went to the Raymond residence twice between 10:20 and 11:15 p.m. that night to determine whether the Raymond automobile was there. Those two trips being unproductive, he returned between 11:30 and 11:35 p.m. and found it parked at the residence. While he had the car under surveillance, Williams and the defendant Binns arrived. Knight's testimony is uncontradicted that the vehicle was locked until after Raymond had been arrested and taken to the police station. Since the vehicle was locked and under police observation from the time of Knight's last arrival and until Raymond was taken out of his trailer under arrest, the "stuff" — of which Haworth speaks and which Prendergast says "were in fact in [the Raymonds'] possession in the rear of the vehicle they operated" — must necessarily have been then resting where Prendergast says it was. This conclusion is inescapable if Haworth's testimony that Molly Raymond told her she wanted to keep the statue is the truth. That testimony carries with it the inference, implicit in Prendergast's deduction, that during the fifteen to twenty minute period when Knight was not at the trailer Richard Raymond arrived with the spoils of the housebreak providing his wife with the opportunity of seeing the statue and forming the desire to keep it for herself.
A rational person, it would seem, might be forgiven for having extremely grave doubts about her truthfulness when other evidence adduced at the defendants' trial is taken into account. There is no question, as Prendergast put in his March 19 report, that articles were found "in the rear of the vehicle," but whether the Raymonds put them there or whether Molly Raymond ever saw a statue are very different matters. It should be reiterated here that Knight's testimony at the trial was that the articles taken out of the Ronci house by the defendants were "a multi-colored blanket, . . . a bronze statue of a wolf and a multi-colored eyeglass case with some coins in it." [TT: V.2, 270]
If Haworth was knowledgeable about defendant Tooher's testimony at his trial, she certainly was not circumspect in providing the basis of "how I remember the statue so much." Defendant Tooher's testimony opens to question Haworth's account that she was told by Molly Raymond that Richard Raymond took the statue. The trial jury were informed that defendant Tooher had testified under oath before the grand jury investigating this case that he felt that Richard Raymond did not break into the Ronci house. The basis of that feeling, he said, was the result of going to the scene of the crime and "[t]here was a four foot screen TV that had been unplugged and taken from one section of the house to the front door, which is a huge instrument which led me to believe the maybe two people were involved." [Ex. 25, 29] In that belief, he was, in effect, giving credence to information imparted to him by Molly Raymond after her husband's arrest that her husband had lent his car out that evening to two young men. At his trial, defendant Tooher acknowledged not only that it was his feeling at the time of his grand jury appearance that Richard Raymond was not the Ronci burglar, but also that he had his doubts that Raymond was the felon even before he testified at the grand jury. [TT: V.4, 980-981] Being the chief of a police department which he believed had arrested the wrong person for the crime, he exercised what he considered the better part of discretion by tearing up, in the presence of the Raymonds, the purported arrest warrant, the criminal complaint which charged the husband with the Ronci break and secured a release from legal liability not only from the husband, but from the wife as well. [Id. 940-941] See exhibits 11, 12 and 21.
Other trial testimony bearing on Haworth's credibility relates to police conduct immediately before and immediately after Raymond's arrest. Williams testified that after his arrival at the Raymond trailer home and before Raymond's arrest, he and Knight looked into the Raymond automobile. Although the car was old "it was very clean inside, and there was nothing that [he] could see inside it at all." [TT: V.1, 104] He described how the examination was conducted:
 "A I wouldn't want to call it a duck walk but let's say we crouched down and approached the vehicle on opposite sides of it, and Sgt. Knight and I looked inside with our flashlights.
 * * *
 Q When you went over to the vehicle, were you and Sgt. Knight on different sides?
 A Yes.
 Q And what exactly did you do?
 A We stood up from our crouched position, shown [sic] the flashlights into the interior of the vehicle and looked around the front and back.
 Q And was that it?
 A Yes.
 Q Did you ever do that again?
 A I never did, no.
 Q And from your observation, you couldn't see anything in the car?
 A There was nothing in the car." (Emphasis added.)
 [Id. 206-207]
Knight testified in a similar vein. As had Williams, he stated that the car doors were not opened during the examination. Using flashlights, "we . . . looked through the entire vehicle, back seat, front seat and the floor on the back and the front [and saw] nothing." [Id. V.2, 244] Unlike Williams, however, he remained at the vehicle obeying defendant Binns' order to keep control of the car until it was towed to the Chepachet state police barracks. He related that the car was unlocked by Molly Raymond in his presence when she came out of the trailer and tried to drive it away. He had to take her out of the car and the car stayed unlocked when he left it at the state police barracks. [Id. 260, 263] Knight went on to say that he looked inside the vehicle a second time:
 "Q Did you at any time open the doors and look under the seats?
 A One time the door was open and I looked under the seats.
 Q When was that?
 A It was after all the officers left except myself and Trooper Treml was there. Mrs. Raymond tried to drive the vehicle out of the yard. I had to pull my cruiser behind her and physically take her out of the vehicle. When she got out of the vehicle, the doors were open and I looked inside the vehicle at that time.
 Q And you're sure you looked under the seats?
 A Yes, sir. I pulled both seats forward and looked.
It's a Mercury Cougar, older model, it sits right on the floor. There's very little room under the seats." (Emphasis added.)
 [Id. 303]
From that time to the time he left the car at the state police barracks, it was under his supervision and control. [Id. 321] When he left the Automobile at the barracks, "there was nothing inside it." [Id. 263, 264]
It was Molly Raymond's testimony that after her husband was placed in the cruiser, she and defendant Binns got into an argument because she did not want the automobile towed but wished to use it to go to the police station. After defendant Binns left for the police station with her husband, she placed her son in the car and then got in herself to go to the police station. She was unable to leave because a police "cruiser kept blocking me off." She pulled into the driveway and locked the car. Defendant Binns returned, told her he was taking the car and asked for the keys. When she refused, defendant Binns "went to the cruiser, got some kind of object and unlocked the door." At that point the tow truck arrived and the car was towed away. She stated that when that occurred, she did not know a police officer named Knight. [Id. V.2, 508-514]
Later on the morning of July 1, 1984, the car was visited by defendant Binns and Sergeant Jaime Hainsworth who testified that the car was unlocked. [Id. V.3, 564] Hainsworth recorded the items which defendant Binns removed from the car. Those items were: a tire iron, a flashlight, a pair of gloves, an afghan or a blanket, an eyeglass case containing coins and an Italian statue. [Id. 561] He described the locations of the items by saying that he opened the door of the vehicle, looked inside and:
 "A I remember, as you open the driver's door, there was a tire iron right there, right on the, [sic] between the seat and the driver's door. Sometimes people put a map or something right there, they stuff it between the seat and the floor. There was a tire iron right there.
 Q Was there a compartment there where the tire iron was placed?
 A No, sir.
 Q There was not. What else did you see, and where?
 A On the back floor, right behind the driver's seat, there was that red plaid afghan. It was between the rear seat and the front seat on the floor, partially underneath the front seat, partially right on the floor, in full view.
 Q When you say it was partially underneath the front seat, would you describe if you will, Sergeant, the interior of that vehicle?
 A Two bucket seats in the front. Bench seat in the rear. Two doors. Very small space, maybe a foot, between the front driver's seat and the rear seat on the floor.
 Q How when you say the afghan was partially underneath the front seat, are you telling us that it was partially underneath the rear portion of that front seat, is that what you're saying?
 A Yes, sir.
 Q Was there anything else in that area of the vehicle, the area of the rear part of the front seat?
 A Underneath the afghan there was a statue, I believe it's an Italian statue.
 Q Was there anything else there?
 A That's where also the eyeglass case was. I'm not sure if the gloves were under there or not, but I believe they were right around that area." (Emphasis added.)
 [Id. 566-568]
There was also an object on the floor in front of the passenger's front seat "where a man [who] would be riding in that seat would put his feet." He could not recall what the object was. [Id. 568]
Trial exhibit 15 is a Glocester police department form designated as an "Offense Report." The fifth paragraph on its second page describes defendant Binns finding, among other articles, a "red blanket . . . a bronze statue of an animal and a multi-colored eyeglass case containing coins" in Raymond's car at the state police barracks. Knight testified that when he left the barracks on the morning of July 1 none of the items enumerated in that report were in the vehicle. Of all the listed articles, three of them, he said, were the same articles that he saw the defendants remove from the Ronci residence. [TT: V.2, 321-322] While the afghan or blanket was often described as multi-colored at the trial, the jury were able to see both its color and its size by examining exhibit 19.
Hainsworth's testimony is uncontradicted and unimpeached. It admits of only two inferences: the things which he noted present in the vehicle were present when Knight left the vehicle at the barracks or they were not. Knight testified that they were not. If Haworth's testimony is to be believed, the statue which Molly Raymond had to have seen in order to want to keep it, and the blanket covering it, had to be in the place noted by Hainsworth while the Raymond vehicle rested in a locked condition outside the Raymond trailer home. Both Knight and Williams stated that their examinations of the automobile's interior showed that the items were not there. Considering the location of the object on the floor on the passenger's side of the front seat and the size, colors and location of the afghan, which Hainsworth said was "in full view," it is inconceivable that both Knight and Williams failed to see them in the initial flashlight examinations or that Knight missed them again when he examined the interior with the doors open and having "pulled both seats forward and looked."
In final summation, defense counsel suggested to the jury that Williams and Knight, both of whose credibility he attacked, may not have seen what was in fact there because the articles could not be observed at the time of their examination, but later came to rest, where they were subsequently found, by the force of gravity. His argument proposed that the car was on an incline while it was being towed and that the "items underneath that seat would now roll on the floor, slide back onto the back seat — back portion of the car." [TT: V.6, 22] If one wishes to ignore or discredit Knight's testimony that he "pulled both seats forward and looked," the notion that the statute and the multi-colored coin case rolled back may be endowed with some plausibility. But accepting, as one must, the undisputed evidence that the seats sit "right on the floor," and there is "very little room under the seats," it violates the very common sense that defense counsel asked the jury to employ for a rational person to accept, as fact, defense counsel's inference that a blanket of the size shown in exhibit 19 could have been hidden under the seat and rolled out in the course of towing.
Even assuming that Richard Raymond broke into the Ronci home, if the evidence given by Williams and Knight that there was nothing in the vehicle that evening is true, Molly Raymond could not have said to Haworth on July 1, 1984 that she wanted to keep a statue that her husband had stolen from the "jewelry guy's" house. For Haworth's testimony to be credited, having in mind all of the evidence bearing on this issue, the fact would have to be accepted that the statue was in the vehicle covered by a brightly colored blanket when Williams and Knight shone their flashlights within. Accepting her testimony as fact renders one or both of the two police officers either unobservant or to be lying.
There is no evidence in contradiction or impeachment of Williams or Knight with respect to their testimony that they examined the interior of the automobile with their flashlights. Nor is Knight's testimony that he looked into the vehicle a second time with the doors open and the seats pulled forward contradicted or impeached. In this regard, it must not be overlooked that he was not the only police officer at the scene of that examination. Trooper Treml waited with Knight at the trailer after defendant Binns and Trooper Pontarelli departed. [TT: V.2, 327] Treml appeared as a witness at the trial and was subject to examination if the defendants had any doubt about Knight's more inclusive second examination of the car's interior. What one might with validity say was impeached was their testimony that there was nothing in the car when they looked. This flows from the denial of the defendants that they removed "a statue, blanket, coins, eyeglass case from the Ronci home." SeeId. V.4, 852-853; Ex. 25, 10-11. The jury's verdicts were that the defendants' denials did not comport with their conduct on July 1, 1984. Implicitly, the jury believed either Williams or Knight or both regarding whether there was anything in the Raymond automobile on the night of June 30, 1984. The question is raised again through Haworth's appearance now. In assessing Haworth's credibility, Hainsworth's testimony that the brightly colored blanket was in full view in the automobile is unassailable. For the Court to believe her testimony that Molly Raymond mentioned a statue to her on July 1, 1984, the Court would have to conclude the following: that on both of the occasions on which Knight inspected the car's interior, the blanket was in full view; that as Hainsworth testified, the statue and the eyeglass case were covered by the blanket; that Knight's accusation that the defendants removed those objects from the Ronci home after he left the Raymond automobile at the state police barracks is false; that the blanket was seen in the Raymond vehicle by Williams as well and that Knight prevailed upon Williams to cooperate with him to say that there was nothing in the automobile. Only by this confluence of events could the statue have been available to Molly Raymond before the police arrived at her trailer home in order for her to tell Haworth that she wanted to keep it. Ignoring the faint likelihood of the Knight-Williams conspiracy which the defendants insinuate the Court should adopt, the Court looks to Haworth's other testimony to resolve the issue of her credibility.
 2. Haworth's testimony about the date of the conversation.
Were the Court required to determine Haworth's objectivity and truthfulness solely on the basis of her examination by Prendergast on March 9, it would find it difficult to weigh the balance in her favor with any degree of conviction. By the yardstick of that event, a judgment that she is a credible person would be made accompanied by serious misgivings. Having in mind that most of that interview represents a repetition of the disclosures of insurance frauds and "scams" which the defendants have previously presented to the Court, the only element which really can be looked upon as new is the purported mention of a statue by Molly Raymond on July 1, 1984. In those regards, the interview does not present Haworth as supplying the date of her own accord nor does it develop the import or significance of the statue beyond the fact that its mention made an impression upon her. It is questionable whether she would have ever placed the morning after the burglary as being "during 1984" and then as "July 1st" had not Prendergast put those dates in her mouth. Though told by Molly Raymond that her husband Richard had taken "stuff" out of the Ronci house, Haworth was able to remember a statue, clearly implying the recitation by Molly Raymond of other items stolen which Haworth could not remember. This comes through unmistakenly when Haworth says that what "just stuck" with her was the statue; a recollection by pure happenstance. Rather than being restrained by facts, the interview contains instances of gratuitous statements which emit an air of anger and enmity wholly foreign to the objective of clearing "two police officers that were wrongly accused." With the whole Prendergast interview in focus, the interstices are enough to command very close scrutiny of the witness' fidelity to truth-telling.
It did not take long, however, for it to become evident that rather than an agent of justice in this case, Haworth was another of its debasers. In the course of the month following the interview, her memory flourished in the critical areas incompletely referred to before. In the end, she herself made it plain — as her testimony shows — that her mendacity discredits whatever other phases of her testimony might be the truth.
Haworth would have served the defendants better had she not concocted the stories about how she remembered the statue and the date of July 1, 1984. The evidence that she lived with the Raymonds from 1978 until 1983 and spoke with Molly Raymond both personally and by telephone regularly was sufficient to render it tenable that Raymond called Haworth and said that her husband was in the hospital, having been arrested the night before. When Haworth was speaking to Prendergast and to the Court in 1992, there was neither a need, apart from the defendants' interests in this case, nor a reason for her to remember the date of that particular conversation which occurred eight years earlier. It is very likely that she would have recalled that it was the morning after Richard Raymond was arrested, but unless she could connect the date with some other significant event in her life, as she attempted to do in testifying before the Court, she could not possibly remember the month, day and year of that conversation. Even were she able to connect the conversation to the first day of July because of its proximity to the celebration of the Fourth of July, there is no reason why the year 1984 was so consequential as to cause her to remember it. Yet that is what she did in her interview when solicited to do so by Prendergast. With the untold numbers of conversation she and Molly Raymond had over the fourteen years between 1978 and 1992, it is not credible that she was able to respond to Prendergast with the month, day and year of July 1, 1984. Her relationship with the Raymonds makes it a natural event for Molly Raymond to tell her that her husband had been arrested the evening before. Those are facts that Haworth could recall. But there would be no reason for Haworth to have remembered the date on which those facts were heard by her. With her impending court appearance, she came prepared to explain how she was able to recall the date to which she had committed herself to Prendergast.
As she did with regard to other subjects while testifying before the court, she told the Court "I remember [the date July 1, 1984] well." * * * "That morning of July 1st, I was waiting for the mail and waiting for the check." She was referring to her welfare check which she had told her brother that she would use to pay for the party on the Fourth of July. When the court elicited the fact that she received such a check on the first day of every month of 1984 she volunteered, "But I remember it was July." She was so certain of the date in anticipation of receiving the check that she was capable of recalling where she was when the Raymond telephone call came in: she "was downstairs waiting for the mailman." All of this recollection proved to be a recent contrivance, one which leads the Court to conclude, as Williams and Knight testified, that there was no statue in the Raymond vehicle on the night of June 30, 1984 nor any mention of it to Haworth by Molly Raymond if there was a conversation on the next morning.
Haworth's credibility evaporated when her testimony came to an end with these responses to the Court's questions:
 "Q And you are absolutely certain that you were waiting for a check?
 A Yes.
 Q Does mail come to you on a Sunday?
 A No.
 Q Did you know that July 1, 1984 was a Sunday?
 A No, I did not.
 Q Would you expect that check that day?
 A No." (Emphases added.)
 [CT: 4/6/92, 121]
Confronted with the seriousness of their witness' perjury, the defendants made this effort at rehabilitation, found in footnote 9 of their filing on June 12, 1992:
 "Ms. Haworth testified that the telephone call occurred on July 1, 1984 and that she remembered the date because she was waiting for a welfare check to arrive by mail. This Court appeared skeptical of this recollection, noting that July 1, 1984 was a Sunday. However, evidence in the form of telephone toll records exists which should document that date and time of any such call. Defendants submit that, if this Court finds that it must 
reach issues beyond the misconduct of the prosecutor, the Court should authorize a subpoena for the production of such toll records. Defendants also note that Molly Raymond's trial testimony was inconsistent about the date on which she visited her husband in the hospital and discussed matters with an attorney, first stating it was July 1 and later stating that it was July 2.
Looking, for the moment, to the last sentence of footnote 9, it can be said that that inconsistency is not the only one that might be found in Molly Raymond's trial testimony. The Court has remarked on more than one occasion that evidence which the defendants wish to present to another jury in an effort to impeach the Raymonds is cumulative in nature because the Raymonds' testimony had been impeached in the course of the trial. That last sentence simply affirms the Court's position. In addition, Molly Raymond's trial inconsistencies have nothing to do with Haworth's credibility in the instant inquiry. The former's credibility was subject to jury assessment. It is the latter's credibility which is now under scrutiny and which must stand or fall in the light of the record in its entirety.
With regard to the substance of the footnote, the Court would not be surprised in the least if telephone records were to disclose that a telephone call was made between Molly Raymond and Haworth on July 1, 1984. The Court has already opined that it would be a natural thing for Molly Raymond to call Haworth that day and tell her that her husband was arrested on the night before. The Court could deduce for itself — without the need of subpoenaed telephone records — that such a conversation occurred on July 1, 1984. Nevertheless, a telephone record corroborating the date does not alter the fact that Haworth lied in giving thereason why she purportedly recalled the date — and with such specificity. It would have been completely reasonable for Haworth to have told Prendergast that she could not remember the date of the telephone call but that it was the date following the day on which Richard Raymond was arrested. That kind of testimony makes sense, but as will be discussed later on, she was motivated to manufacture events which sought to persuade the Court that she remembered the date so well. The Court finds that her testimony is perjurious by her own admission and — quite apart from the evidence given by Williams, Knight and Hainsworth at the trial — destroys the credibility of her testimony that, in a conversation which occurred on that date, Molly Raymond said she wanted to keep a statue which had been taken by her husband from the Ronci residence and found in his car by the Glocester police.
The Court has no doubt that in the course of the Haworth-Raymond friendship Haworth heard of the statue. According to her testimony, between July 1, 1984 and March 9, 1992 she and Molly Raymond talked about the Ronci break "[f]ifty, sixty, seventy times." [Id. 75] Specifically with respect to 1986, she testified that she came from New York and visited with Molly Raymond about ten times. Some of the visits happened from June through September. She testified:
 "Q Did she ever tell you about the Glocester break between June and August or September of 1986?
 A She probably mentioned it a few times.
 Q Well, do you remember?
 A I can't remember.
 Q Pardon me?
 A I don't remember.
 Q You don't remember anything specifically about these Glocester police officers —
 A No.
 Q — and Richard getting a beating?
 A No, no, I never knew these two cops were going to go to jail for anything. I never knew it.
 Q When did you find out?
 A I did not find out until I moved down here in '87, probably a year or two later. I did not know until I picked up the paper and read it in the paper — oh, my God, I did not know this; that is when I went back and asked Molly what was going on.
 Q What did she tell you?
 A She told me they were getting what they deserved."
 [Id. 93-94]
This testimony is revealing in a number of facets. For one thing, it confirms the untruthfulness of her testimony that it was on July 1, 1984 that mention was made of a statue. She and Molly Raymond conversed in June, July, August and September of 1986 — a time period encompassing before, during and after the defendants' trial. Her then close, personal relationship with Molly Raymond and the acknowledged sixty-some conversations which they had about the Ronci break from 1984 to 1992 renders it a certainty that during the months of June through September they discussed the trial, the Raymonds' appearance in court and the verdict. Although she claims a loss of memory of anything at all
that was talked about during the months when the Raymonds were experiencing an event unique in the life of most people — involvement as witnesses in a criminal trial — she would have the Court believe that she was able to remember what was said by Molly Raymond on a specific date. The Court is persuaded that she learned of the statue during the defendants' trial in 1986 and also became aware in 1986 and not in 1988 or 1989 that, as she put it. "These two cops were going to jail for anything." Her penchant for prevarication is so much a part of her psyche that within minutes she contradicted herself by saying that she "learned from [defense counsel in 1991] that two police officers were going to go to jail for something they did not do" and that she never learned "that the police officers had been sentenced to prison . . . until I talked to Mr. Prendergast" in 1992. [Id. 97]
In referring to defendants' footnote 10 previously, the Court noted that the defendants viewed Haworth's testimony as containing "inconsistencies and gaps." They there suggest that these deficiencies can be explained because of her age at the time of the occurrence of the events involved; the remoteness of the events testified to; her lack of bias or interest in the outcome of the proceedings; her admitted friendship with Molly Raymond and her candor about her own drug abuse.
It is unclear what Haworth's age has to do with the inconsistencies and gaps which permeate her testimony. If she told the Court the truth about her age, she was in her twentieth year on July 1, 1984 and in her twenty-second year during the defendants' trial. In either case, her capacity to recall events is presumed to be no different than that of any other adult witness. The argument that the events testified to were remote simply underscores a point made by the Court. She testified in April 1992 that during the months from June through September 1986 she probably discussed the Glocester break but could not "remember anything specifically about these Glocester police officers." Yet in giving her statement in March 1992 she said she could then recall — two years more remote from 1986 — the date July 1, 1984 and could also recall the mention of a statue. The defendants make no effort to explain that feat of memory.
For the defendants to say that Haworth has a lack of bias is to ignore her own self-interest. That is an element which is plainly evident in her testimony. Despite her pious incantation that in providing the information in her March 1992 interview she was doing it as a law-abiding citizen, the Court does not lose sight of the fact that she was never forthcoming of her own initiative. She says that she did not know until 1988 or 1989, instead of 1986, that the defendants were going to jail "[f]or something they did not do." [Id. 97] By her own account, if true, it took her three or four years to tell law enforcement agents that she wanted "to clear two police officers." Even after she conferred with defense counsel in 1991, she failed to go to the police. It was not until a year later, in March 1992, that the state police got in touch with her; not by her effort but by theirs. See CT: 4/6/92, 100. Her concern for a miscarriage of justice which victimized the defendants rings hollow with the realization that, during the years which it took her to be a law-abiding citizen and bring this alleged new evidence to the fore, the defendants might have served their sentences completely.
She spoke with detectives Prendergast and Youngsma only to protect herself. Her statement to them was that she had not come forward because "I just didn't want to get involved" and that she did not "want to get in trouble for anything that I know." It became quite clear from the following testimony not only what she feared getting into trouble about, but also that she would never have sought to "clear two police officers" without the appearance on the scene of the two state police detectives.
 "A All right, I came forward because they came and started talking to me about it. You know, I mean, I did not — [sic] I really did not know anything about it except what Molly told me and then when they came and started questioning me about it, I told them, yeah, I'm going to tell you the truth. I had nothing to hide. I don't want to hide anything. I don't want to get into trouble for it.
 Q What do you mean — `I don't want to get in trouble for anything I know?'
 A Yeah, exactly I mean I was —
 Q What is it that you were concerned about getting into trouble over?
 A Oh. Roland Desper with the insurance case and stuff.
 Q Why were you concerned about that?
 A Because the winter, last winter before I talked, the day after I talked to [defense counsel] Ina Schiff, I seen [sic] Molly out shopping at the store and I had come up to her and asked her — I heard you went to the Attorney General's Office and told them that I was the perpetrator of all those insurance cases. You know she says, no, I did not do no such thing and told anything, anything I want [sic] and Diane Loiselle says I don't care, I use people too. I was there, yes, but I had nothing to do with it." [Emphases added.]
 [Id. 99]
Roland Desper and Diane Loiselle had been under investigation for committing a federal offense which the Federal Bureau of Investigation described as "fraud by wire." Although Haworth states that she had "nothing to do with it" — an additional area of credibility the Court will shortly get into — her fear of being implicated in that crime, whether that fear was well-founded or not, created a bias of self-protection and the motivation for the volunteered irrelevancies to be found sprinkled liberally in the Prendergast interview. Her guilty participation in Desper's fraud sought protection by providing false evidence which would help two police officers obtain a new trial. Her vituperation reached its climax, it would seem, when she was asked by the Court whether it was she who decided that the defendants "were going to go to jail for something they did not do." Her response to that was, "Yes, because knowing the Raymonds like I know them, absolutely." [Id. 97]
It is certainly true, as the defendants aver, that there had existed a friendship between Haworth and Molly Raymond, but according to Haworth, although they still spoke with one another, "it's not like it was years ago;" [3/9/92, 10] "it is not even close to being like that today." [CT: 4/6/92, 30] Be that as it may, one may rest assured that whatever the bond between them, sensing that law enforcement might well be bent on pursuing her as well as the Raymonds, she did her utmost to extricate herself by contriving testimony damning the Raymonds to two investigating police officers "to clear two police officers" who, in her uninformed judgment, were wrongly convicted. It is unquestionably a mark and measure of her desire to please two state police detectives, to her advantage, that she so indiscriminately accepted Prendergast's suggestions during her examination. Molly Raymond might well be, as Haworth accuses, "a thief, a drug addict, a liar," but what is not open to question is that Haworth's statements to Prendergast and to the Court are completely untrustworthy. Her obdurate nature to falsify is further revealed in the testimony she gave about the aftermath to the part she played in the Desper "scam."
 3. Haworth's denials regarding her statements to the FederalBureau of Investigation.
The Court has made reference to exhibit B which the defendants have attached to their filing of March 23, 1992 consisting of records of the Federal Bureau of Investigation. Pertinent to the present inquiry is Haworth's testimony that she was interviewed by the bureau in 1981. [CT: 4/6/92, 33] Included in exhibit B are handwritten notes of Special Agent Richard A. Cleary bearing the date of "10/9" and the transcription of those notes on "10/21/81." The Court observes that the transcription erroneously refers to the date of investigation as "10/9/91" instead of 10/9/81. All of his recordings relate to Roland Desper's fall in the Almacs store and are dated in 1981 and 1982. In addition to Cleary's name, the transcription reflects that Special Agent James F. Bubela was part of the investigation. The Court reproduces here the content of their report.
 "Sheila Marion Haworth, 146 Third Avenue, Woonsocket, Rhode Island, was interviewed and advised she recalled an incident in early 1981 whereby Roland Desper fell on the floor of the Almacs store, Pulaski Boulevard, Woonsocket, Rhode Island. She stated that this fall was prearranged and that Richard and Molly Raymond had a part in the scheme to obtain money through Almacs's insurance company. She stated that per the plan Richard "Bo" Raymond went into Almacs and put some oil on the floor of the store. Following that she went into the store with Roland Desper's girlfriend Diane Loiselle, Molly Raymond, Richard Raymond, and Roland. Shortly after Roland went into the store Molly and Richard left. Then right after that Diane Loiselle told her that she would have to be Roland's girlfriend for the scheme and Diane left the store. Roland Desper faked a fall on the floor and layed [sic] there. Sheila stated that per the plan she went over to him and stated that she was his girlfriend. She added that she then followed him to Woonsocket Hospital, stayed with him, and then walked to his residence with him after his release.
 When this first happened it was suppose [sic] to happen that she was going to receive something herself. Later she told him she did not want anything and she has not received any money for it according to herself.
 Sheila Haworth stated that she heard that at one point in trying to obtain money from the insurance Roland became scared and told them he did not want to pursue the matter. Later he changed his mind and told them that he did need some money to pay his bills. She stated that she understands that he has received some money for this fall but she does not know how much.
 A description of Sheila Marion Haworth as obtained through interview and observation is as follows:
 Race — Caucasian Sex — Female Date of Birth — March 8, 1964 [sic] Place of Birth — Providence, Rhode Island Height — 5'5" Weight — 106 pounds Hair — Brown Eyes — Hazel Social Security Account Number — 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"
During the April 6, 1992 proceeding the Court questioned Haworth about the matters contained in the first two paragraphs of the agents' transcription of the Cleary notes. She denied making those statements to either Cleary or Bubela. [Id. 45] At one point she said, "I never spoke to no agents" [Id. 43] and at another, "Your honor, I did not speak to no agents [sic]. I wouldhave remembered this." [Id. 46] (Emphasis added.) She testified that at one time she "was living on Third Avenue with a guy." [Id. 40] His name was "Thomas Dubeau (phonetic spelling)." [Id.
46] They lived in the front left side of the first floor and later moved to the front right side. [Id]
Cleary's handwritten record of October 9, 1981 contains these notations: "146 3rd Ave; Front left; Sheila Marion Howarth; 3/8/64; Prov.; 17; 5'5"; 106; Brown; Hazel; 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; 192 Lincoln St.; Tom Dubois; RI Comm 11283." Without doubt, these are notes which Cleary made as he was receiving answers to questions he was putting to Haworth and then transcribed into the report of October 21. Notwithstanding her protestation that she spoke with no agents, it is very clear that the information which he recorded he got from her.
She told the Court that the social security account number was correct [Id. 18]; that the Pulaski Boulevard store was "exactly where [Desper's fall] happened" [Id. 41]; that [Desper] "did fake the fall and did lay there" [Id. 43]; and that it was true that "she stayed with him and walked to his residence with him after his release." [Id. 44]
These other items which appear in Cleary's handwritten notes were confirmed by Haworth: that she had lived in the front left side on the first floor of a tenement house on Third Avenue with Thomas Dubois [Id. 45-46]; that when she appeared before the federal grand jury she was staying with her mother on Lincoln Street [Id. 40]; and that her mother's address was 192 Lincoln Street. [Id. 46]
Two other notes written by Cleary bear mention. One is undated, reciting, "Roland — 1974 Ford Tan Pickup" followed by the same automobile registration number appearing on Cleary's October 9 interview: RI Comm 11283. The other is dated September 1, 1982 stating, "Sheila Haworth — with Kenny Bouvier ex of Woonsocket." Haworth told the Court that Bouvier was someone she hung around with on High Street when they were growing up.
No one in whom is reposed the responsibility of assessing the credibility of an individual's statements may accept them as true merely because of the declarant's status in the community or because of an official position held. As Cleary's report shows, he attributes Haworth with the statement that Desper's fall was prearranged. She told the Court that the fall was a complete surprise to her. [Id. 35] Had Sheila Haworth arrived at this point in the Court's decision with her credibility still intact, the Court would be compelled to conclude that she has testified falsely with regard to the Desper affair. The mere fact that Cleary's notes exist reflecting matters within Haworth's knowledge puts the lie to what can be characterized only as a brazen attempt at deception when she said, "Your honor, I did not speak to no agents" with the denouement upon her recollections of July 1, 1984, "I would have remembered this." Insofar as this proceeding is concerned, it might be said that whether she knew that the Desper fall was planned in advance or not is of little consequence. It is quite unlikely that she would have experienced any legal repercussions had she admitted meeting with Cleary and Bubela and had told the Court truthfully that she had given the statement as Cleary reported it. Her denial that she made any statements at all to the agents accentuates her fear of legal retribution for her part in the Desper "scam" and illuminates her illicit motive in inventing the tale that Molly Raymond told her on July 1, 1984 that she had fallen in love with a statue that her husband had stolen which she had hoped to keep.
The defendants wish to present this person before a jury for her to impart "newly discovered evidence." Having considered her testimony and having observed her while she was giving it, the Court is compelled to say that to permit her to do so would sanction the presentation of fabricated evidence ranging from frauds committed by both Raymonds to Richard Raymond carrying away from the Ronci burglary items for which the defendants have been convicted of planting in the Raymond automobile.
 E. The Purpose of the Haworth Evidence.
Haworth's discredited testimony is designed to tell a jury essentially two things: that the Raymonds are, if not criminals, at least cheats and liars, and that it was Richard Raymond and not the defendants who placed the articles which were found in his vehicle. With respect to the latter purpose, the intimation is that if Molly Raymond were to assuage her guilty conscience, she would say the same thing.
The Haworth evidence, which, as the Court has stated was available to the defendants for their 1988 motion for a new trial, parrots the evidence which the defendants presented in their 1988 motion through Gina Raymond, Richard Bressan and James Lancia. Qualitatively, the assertions of the latter three should be viewed as having greater persuasive force because they were allegedly based on declarations by Richard Raymond himself whereas Haworth's statements depend almost exclusively upon Molly Raymond.
The Court observed in its 1991 decision, and reiterates here, that the jury had ample evidence upon which to acquit the defendants. Even had the defendants not denied to the jury that they had obstructed justice, the jury could not be faulted had they concluded that Richard Raymond had taken the Ronci property and that it was impossible for Knight to have been with the defendants at sunrise.
If Haworth were a truthful individual and told another jury all that she has told Prendergast and the Court, she would not be telling the jury anything which the trial jury did not have available for its consideration or providing a new jury with any basis to change the verdicts for which the defendants have been sentenced.
V. Defendants' Claims of Prosecutorial Misconduct. A. Introduction.
Nugent's deposition of April 12, 1991, occasioned by his telephone call to Craven the month previous, became the source of the following contentions presented by the defendants in their petition for discovery and subpoenas of May 21, 1991:
 "At deposition, prosecutor Nugent admitted that he began to review the evidence in this matter in late June 1986 and that he met with Knight on a weekend in July 1986 shortly before trial. During the first minutes of trial, without explanation but with the specific representation that no exculpatory evidence was involved, prosecutor Nugent moved to dismiss the arson count against Defendant Tooher.
 Nugent now claims that he dismissed the arson count because it occurred on a different day, involved only Defendant Tooher, and would confuse the jury. (Nugent Deposition) This explanation is lame and disingenuous. The alleged arson occurred on the same day with the obstruction of justice alleged. Moreover, Nugent did not dismiss the larceny count against Defendant Tooher even though it did allegedly occur on a different day, was wholly unrelated to any other charges, and clearly should have had a more confusing effect upon the jury than the alleged arson.
 Defendants assert that prosecutor Nugent dismissed the arson count because during his review of the statements and testimony available to him in late June two things became clear to him. First, that the alleged removal of items from the Ronci house by Defendants had to have occurred after 2:30 a.m. when Raymond first claimed injury, and, second, that independent evidence confirmed that Defendant Binns was at Fogarty Hospital from shortly after 2:30 a.m. until after 5:16 a.m."
Nugent's deposition of April 12 was also the reason for his appearance as a witness before the Court on October 11, 1991. In their May 21 petition (page 8), the defendants sought an additional deposition of Nugent. To afford a more informative examination, Nugent testified in open court. Where the defendants found his deposition testimony grounds simply for additional discovery, they place a darker hue on his court testimony. It resulted in a motion filed on November 5, 1991 "for a new trial on the grounds of newly discovered evidence of misconduct by prosecutor J. Joseph Nugent." It repeats verbatim the contentions which the Court has quoted above. Apparently because of the glasses through which they read his court testimony, they have recast other allegations contained in their petition so that the new trial motion reads:
 "Prosecutor Nugent has now admitted to this Court that, prior to trial, he personally became aware that Knight would testify that his smoking-gun observation of the Defendants at the Ronci house occurred around 5:00 a.m.
 * * * Nugent, before trial, knew that knight's testimony would conflict with Williams's expected testimony regarding the arson count and that Knight's testimony at trial would differ from his May 6 statement in the material aspect of time.
 At no time prior to Knight's testimony did Nugent disclose to defense counsel the material and exculpatory change in Knight's testimony.
 At no time prior to Williams's testimony or prior to Knight's testimony did Nugent disclose to defense counsel the exculpatory conflict between Williams's and Knight's stories.
 Instead, Nugent chose to obstruct justice himself. He failed to inform Defendants' counsel of Knight's new story. Secure in his belief that Defendants' counsel had to be unaware of the conflict between Knight's new story and William's [sic] old sunrise arson story, Nugent sought to eliminate the conflict between the expected testimony of his two star witnesses by eliminating the need for Williams to testify about the arson.
 At the start of Defendants' trial, Nugent moved for the dismissal of the arson count against Defendant Tooher. In doing so, Nugent lied to this Court, representing that no exculpatory information was involved in the dismissal of the arson count."
In filing their memorandum on November 27, 1991 in support of the motion, the defendants repeated verbatim all of the language which has been herein reproduced except that the previous label used to characterize Nugent's explanation -"lame and disingenuous"-has been elevated more in keeping with the motion. The explanation is now "non-credible."
The major premise of the defendants' accusations of Nugent's crime and falsehood rests on the personal knowledge to which he was privy when he entered the courtroom in July 1986 to prosecute the instant indictment. From the record before it, the Court examines the state of his knowledge at two periods: on June 30, 1986 and on the day he dismissed the arson count.
 B. Nugent's Knowledge on June 30, 1986.
By way of background, it is helpful to relate here that one of the charges preferred by the grand jury against defendant Tooher was that he had committed arson. Just before the trial began, Nugent dismissed the arson count. He gave no reason for doing so but assured the Court and defense counsel that it was not occasioned by "any exculpatory rights whatsoever. . . ." [TT: V.1, 1] Had that count been prosecuted and the state put to its proof, it appears from the record now before the Court that Williams would have testified that he and defendant Tooher were together when the defendant is alleged to have set fire to an automobile between 5:00 and 5:15 a.m. on July 1, 1984. At trial, on the other hand, Knight testified that he was with defendant Binns and defendant Tooher at the Ronci house at about the same time, namely, "around sunrise." The defendants characterize this circumstance as an "exculpatory conflict" of which Nugent well knew and constituted the true basis for the dismissal of the arson count thereby avoiding disclosure of the purported conflict.
In the interest of accuracy, it is to be remarked that Nugent has not said, as the defendants say, that "he dismissed the arson count because it occurred on a different day" [than the obstruction of justice by the defendants]. He said that he did not recall as he sat at the deposition on April 12, 1991 that the car fire and the obstruction of justice both happened on July 1, 1984, but if that was the fact he would have known that fact when he dismissed the arson charge just before trial in July 1986. It has been established that both incidents did occur on July 1, 1984, and the Court concludes that Nugent knew that fact when he dismissed the arson count.
With that correction, it is best to hear from Nugent himself on the reason for the dismissal. The question was put to him directly, "Why did you dismiss that arson count?" and he answered:
 "My recollection is that they — that the arson count was — it was too dissimilar in nature for one thing, it really didn't have anything to do with the fact I think you're getting into, that they were at the same time and, therefore, the times conflicted, that's really not it. My recollection is fairly clear. I 48 A'd those because only one of the defendants was involved, that's number one, and number two, they would distract — they would — the factual nature of the claims which would be supported by only one witness, Williams, would distract the jury from the obstruction of justice charges." [sic]
 [DT: 4/12/91, 30]
The defendants correctly point out that Nugent nevertheless continued to prosecute a charge of larceny against the defendant Tooher which was said to have been committed in December 1985. Having made that point, the defendants bring the Court to Nugent's motive for the dismissal. The Court turns its attention to it.
At this stage of argument, the defendants direct the Court to "the statements and testimony available to [Nugent] in late June 1986." The defendants are content to avoid specification and to rest on that broad generalization. As a consequence, the Court looks to what has been properly available to it to be treated in the same manner as if such material was reviewed by Nugent at the end of June 1986. Some of that information eventually became documentary evidence at the trial and, of course, the Court takes that also into account.
Although Nugent had been assigned the instant matter by the attorney general a "month or two before it went to the grand jury" [Id. 19] in February 1986, there is nothing in the record before the Court which reveals that Nugent and Knight had ever met on this case before Knight testified before that grand jury. Nugent was present when Knight gave his grand jury testimony. [Id. 22] He heard Knight say that after he attended to the towing of the Raymond automobile to the rear of the Chepachet state police barracks, he went back to the Glocester police station and, being off duty at the time because his shift had ended, he then went home. In reading a statement dated May 6, 1986 and signed by Knight, Nugent knew that Knight had given an attorney general's investigator an entirely different story. There Knight said that his shift ended at 2:00 a.m. on July 1, 1984 and that he went to the Ronci residence near that time with the defendants.
In June 1986 Nugent also possessed defendant Tooher's grand jury testimony of the previous February as well as a sworn statement which defendant Tooher gave on February 5, 1985 to Lieutenants Joseph Green and John Moy of the Rhode Island State Police. Nugent learned from that 1985 statement that defendant Tooher placed his arrival at the Glocester police station on the morning of July 1, 1984 variously as "[s]ometime between 12:30 and 1:30, sometime after 12. . . ." and "somewhere after 12:30." He stated that "[s]ometime after 1:30" he and defendant Binns went to the Ronci residence and when they got there "Patrolman Williams was either there or arrived as [they] did."
In addition to his presentation of defendant Tooher's testimony to the grand jury in February 1986, (see DT: 4/12/91, 19) at trial Nugent submitted into evidence as exhibit 25 a partial transcript of that testimony. The testimony critical to the present issue before the Court is the aftermath of the defendants' sojourn to the Ronci house.
Defendant Tooher told the grand jury that after he arrived at the police station he left for the Ronci home with Patrolman Williams and defendant Binns. Upon their return to the police station, Raymond stated he had trouble with his legs. [Ex. 25, 14] Their trip to the scene of the Ronci break prior to the transportation of Raymond to Fogarty Hospital he said "would have been sometime between 1 and 3 a.m." [Id. 31] After hearing Raymond's complaint, defendant Tooher directed that the rescue squad be called. [Id. 15] Defendant Binns followed the rescue truck to Fogarty Hospital and thereafter he and defendant Tooher spoke several times by telephone. At the last call defendant Binns said that Raymond was being transferred to another hospital. [Id. 16]
Defendant Binns returned to the police station and within five or ten minutes a woman walked into the station and reported that an automobile was on fire at the Jackson Schoolhouse Road curve and route 44. [Id. 16] Defendant Tooher told state police lieutenants Green and Moy that upon receipt of this report he and defendant Binns went to the scene of the fire. Of particular interest to Nugent should have been the following answers to questions put by the state police officers during their interrogation of defendant Tooher on February 5, 1985:
 "18 Q. Dealing with your arrival at the police station, until the report of the discovery or the report of the fire, did you at anytime enter a cruiser with Patrolman Williams of your Department and travel west along Route 44?
 A. No.
 19 Q. Was Patrolman Williams ever in your presence again during this same time frame, and both you — [sic] in a marked cruiser traveling west on 44?
 A. No."
 * * *
 49 Q. The main thrust or the main probe of this Ronci investigation, the allegations are that articles were taken from the Ronci home and placed into this vehicle owned by Raymond at a later time; do you have any knowledge of this?
 A. None whatsoever.
 * * *
 80 Q. Do you have any comment to make at all relative to the allegations that I'm sure you're aware of?
 A. I believe they're totally unfounded."
In addition, defendant Tooher told the grand jury that neither he nor defendant Binns removed any items at all from the Ronci residence. [Ex. 25, 31]
On February 7, 1985 defendant Binns gave a statement to the same two state police officers. He said that he and defendant Tooher went to the Ronci residence and found Williams there upon arrival. They remained at the scene "a matter of possibly 20 minutes" and then returned to the Glocester police station leaving Williams behind at the scene. Shortly after their return, Raymond complained of numbness in his legs and the Chepachet rescue squad was called. He accompanied the rescue truck and arrived at Fogarty Hospital shortly after 3 a.m. A little after five o'clock — five-fifteen or so — he left the hospital and returned directly to the station. Normally it takes somewhere in the area of 15 to 25 minutes to get from the hospital to the police station. Not long after his return he and defendant Tooher went to the scene of a car fire on route 44 just above Jackson Schoolhouse Road which a woman had come in to report. The trip to the fire took two to three minutes. "The fire was basically out." While he and defendant Tooher were there Williams and the Chepachet fire department arrived.
He too denied taking any articles out of the Ronci home and placing them in Raymond's car.
Defendant Binns testified before the grand jury in February 1986 that between the time of defendant Tooher's arrival at the station and the time Raymond was transported to the hospital he and defendant Tooher went to the Ronci home. [Ex. 25, 10] After his return from Ronci's, he followed the rescue truck carrying Raymond to Fogarty Hospital and remained at the hospital right up until the time that he was notified that Raymond was going to be transferred to another hospital. [Id. 9] He denied to the grand jury that he and defendant Tooher took any items out of the Ronci residence. [Id. 10-11]
On September 5, 1985, Williams gave a statement to investigators for the attorney general. He said that after Raymond was arrested and was still in custody at the Glocester police station the defendants left together and were away for approximately an hour. During that time he remained at the station. The only other person present at the station was dispatcher Piccirillo. A couple hours later he accompanied defendant Tooher who drove west on route 44 to its intersection at Jackson Schoolhouse Road. He believed it was July 1, 1982 [sic]. Defendant Tooher got out of his cruiser, set afire an automobile situated in the breakdown lane, got back in the cruiser and drove back to the station. Approximately 45 minutes later a woman came into the station and reported the car fire. Defendant Tooher dispatched fire apparatus to the scene. Williams thought the time of the dispatch was approximately 7 a.m.
In addition to these statements and the grand jury testimony, Nugent had in the file before him in June 1986 documents from which he could reconstruct with great accuracy the times during which these various events occurred on July 1, 1984. Some of these documents eventually were presented to the trial jury as exhibits.
The Glocester police day sheets, which were admitted at trial as exhibit A, show that at 12:10 a.m. defendant Binns called the base (the station) and reported that Raymond was in custody. In pertinent part it reads, "0010 102-B/have subject in custody. . ." The time is military time — ten minutes after midnight. It was testified at trial that the designation "102" was defendant Binns' identification. Trial exhibit 8 reveals that Raymond was arrested at that time by defendant Binns, Knight and Williams and that the defendant Tooher was the officer in charge. Trial exhibit 16 is a report signed by defendant Tooher stating that he and Raymond conversed "[a]t about 2 a.m."
Trial exhibit 3 reflects that the Chepachet rescue team left their base at 2:40 a.m. and were at the police station a minute later. Trial exhibit A records that at 3:21 a.m. defendant Binns reported that he was "out of car at Fogarty Hosp. with prisoner." Trial exhibit 1 shows that Raymond was logged in at Fogarty Hospital at 3:30 a.m. and was later transferred to Rhode Island Hospital. According to trial exhibit A, defendant Binns called the station at 5:16 a.m. to report he was leaving Fogarty Hospital.
Within the State's answer for discovery filed April 29, 1986 is item 4h., a Glocester police departmental offense report dated July 1, 1984 numbered CR#84-0588. By that document dispatcher Piccirillo reported that he received a radio call at 5:56 a.m. According to his report, there was an offense of malicious damage that occurred at 5:56 a.m. He recorded that the time of the offense was the same time as the receipt of the radio call which came to him from the scene of the fire, route 44 and Jackson Schoolhouse Road. He went on to say that the investigating officer was the defendant Tooher who went to the scene immediately and was back in service at 6:23 a.m.
Trial exhibit A reflects that an unidentified female came to the police station at 5:56 a.m. to report a car fire at the corner of Jackson Schoolhouse Road and that defendant Binns went to the scene. He was at the scene at 6:03 a.m. and advised the fire apparatus to proceed with caution. At 6:10 a.m. defendant Tooher called the station and was given data relating to the registration of the burned automobile.
There is in the state's supplemental answer to discovery filed on May 19, 1986 sheet number 3 of the fire record of the Glocester fire department. It shows that on July 1, 1984 the department received an alarm at 5:56 a.m. of a car fire at route 44 and Jackson Schoolhouse Road and that the department's activity terminated at 6:15 a.m.
On the basis of all of the foregoing information in Nugent's hands in June of 1986, the defendants' proposition that it became clear to him that the obstruction of justice "had to have occurred after 2:30 a.m. when Raymond first claimed injury" is totally untenable. Ignoring for the moment what parties with interests had said up to that time in June, Nugent was bound to accept one central fact as beyond any dispute: that Richard Raymond left the Glocester police station for Fogarty Hospital sometime between 2:41 a.m. and 3:00 a.m. Accepting this fact as he must, Nugent's analysis of the material before him would warrant a conclusion that the obstruction of justice occurredbefore and not, as the defendants contend, after 2:30 a.m.
Both defendants admit that they were at the Ronci home together before returning to the police station. Upon their return Raymond complained about a loss of sensation. Their return to the station could not have been later than 2:40 a.m., because that is the time at which defendant Tooher called for the rescue squad. Defendant Binns estimated their stay at the Ronci place as "a matter of possibly 20 minutes." Since both defendants recalled that Raymond complained of injury when both returned from Ronci's and since defendant Tooher was in the station speaking with Raymond "at about 2 a.m." before they left for Ronci's, the defendants themselves set the time of their presence in the Ronci home between 2:00 and 2:40 a.m. These are documented facts which Nugent had to accept.
It is true, as the defendants argue, that the records in Nugent's possession would cause him to believe that defendant Binns was at Fogarty Hospital until 5:16 a.m. That fact would but buttress his conclusion that Knight and the defendants were at the Ronci house at a time given by Knight to the attorney general's investigators; namely, when Knight's shift ended at two o'clock.
Going into his meeting with Knight in July 1986 in preparation of trial, then, the deductions which Nugent was entitled to make were simple and obvious ones: the defendants said they were at Ronci's before Raymond was taken to Fogarty Hospital and this must be true because the records show that (a) defendant Binns could not have been at Ronci's between 2:40 and 5:16 a.m. and (b) that within the same time span the defendant Tooher was either in the station or with Williams. From the statements, testimony and documents he had at that stage Nugent was not facing any conflict, of time or otherwise, between the expected testimony of Williams in proof of the arson count and the expected testimony of Knight on the obstruction of justice charge. All of the material which Nugent had at his disposal to review (whether he reviewed it or not) on his vacation cruise at the end of June 1986 does not even hint from any statement by Knight that Knight witnessed the obstruction of justice by the defendants at around sunrise on July 1, 1984. At the end of June 1986 the evident conflict was between what Knight told the grand jury in February 1986 and what he told the attorney general's investigators the following May. Nugent was not ignorant of this conflict. He acknowledged in his deposition and again in court that he was aware of inconsistencies in Knight's versions. From the cold record Nugent could be confident, nonetheless, that if Knight did not go home after his shift ended but did indeed witness an obstruction of justice being engaged in by the defendants, he witnessed it between 2:00 and 2:40 a.m. As the prosecutor, Nugent knew that he could place the defendants from their own testimony to the grand jury inside the Ronci house during that time period. As the prosecutor, he also knew that it was for the jury to decide whether Knight was inside the Ronci house with the defendants or whether he was at home.
The evidence completely refutes the defendants' contention that Nugent knew in June of 1986 that Knight's testimony would be in conflict with Williams'. The record presented by the defendants themselves makes it abundantly apparent that as of June Nugent had nothing before him which would cause him to conclude that Knight would testify that he and the defendants went to Ronci's at sunrise.
If one were looking for a plausible reason for the dismissal of the arson count, one might ponder the probability of the success of its prosecution given the demonstrated confusing nature of the evidence regarding the reporting of the fire. Nugent practically said as much when he gave as a reason for the dismissal, supra: "the factual nature of the claims which would be supported by only one witness, Williams, would distract from the obstruction of justice charges." (Emphasis added.) If the contradictions relating to the manner in which the fire was reported and the time at which it occurred gave Nugent cause for concern, his concern was well founded.
 C. Nugent's knowledge at the Dismissal of the Arson Count.
There appears to be a suggestion implicit in the defendants' argument that if Nugent did not know by the end of June that Knight was going to say at the trial that he was with the defendants at Ronci's at around sunrise, he learned it sometime before the dismissal of the arson count. As the Court has previously pointed out, the defendants contend that "Nugent hasadmitted to this Court that, prior to trial, he personally became aware that Knight would testify that his smoking-gun observation of the Defendants at the Ronci house occurred around 5:00 a.m." (Emphasis added.) That assertion, however, hangs vaporously in mid-air without a solitary reference anywhere to the place where the Court might find the admission. The defendants go only so far as to quote Nugent's testimony on October 11 that, "I had gone through everything in the file, I mean, including all the grand jury transcripts and everything . . . going through that file exhaustively and then having Mr. Knight and a couple of other witnesses right in," and then draw their conclusion that "Nugent, before trial, knew that Knight's testimony would conflict with William's expected testimony regarding the arson count and that Knight's testimony at trial would differ from his May 6 statement in the material aspect of time." It seems to be the reasoning of the defendants that Nugent dismissed the arson count only because he knew that, if he went forward with it, Knight and Williams would be testifying in contradiction to each other. This argument is post hoc, but whatever slender plausibility that thinking has to commend it, it most certainly cannot be equated with an admission made to the Court.
There is nothing in any of Nugent's testimony that constitutes such an admission. To the contrary there is evidence that, while Nugent could not say that Knight's testimony surprised him, he nonetheless did not know of it beforehand. He said during his deposition:
 "Q Okay, did you concentrate at all on the time that this evidence was removed from the Ronci home?
 A No, no, I don't I don't remember it being a big deal, as a matter of fact.
 Q Did you in putting together or preparing your case for trial do a chronology of the events based upon the statements of the witnesses?
 A I may have, but that is not the — at least currently that's not my practice.
 Q But you don't recall anything jumping out at you, so to speak, at trial with regard to Mr. Knight's testimony?
 A I don't recall anything with respect to times jumping out at me, but that's not to say it didn't.
 Q Did Mr. Knight indicate to you that he was going to testify at trial that he had followed the Defendants shortly before sunrise?
 A No, I don't recall that, and I have been trying to, but I can't recall that, I can't, and I cannot say truthfully that when he said it at the trial it was a surprise, so . . ."
 [DT: 4/12/91, 25-26]
 * * *
 "Q Prior to the trial, did you recognize that there was going to be a conflict between Jimmy Williams's testimony about the car fire and Knight's testimony about the time that he indicated he followed Binns and Tooher to the Ronci residence?
 A No, I have no recollection of that."
 [Id. 30]
If Nugent knew beforehand that Knight was going to testify as he eventually did, there was no reason or advantage to withhold the information from the defendants. He had already apprised the defendants of Knight's two conflicting statements. Nugent had nothing whatsoever to gain by failing to disclose Knight's "it happened around sunrise" testimony. If he knew about that testimony and divulged it before trial the objective of the state's case, apart from any additional effect upon Knight's credibility, would have been unaffected because it related to the time he saw the crime committed and not whether he saw the crime committed at all. The alleged non-disclosure did nothing to attenuate the potential damage to the prosecution or strengthen the prosecution's hand because Knight's grand jury testimony that he went home after his shift told the jury not that he was confused about the time a crime was committed but that he never went to Ronci's with the defendants. Nugent had to be more concerned with that grand jury testimony than withholding information from the defendants that Knight would testify he saw the defendants' criminal conduct at around sunrise instead of around 2:00 a.m. It is as plain as day that if the jury believed that Knight had gone home there would have been no conviction. Alternatively, Nugent was bound to foresee that if the jury accepted Knight's core testimony that he was present when the defendants committed their crime the jury might still convict, concluding that Knight was mistaken as to the time of its commission. This passage in Nugent's testimony, which the Court accepts as true, speaks to his belief that Knight was an eyewitness to the defendants' obstruction of justice:
 "And I don't have to tell you, I did not knowingly put Knight on the stand — I did not put Knight on the stand as the State's witness knowing that he was a liar. I knew he had many inconsistencies and flaws in his testimony which I expected would be exploited favorably by the defense, but I never believed for a moment that he was a liar."
 [CT: 10/11/91, 8]
Had there been a disclosure, Nugent would have given the defense another inconsistency to be exploited but not one which would have Knight saying he was not at the Ronci house at all. Only the latter has the patina of being exculpatory; the former is nothing more than additional impeaching material which the jury had before it in finding the defendants guilty.
A more compelling reason to believe that Nugent had no pretrial knowledge of Knight's "sunrise" version is that had he known it and revealed it the resulting conflict which defendants claim to exist between what Knight and Williams would testify to would in no way have prevented him from dismissing the arson charge against defendant Tooher. He could well have told the court that the very reason for the dismissal was that he foresaw the existence of a conflict. He might have said, in effect, "Williams and Knight have said contradictory things to me and I prefer to dismiss the arson count and rely on Knight." Had Nugent done that, the defense would have found itself in no different posture that it found itself at trial.
In the Court's view, if Nugent knew of the "sunrise" version and were ill-motivated he would have been much better off in the prosecution of the case to have persuaded Knight to testify that the obstruction of justice occurred in the vicinity of two o'clock. He could have done this by pointing out to Knight that the defendants could not have been with him at sunrise because Williams said that he was with defendant Tooher at about the same time and that defendant Binns was at the hospital during that period. If Nugent were as base in his character as the defendants charge, one must also say that he would have had no compunction in following that course and continuing with the prosecution of the arson charge. On a more salutary level, Nugent could have properly shown Knight that Knight was mistaken since the information which Nugent then possessed disclosed that the defendants themselves said they were at Ronci's at the same time that Knight had told the attorney general's investigators on May 6 that he was with them, viz., around the time his shift ended at 2:00 a.m. Under either of these hypotheses, Knight would not have testified as he did.
If Nugent knew of that testimony in advance his dismissal of the arson count placed the entire indictment in jeopardy. The risk undertaken by Nugent by that course of conduct is best understood by a literal repetition of Knight's critical testimony and an appreciation of the facts which the defendants had in hand and could dependably use to create a reasonable doubt about the guilt of the defendants on any charge. The following direct and cross-examination of Knight laid the groundwork to that end:
 [By the prosecutor]
 "Q So is it your testimony when you left the automobile at the State Police barracks, there was nothing inside it?
 A That's correct.
 Q That is, visible from the outside?
 A Yes, sir.
 Q After that, did you return to the station?
 A It was later on that morning I returned back to the station.
 Q Your usual shift ended at 2 A.M.?
 A Yes, it did.
 Q Sergeant, did you see Lt. Binns in the company of Chief Tooher at any time after you dropped the car off at the State Police barracks?
 A Yes, I did.
 Q Where did you see them?
 A They were at the Glocester police station.
 Q Did you see them at any other place?
 A Yes, they left the Glocester police station in the Chief's vehicle and went back to the Ronci residence.
 Q And did you see them inside the Ronci residence?
 A Yes, I did.
 Q Were you with them?
 A Yes, I was.
 Q What time was this in relation to the time you dropped the car off at the State Police barracks?
 A Was later that morning. I can't recall the exact time.
 Q Was it after sunrise?
 A It was right around that time."
 [TT: V.2, 264-265]
 * * *
 [By defense counsel]
 "Q The night of June 30th, 1984, the early morning hours of July 1 of '84, you say you went to the Ronci residence along with the Chief and Lt. Binns?
 A Yes, sir.
 Q Were you riding along with them?
 A No, sir.
 Q How did you get there?
 A I had my own cruiser.
 Q And what time was it, to your best recollection?
 A It was early in the morning.
 Q Well, how early was it?
 A It was around sunrise. Would have been around 5:00, 5:30, some time around there.
 Q So when you say around sunrise, I assume you mean the sun was coming up?
 A Well, it came up some time after that time.
 Q Well, was it daylight or was it dark?
 A It was dark when we got to the house.
 Q Why do you say it was sunrise?
 A It was around that time of morning.
 Q Do you know what time sunrise was on July 1 of 1984?
 A Not exactly.
 Q Well you used the term sunrise, Mr. Knight. What do you mean by that? As of July 1, 1984.
 A Sunrise is the time the sun gets up and it starts getting bright out in the morning.
 Q Was it after 3 o'clock?
 A Yes.
 Q Was it after 4 o'clock?
 A I believe so.
 Q Was it after 5 o'clock?
 A I couldn't say."
 [Id. 276-278]
 * * *
 Q In other words, the only persons [at the Ronci residence] were you, the Chief and the Lieutenant?
 A Yes, sir.
 Q Do you know what time Lt. Binns got back from the hospital that evening, or that morning?
 A No, I don't.
 Q Do you know whether or not he went to the hospital with Mr. Raymond that morning?
 A I can't recall if he went or not.
 Q Do you recall at all that he went to the hospital?
 A I just stated I don't recall if he went or not.
 Q You weren't present when the rescue came to the station, were you?
 A No, sir.
 Q Do you know what police officer, if you do know, went to the hospital with Mr. Raymond?
 A I don't know.
 Q So you have no idea, Mr. Knight, whether or not Lt. Binns went to the hospital with Mr. Raymond on July 1, 1984?
 A No, sir.
 Q But you're sure that you saw them after four o'clock, the Chief and the Lieutenant, leave the police station, go to the Ronci residence, and have the discussion that you just related to us?
 A Yes, some time early in the morning of the first.
 Q Was it before 6 o'clock?
 A I stated I don't know exactly what time it was.
 Q But nevertheless, Mr. Knight, it was still dark?
 A Yes, sir.
 Q But around sunrise?
 A Early in the morning, yes, sir." (Emphasis added.)
 [Id. 282-283]
At that point in the trial defendant Binns knew that he could, without taking the stand, show the jury the time period during which he was engaged with Raymond at Fogarty Hospital. Trial exhibit A sets his arrival there at 3:21 a.m. and his departure at 5:16 a.m. He had two potential witnesses to corroborate his presence: Dr. L. Goldstein and nurse A. Hopkins, both of whom are listed in trial exhibit 1 as having attended Raymond. The defendants say, "First light occurred shortly after 4:30 a.m., and the sun had fully risen before 5:10 a.m." [Supplemented Motion: 3/23/92, 7 fn. 6] If that is a fact, the defendants failed to introduce such evidence at the trial.
The defendants argue that the testimony of Knight and Williams created an "exculpatory conflict." Given Knight's testimony as the Court has excerpted it above, the defendant Tooher could have exploited that imagined conflict. Williams could have been called to testify that he and defendant Tooher were riding together in the latter's cruiser going to Jackson Schoolhouse Road at the same time Knight said defendant Tooher was with him. The dismissal of the arson count did not and could not prevent Williams being called as such a witness. The arson count having been dismissed, the defendants could have sought a limitation on Williams' testimony without any reference to the car fire. Beyond that, Williams could have been used to advantage by both defendants. Both had previously made statements that Williams was with them while they were in the Ronci home. He was available as their witness to corroborate that fact. As the evidence developed, it is plain why they did not produce him in their case. Nugent called him in rebuttal instead and Williams denied the fact.
As the Court views this area of the trial evidence which the Court has reproduced and the information which Nugent knew that the defendants possessed, for him to dismiss the arson count only because he was aware that Knight would so testify would have been a foolhardy act indeed. The Court concludes that Nugent had no knowledge before Knight took the stand that he would say that the obstruction of justice occurred around sunrise. Whatever reason prompted Nugent to dismiss the arson charge, it was not bottomed on any knowledge or concern that there was an "exculpatory conflict" in the testimony of Knight and Williams.
 D. Nugent's Intentional Violation of Rule of CriminalProcedure 16. 1. Introduction.
Since the Court finds that Nugent did not know that Knight would say that he was with the defendants near sunrise rather than near the time his shift ended at two o'clock, it is the further finding of the Court that there was no violation of our criminal rule 16. It is obvious that he could not tell the defendants something he did not know. The defendants' accusation that there was prosecutorial misconduct on Nugent's part is baseless. Nevertheless, the Court considers an argument made by the defendants to be subject to a couple of observations. They say, "Where a Rule 16 violation occurs not inadvertently but as part of the State's trial strategy, defendants are entitled to a new trial. State v. Heredia, 493 A.2d 831, 833 (R.I. 1985)."
The defendants have contended in the instant proceeding that Nugent intentionally withheld information as part of the state's trial strategy. They have gone so far as to say, "Nugent lied to this Court, representing that no exculpatory information was involved in the dismissal of the arson count."
 2. Nugent's intentional concealment of evidence.
In Heredia, the state's witness revealed facts at trial of which the defense had not previously been made aware. The court concluded from the tenor of his direct examination that the prosecutor knew what the witness was going to say beforehand and, having that foreknowledge, intentionally withheld the information.
An analysis of Nugent's examination of Knight leads the Court to find that Knight's testimony was wholly unanticipated. The Court's finding in this respect rests upon testimony which the Court has earlier set out in another context. It is beneficial to an understanding of the Court's rationale to repeat some of that testimony and to add to it defense counsel's request not previously set out.
 [By the prosecutor]
 "Q So is it your testimony when you left the automobile at the State Police barracks, there was nothing inside it?
 A That's correct.
 Q That is, visible from the outside?
 A Yes, sir.
 Q After that, did you return to the station?
 A It was later on that morning I returned back to the station.
 Q Your usual shift ended at 2 A.M.?
 A Yes, it did.
 Q Sergeant, did you see Lt. Binns in the company of Chief Tooher at any time after you dropped the car off at the State Police barracks?
 A Yes, I did.
 Q Where did you see them?
 A They were at the Glocester police station.
 Q Did you see them at any other place?
 A Yes, they left the Glocester police station in the Chief's vehicle and went back to the Ronci residence.
 Q And did you see them inside the Ronci residence?
 A Yes, I did.
 Q Were you with them?
 A Yes, I was.
 Q What time was this in relation to the time you dropped the car off at the State Police barracks?
 A Was later that morning, I can't recall the exact time.
 Q Was it after sunrise?
 A It was around that time.
 Q What, if anything, did they do in your presence inside the Ronci house?
 MR. DIMITRI: I'm sorry, your Honor, may I have the previous question read back and the answer?"
 (Question and answer read.)
 (Emphasis added.)
 [TT: V.2, 264-265]
It is evident that the progression of this examination was based on Nugent's reliance on what Knight told the attorney general's investigators on May 6, 1986. As Nugent approached the pivotal stage of the evidence supporting the conspiracy and obstruction of justice counts, he sought to anchor it with Knight's return to the police station from the state police barracks in the vicinity of two o'clock. That is what Knight told the investigators on May 6 and Nugent had reason to expect a simple "yes" to his question, "After that did you return to the station?" Instead, Knight answered ambiguously, "It was later on that morning I returned to the station." Nugent knew, of course, that Knight had stated on May 6, "I returned to the Glocester police station because it was nearing the end of my shift which was 6 p.m. to 2 a.m. At that time Lt. Binns and Chief Tooher were responding back to the Ronci residence." To get Knight back on track to his May 6 statement, Nugent asked pointedly, "Your usual shift ended at 2 a.m.?" Receiving Knight's acknowledgement, Nugent then brought Knight and the defendant's inside Ronci's home and, in another effort to elicit what Knight had said but two months before, posed this: "What time was this in relation tothe time you dropped the car off at the State Police Barracks?" (Emphasis added.) Instead of answering, "Around the time my shift ended at two o'clock" as Nugent should have expected, Knight could not "recall the exact time" but it was "later that morning." Failing to obtain a definitive response, Nugent put a question which sought to confine Knight to an outside time limit in order to return him eventually to his May statement; a question to which, on the basis of what Nugent then knew, he would expect a negative answer: "Was it after sunrise?" (Emphasis added.) With Knight's answer, "It was around that time" the state had to live with what it had. At that point the better part of discretion was to have the matter lay there. Defense counsel's alertness in requesting the repetition of that question and answer makes it plain that Knight's shift in testimony was at once apprehended.
What emerges from these questions is not a prosecutor who knows that there is evidence he wants the jury to have and has intentionally withheld from the defendants but a prosecutor who is struggling to get the witness to say on July 10, 1986 what he told the attorney general's office but a couple of months before.
 3. Defendants' failure to act.
It strikes the Court as somewhat duplicitous for the defendants to raise the issue of Knight's testimony at this time in these proceedings. Again unlike Heredia, when the defendants heard what they now claim is "exculpatory" evidence, they did not object to or move to strike the testimony because of a rule 16 violation nor move for a continuance or seek a mistrial. When Knight placed the time of the crime as, "It was around that time," [sunrise] defense counsel sought immediately to insure that he had heard correctly by having the question and the answer repeated. The repetition of Knight's testimony at defendants' request forecloses any notion that it may have been inadvertently overlooked. Not having been provided with Knight's testimony through discovery, and had they felt prejudiced because of it, the time for the defendants to complain of Nugent's purported non-disclosure was at that moment. It is too late for them to do it today.
The Court holds no illusions about the fact that they were content with Knight's testimony. Their's was a conscious decision to let the evidence stand unchallenged. They knew they were already on record as having admitted being in the Ronci home between 2:00 and 2:40 a.m. Later on, defendant Tooher told that very thing to the jury. [TT: V.4, 848] When Knight testified he was with the defendants at sunrise instead of two o'clock as they had expected, it was an evidentiary windfall. It is not at all surprising that the cross-examination did not confront Knight with his May 6 inconsistent statement. The quantum value of that impeachment ran the risk, in spite of an instruction by the Court, that the jury might conclude that Knight was with the defendants when they said they were at Ronci's and that Knight had his time periods mixed up. The defendants made certain, however, to impeach Knight with his grand jury testimony that when his shift was over he went home. While the defendants might not be faulted for their trial strategy, their failed venture may not be metamorphosed into a basis for a new trial.
The Court reiterates an earlier observation made in another context. When Knight's appearance came to an end in the state's case in chief, the defendants exerted no effort to determine from the Court the extent to which the defendants would be permitted to utilize a part of the evidence Williams was prepared to give in proof of the arson count. What Williams had told the attorney general's office before trial placed him and defendant Tooher together at about the time that Knight, at trial, placed himself and the defendants together in the Ronci house. That the defendants chose not to raise the point as Knight left the witness stand can reasonably be attributed to their assessment that Knight's testimony before both the grand jury and the trial jury, together with the defendant Tooher's testimony that Knight was nowhere to be seen that morning, to be sufficiently damaging to create a reasonable doubt. It is not difficult to surmise why the defendants were uninterested in calling Williams to support their case in that regard. Had they done so, they would have been hard put not to ask him whether he was present with the defendants at Ronci's as they said he was, a fact, as the Court has previously pointed out, he denied in rebuttal.
Although the defendants make an issue of the manner in which Nugent dismissed the arson count, the issue could have been resolved at that very time.
Before the jury was empanelled for the trial of this indictment, the state and the defendants called upon the Court for rulings on motions. Nugent began the proceedings with these words:
 "I think that at least initially, the record should reflect that the State has exercised its discretion under Rule 48, subsection (a), of the Rules of Criminal Procedure and has filed the necessary form in which to discontinue or nolle prosse Count 4 of the indictment against these two defendants, which alleges that the defendant Richard Tooher did commit a fourth — pardon me — a fourth degree arson, that is, of a motor vehicle, in Glocester, on or about July 1, 1984. Now — and the subject has been raised as to whether or not the decision to do that at such late date rests in whole or in part on the knowledge by the State, of any exculpatory rights whatsoever to the defendant Tooher or the defendant Binns; and I can state categorically that it does not, that the exercise of the State's discretion under Rule 48(a) with respect to that specific count is merely a judgment call played by me personally.
 [TT: V.1, 1-2]
If Nugent lied to the Court in making that representation, as the defendants contend, a subsequent event provided them with the means of getting to the bottom of the dismissal and to the truth before the trial began. The defendants were given an opportunity to inquire into the elements which comprised his judgment call and they exercised a judgment call of their own in declining to do so.
The opportunity was provided in the course of hearing a pre-trial motion filed by the defendants to dismiss the indictment. The pre-trial motion was grounded on the failure of the state to produce the instructions which the grand jury had received preparatory to its deliberations. It appeared that the instructions had not been recorded and it was argued that Nugent's affidavit that he had given instructions did not satisfy the mandate of Rule 6 of our Rules of Criminal Procedure. In that regard, the following colloquy took place:
 "MR. DIMITRI: This morning in this Court a motion for 48(a) dismissal was filed by the State. I would assume, not having read any Grand Jury transcripts of the instructions, that Mr. Nugent instructed that Grand Jury as to what the elements were in fourth-degree arson and everything that went along with it. However, he came to the conclusion today that the count is no value [sic] to the State, that they can't prove it, obviously, otherwise he would go with it. I think that points out to some extent, your Honor, that there is a need for me to have the information, the instructions to the Grand Jury. Because if the State faulted on that count, they may have faulted on all; and I will never know that, your Honor, without having that information before me.
 THE COURT: All I know is Mr. Nugent made a representation to the Court it was a judgment call and had nothing to do with the instructions.
 MR. NUGENT: That's correct.
 THE COURT: If you want to examine Mr. Nugent, I'll permit you to do that.
 MR. DIMITRI: I won't do that, your Honor." (Emphasis added.)
 [Id. 57-58]
What defense counsel said in effect was that the arson count may have been dismissed by Nugent either because his instructions were fatally tainted or were not given at all, in which latter event the entire indictment was jeopardized. The Court's invitation that Nugent be questioned carried the implicit query: if absent or faulty instructions did not prompt the dismissal, what did? Here the defendants had available the opportunity to inquire about matters affecting the indictment as a whole and the arson count in particular. Having chosen not to do so, they choose now to brand Nugent a liar.
 E. Defendants' Inference that Nugent Lied to the Court. 1. Introduction.
Unable to sustain directly their reproach that "Nugent lied to this Court," the defendants attempt to do so by indirection through the medium of an "inference." This notion is first introduced in their May 21, 1991 petition for discovery at pages 7-8 in part as text and in part as footnote 12. It is repeated verbatim in consolidated form as footnote 8 both in the November 5 motion for a new trial on page 6 and at page 7 in their memorandum in support of that motion. In light of the identity of language in these three separate documents, the Court's consideration of the allegations might more easily be followed by reference to footnote 8. The first two paragraphs of footnote 8 read as follows:
 "Further supporting this inference [that `Nugent lied to this Court'] is information developed since the trial concerning the conduct of prosecutor Nugent in other matters. (See Deposition of Wayne Sacco and Exhibits attached thereto.)
 Attorney General Violet dismissed prosecutor Nugent following the discovery that he had drafted a materially false affidavit for execution by DAGI Sacco which was submitted to the Superior Court and had subsequently attempted to cover up the action by submitting, without explanation, a second affidavit. At a deposition in Pontarelli v. Stone, C.A. 86-370, U.S. District Court for the District of Rhode Island, State Police Lieutenant Walter Reynolds testified that he had requested to appear before the grand jury to request a subpoena for the attendance sheet for a specific meeting of the R.I. State Police Lodge, Fraternal Order of Police. Prosecutor Nugent drafted the subpoena, in Lieutenant Reynolds's presence and over his protests, to include all FOP records, including meeting minutes, for several years. When Reynolds protested that the subpoena was overbroad and unrelated to his investigation, Nugent told him to take the subpoena as typed or leave. Nugent then took Reynolds before the grand jury and obtained the foreperson's signature on the subpoena. Deposition of Walter Reynolds, Vol. V, pp. 50-52."
On the issue of having "drafted a materially false affidavit" and its subsequent substitution without explanation, the defendants have provided the Court with the testimony given by Wayne Sacco under oath on three occasions. Chronologically, he appeared in the Superior Court before then Associate Justice Joseph F. Rodgers, Jr. on October 17, 1986. Judge Rodgers had previously been assigned to preside at the trial of State v.Antone S. Cruz, Jr. and others, Indictment Number 85-1005. Nugent, the state's prosecutor in the case, had filed a motion to recuse Judge Rodgers on the basis of facts alleged by Sacco in two separate affidavits, one dated October 14, 1986 and the other October 15, 1986. Sacco was called before Judge Rodgers to testify with regard to erroneous statements he had made in the first affidavit.
The filing of the Sacco affidavits by the state resulted in an inquiry by a body formed, so far as the Court can surmise, by the attorney general. From the material provided by the defendants to the Court, it is obvious that the Court does not have the entire record made before the inquiry board. Such record as the Court has been provided is entitled, "Proceedings at Hearing in Re: Gilbane and Related Matters." It reveals that Sacco and others testified before this group on November 24, 1986 in the main about the circumstances which bore upon his execution of the two affidavits.
Lastly, Sacco testified on April 18, 1991 at a deposition authorized by the Court in connection with the instant proceeding.
Looking at the motley allegations of footnote 8, standing alone, what can be said immediately is that they neither support nor permit an inference that Nugent had lied to the Court. If one were to accept the various statements as acts of prior misconduct or deception or both in other matters, the defendants have not provided the Court with any authority for their proposition that such acts warrant the inference implicated. They must certainly concede that had they attempted to impeach Nugent's credibility during his testimony before the Court in this proceeding — either to show that he was untruthful in dismissing the arson count or was a person generally not to be believed — by the introduction of extraneous acts of misconduct or deception they had to fail.See R.I. Rule of Evidence 608(b). But more specifically and to a larger degree the facts they allege and rely upon in footnote 8 do not support their inference.
 2. Nugent's conduct in drafting the FOP subpoena.
To begin with, the Court does not deem the manner in which Nugent dealt with State Police Lieutenant Reynolds as any sort of misconduct even assuming that the defendants have reproduced the event accurately; a circumstance about which the Court must take on faith since Reynolds's deposition is not a part of this record. Nevertheless, whether Reynolds felt that Nugent was seeking too much it was not for him to protest. The question of overbreadth was for the court and not the state police to decide. In drafting the subpoena, Nugent acted as a state prosecutor with the legal training that Reynolds did not possess. If the grand jury gave its imprimatur in issuing the subpoena as drafted, the public interest was protected. If the subpoena was overbroad when served, the Rhode Island State Police Lodge had the means of protecting its interests.
 3. Nugent's dismissal as an assistant attorney general.
The record which the defendants have given to the Court says nothing about Nugent being dismissed by the attorney general for having "drafted a materially false affidavit for execution by DAGI [department of attorney general investigator] Sacco." What the record does say on this point leads the Court to conclude that Nugent was not dismissed but had resigned as an assistant attorney general even before the internal board made any judgments on the circumstances underlying the drafting of the October 14 affidavit by Nugent and its execution by Sacco.
During the hearing on November 24, 1986, the chairman of the board made this statement:
 "Mr. Nugent, in his resignation letter submitted a statement of his position as to why he had done nothing improper under the Rules, specifically Rule 16. The AG [attorney general] has asked us to consider that report as well, to show Mr. Nugent's side of the position. It doesn't look like we're going to hear from him. At least we have to have — we have his counsel and he can supplement that in any way that counsel would like to. You think he'll [Nugent] take the opportunity to do that?
 NUGENT'S ATTORNEY: I think so."
 [11/24/86, 193-194]
What the board eventually decided about the matter then under investigation is not known to the Court. The Court is impelled to say from this record, however, that the defendants' assertion that Nugent was fired for misconduct is a baseless and reckless one.
 4. Nugent's conduct in drafting the Sacco affidavit.
Beyond the question of dismissal, the defendants have failed to show that Nugent "drafted a materially false affidavit." The defendants might have spared the Court the time and the effort required to deal with this charge against Nugent had they read the record more carefully — or read it at all — in which event they may have had some doubt about Sacco's veracity. As will become apparent, a function of the attorney general's internal investigation board was to learn primarily how it was that the name "Paul Choquette" found its way into the affidavit which Sacco signed on October 14, 1986. It cannot be doubted that the defendants have relied solely and completely upon what Sacco had to say to the inquiry board on November 24, 1986 in making their unfounded accusation against Nugent.
To put things in proper perspective, it should first be said that when Sacco was deposed by the defendants on April 18, 1991 he was not of the view that the inclusion of Paul Choquette's name in the affidavit of October 14, 1986 as even creating a false document as it has been characterized by the defendants. Sacco, as this testimony shows, appraised the matter differently:
 "Q Let's see if we can put this in perspective. There were allegations that the affidavit that you had signed on the 14th was false, is that correct?
 A Not that the affidavit was false, that [sic], that one of the names in the affidavit was incorrect."
 [DT: 4/18/91, 7]
And as for what Sacco told the inquiry board on November 24, 1986, the defendants draw selectively from the evidence to come to a conclusion quite different from Sacco's. The defendants choose to see Nugent as preparing a fraudulent statement. Sacco, who worked with Nugent on the document, saw it as a "misunderstanding." The Court reproduces colloquy between Sacco and Nugent about the manner in which Choquette's name found its way into the affidavit. Sacco testified:
 "A Joe Nugent looked at me and said, `you told an untruth,' and I looked at Joe and said, `what untruth,' and he said, `about Choquette.' That's when I blew my top.
 Q What did you say exactly?
 A I told him I said, `I didn't f____ing tell you that. I never investigated Paul Choquette. I didn't care if Paul Choquette belonged to that club,' and Joe said, `now I remember,' he said, `I think there's been a misunderstanding,' I said, `well I guess so,' and out the door I walked."
 [11/24/86, 25-26]
Although this testimony leads one to conclude that what Nugent and Sacco said to each other in the course of the preparation of the affidavit led to a misunderstanding resulting in the inclusion of Choquette's name, the defendants prefer to allege that Nugent prompted its inclusion as a knowing falsification. The Court rejects both the defendants' allegation of an intentional falsehood and Sacco's disclaimer that it was all a misunderstanding. Because of the Court's conception of Sacco's testimony in toto, the Court is of the opinion that Choquette's name appeared in the October 14 affidavit not by Nugent's hand but because Sacco gave him that name.
Drawing on the evidence in the record provided by the defendants, the Court supplies some background on the events which led to the drafting of the October 14 affidavit by Nugent and its execution by Sacco.
On October 17, 1986, a Friday, Mr. Justice Rodgers called the criminal trial calendar for the week beginning the Monday following. Among the cases called to be tried during the following week was the Cruz indictment. Referring to that case Judge Rodgers stated, "Before we proceed, at 9:30 this morning, as discussed when the Court called the trial calendar for the week of October 20th, recognizing each of you gentlemen were to be before me at 11:30 on this matter, I deferred the call of that case [Cruz] until now." [CT: 10/17/86, 1] He then acknowledged the pendency of a series of pre-trial motions requiring disposition, one of which he cited as follows:
 "And we also have a motion to recuse in which the State of Rhode Island moves this Court to enter an order disqualifying the trial Justice previously assigned this matter [meaning himself] from presiding at the trial of the case or sitting in judgment, or otherwise deciding or ruling on any issue involving Gilbane Building Company on the ground that the assigned trial Justice is associated socially with officers of the Gilbane Building Company as more fully set forth in the attached affidavit, and that said association gives the appearance of impropriety.
 In view of the nature of the motions, I think it appropriate for the Court to address the motion to recuse first."
 [Id. 2-3]
The origin of that motion is found in the testimony given by Leon Blais before the board of inquiry on November 24, 1986. A summary of his testimony follows.
From January 2, 1985 and at least until November 24, 1986, Blais was employed in the department of the attorney general as director of investigations. [11/24/86, 82] A couple of weeks prior to the filing of the motion to recuse Judge Rodgers he instructed Sacco "to investigate the issue of the membership of Judge Rodgers [and] various members of the Gilbane family at the Point Judith Country Club." [Id. 83] In addition, the attorney general's office wished to learn "whether there were any individuals who were connected with either the Gilbane family or Gilbane Building Company in any way who were members of the club" and whether Paul Choquette was a member. [Id. 88] They "were trying to determine who in the corporation would have potential membership or connected with the family. . . ." [Id. 89]
"Perhaps the week before the motion to recuse was filed, somewhere in that period of time," Sacco reported to Blais the results of his first visit to Point Judith Country Club. [Id.
90-91] He asked Sacco whether he had "any evidence that Paul Choquette [is] a member and I can recall him telling me [Blais], no, that he had no indication that Mr. Choquette was a member." [Id. 91] Sacco was instructed to continue to find out whatever he could. [Id. 92]
At some point after Sacco reported to Blais, Nugent notified Blais that he was preparing a motion to recuse and needed to get an affidavit from Sacco "based on whatever evidence [Sacco had] heard up to this point." [Id. 98] Blais suggested that Sacco go directly to Nugent to prepare the affidavit. [Id. 92] As best as Blais could recall, the affidavit was prepared and filed either on the same day or the day following his instruction to Sacco to meet with Nugent [Id. 99] but more probably on the same day. [Id.
100]
After the affidavit was filed, Blais learned that it contained a statement that Paul Choquette was a member of the Point Judith Country Club and that the statement was wrong. He asked Sacco "how could he [Sacco] sign such a thing that said Paul Choquette was in fact a member when he [Sacco] knew in fact that he wasn't." [Id. 101] Sacco explained that Nugent had prepared the affidavit and that "he [Sacco] had not read the affidavit prior to signing it . . . because there was someone standing next to him waiting to get it out to Court to file. . . ." [Id. 102] Blais and Sacco then met with Nugent who asserted that Sacco had told him that Choquette was a member of the club. Upon Sacco's remonstration, Nugent said, "`Oh, you're right. Now that was a mistake, you never said that.'" [Id. 104]
During all of this testimony from Blais, Sacco, who had already testified, was in attendance listening to Blais at the board's invitation. When Blais completed this testimony, the board recognized Sacco in order that he might question Blais. [Id. 113] Sacco questioned him only on a matter other than the evidence which the Court has just recounted, such unrelated matter being Sacco's execution of the second affidavit contrary to Blais's order.
If one accepts Blais's version of the scope of the investigation, it is without question that it was designed to connect Judge Rodgers as a member of the Point Judith Country Club with any individuals who were connected with either the Gilbane family or Gilbane Building Company as club members and, specifically, whether Paul Choquette was a member of the golf club. It must be recalled that although Gilbane Building Company was a co-defendant in the Cruz case when the motion to recuse was in the offing, Choquette and the individual Gilbanes were not. From Blais's testimony, it was the clear purpose of the investigation to develop a basis to remove Judge Rodgers from the Gilbane case by tying him to the Gilbanes and Choquette and, by that association, tying him to the co-defendant Gilbane Building Company.
As the Court has said, Sacco's testimony preceded Blais's testimony on the same day. One must not lose sight of the fact that while both were testifying 38 days after Sacco's superior court appearance on October 17, 1986 both were re-creating the events which culminated in an affidavit being filed on October 14, 1986 and the discovery the next day that Paul Choquette's name should not have been included.
What Sacco said about the scope of the investigation assigned to him by Blais differed markedly. He testified that a few weeks before October 14, 1986 Blais directed him "to just verify that Judge Rodgers belonged to the Point Judith Country Club and if in fact the Gilbanes belonged." [11/24/86, 9] In seeking information during a telephone conversation with someone at the golf club, he inquired into the membership of Judge Rodgers and the Gilbanes but not of Paul Choquette because Blais never asked him about Choquette. [Id. 13] Having completed his mission, he reported to Blais who thereupon sent him to Nugent to impart the information so that Nugent might prepare an affidavit. He gave Nugent what he had learned. [Id. 15] The focus at their meeting then turned to Choquette:
 "Q What did he [Nugent] say in response?
 A He asked me about Choquette.
 Q What did he ask you specifically, if you can recall, how this question was put to you?
 A `Does Paul Choquette belong to the club?'
 Q What was your answer?
 A I answered, `I don't know. I never asked about Paul Choquette. I wasn't told to ask about Paul Choquette,' and he said, `well, isn't Paul Choquette a Gilbane?' I said, `well, I don't know if he is a Gilbane. He might be related through marriage or something. He's president of the company.'
 Q Did you have reason to know that he might have been related through marriage?
 A At that time — just rumors around the office and I didn't know that for a fact. He said, `Didn't that girl tell you that all Gilbanes belong,' and I said at one point she did on the phone conversation but I said I never asked about Paul Choquette and I was never told to investigate about Paul Choquette and I left.
 Q And nothing further was said?
 A Nothing further was said. Now this was getting . . .
 Q Finish your sentence if you want to.
 A This was getting to be late in the afternoon and I was told this affidavit had to be filed before 4:30 to the Court."
 [Id. 15-16]
He related his execution of the affidavit following its composition by Nugent:
 "Q When did you next have occasion that day to deal with the affidavit?
 A Around twenty minutes past four.
 Q How did that happen?
 A Sue Tobin came up to my office. She had the affidavit in her hand, okay, but she had it — I'll demonstrate (indicating), two pages folded back like this and she stood in front of my desk and she said, `you've got to sign this.'
 Q What was showing, which page was showing?
 A The bottom page for the signature.
 Q Did she say to you that she had to — there was a time problem?
 A Oh, yeah, she said it's got to be filed in Court before 4:30, it was definitely a time problem.
 Q I think you just said that she said it had to be filed before 4:30, is that correct?
 A Before the day's end in Court.
 Q What did you do?
 A I signed it.
 Q Did you read it?
 A No, I asked Sue, I said, `is that the information I gave Joe?' and she said, `yes,' meaning the affidavit information and I signed it.
 Q Did you read even the last page?
 A I didn't read the last page.
 Q The page that was exposed?
 A I signed it. Pat Plante notarized it and off it went to Court.
 Q Did you make any effort to persue it to see whether this looked familiar to you?
 A No, I did not. I'll be honest with you. That was my mistake."
 [Id. 20-22]
Following Blais's awareness that Choquette's name should not have been in the affidavit, he called Sacco to his office. Sacco testified that the first thing Blais told him was, "[G]et down to that country club today, identify yourself and see if you can find out if Choquette belongs to this club." [Id. 23] Sacco said to Blais, "I don't know how Paul Choquette's name got in there, because I didn't investigate Paul Choquette and I told Nugent that." [Id.] After doing what he was told by Blais, he returned to Blais's office and found Nugent and Blais together. His testimony continued as follows:
 "Q What did you say to them?
 A Joe Nugent looked at me and said, `you told an untruth,' and I looked at Joe and said, `what untruth,' and he said, `about Choquette.' That's when I blew my top.
 Q What did you say exactly?
 A I told him I said, `I didn't f____ing tell you that. I never investigated Paul Choquette. I didn't care if Paul Choquette belonged to that club, `and Joe Nugent said, `now I remember,' he said, `I think there's been a misunderstanding.' I said, `well, I guess so,' and out the door I walked.
 Q Did Lee [Blais] say anything while you were there during this second meeting?
 A Lee didn't say anything because I was getting ready to deck Joe Nugent."
 [Id. 25-26]
It could not be more plain from Sacco's testimony as repeated by the Court to this point that Choquette's name was put in the affidavit by Nugent without Sacco's knowledge; that is, if Sacco were a credible witness. But neither he nor Blais ever intimated, as the defendants charge here, that Nugent's conduct was that of a person drafting "a materially false affidavit."
Blais and Sacco agree that when they met with Nugent, Nugent at first attributed Sacco as the source of Choquette's name but then recanted. According to Sacco, as previously stated, Nugent said the insertion was the result of a misunderstanding. Blais's version, though slightly different, was essentially the same. He recalled Nugent as saying he made a mistake.
The Court rejects both characterizations because it believes, on its analysis of the record to follow, that Nugent never asserted that he was the cause of the appearance of Choquette's name in the affidavit of October 14, 1986.
On November 24, 1986 Sacco was making his case before the attorney general's inquiry panel that it was not his fault that his sworn statement about Choquette was wrong. The fact that he had signed the affidavit was inescapable; hence, the testimony he gave the panel was predictable.
The posture he assumed was that he did not give Nugent Choquette's name because he never asked about Choquette at the golf club, Blais not having directed him to do so. When Susan Tobin presented the affidavit to him for his signature, she did so with the signature page facing him and the two previous pages turned over and he could not see them. He read none of the pages because he did not have time to do so. It had to be signed, notarized and filed without delay because the clerk's office at the court was about to close. Because there was no time to read it, he signed it after Tobin assured him the affidavit was "the information [he] gave Joe [Nugent]."
This testimony points the finger of blame not only to Nugent but to Tobin as well. The fact must be that Sacco never sought such an assurance from Tobin because Tobin had no means of knowing what information Sacco had given Nugent earlier on that very day. According to this record, Nugent and Sacco were alone when the latter conveyed to the former the information he had gathered for the affidavit. And the record puts a very different aspect on what Tobin knew about the affidavit and the question which Sacco asked her. She told the inquiry board that either Nugent or his secretary gave her the affidavit for Sacco to sign. [11/24/86, 146] Her examination continued:
 "Q Did you read this affidavit before you took it to him?
 A No.
 Q Did you know even what it was about?
 A No.
 Q And did you know that it related to the recusal motion?
 A Yes.
 Q How did you know that?
 A Because when I brought it into Wayne to sign he said,
 `Is this my affidavit on Gilbane regarding Judge Rodgers?'"
 [Id. 148]
Plainly, there is a world of difference in Tobin knowing, on the one hand, that she had a statement in her hand for his signature which, as she also testified, required notarization and, on the other, knowledge of information which Sacco gave to Nugent in her absence. In addition, it could not be clearer from her testimony that since she had not read the contents of the affidavit, she could not have known whether or not it contained "the information that [he] gave Joe." It is also evident that she learned that the affidavit related to the recusal motion from the question which Sacco put to her and not from prior acquired knowledge. She concluded her testimony by stating that she was not sure whether Sacco read the document before signing it. [Id. 153]
The record here is most persuasive that Sacco had been told by Blais to look into Choquette, that Sacco obeyed and provided Choquette's name to Nugent as a result.
Before Blais testified, Sacco told the panel that he did not ask golf club personnel about Choquette because Blais did not instruct him to do so. Blais, in Sacco's presence, testified to the contrary. Yet when Sacco was given the opportunity to question Blais, he asked Blais nothing about the scope of the investigation which he was directed to follow. He asked nothing which might have refreshed Blais's memory or brought circumstances to his attention which might have caused Blais to correct his testimony. Sacco let stand unchallenged Blais's testimony that he had asked Sacco about the result of looking into Paul Choquette and that Sacco had reported to him, before signing the affidavit, "that he had no indication that Mr. Choquette was a member." [Id. 91]
Sacco had weeks after his appearance in front of Judge Rodgers to prepare this fabricated tale upon which the defendants rely in their attempt to discredit Nugent's conduct in the prosecution of this indictment. Had he told the attorney general's board on November 24, 1986 what he had told the court on the afternoon of October 17, 1986 his credibility might still be honored and this Court would have been spared the time expended necessary to inquire into this empty allegation of fraudulent conduct regarding an extraneous matter.
In order to appreciate the predicament in which Sacco found himself on October 17 some repetition of the evidence is necessary. Three days before the 17th a motion to recuse Judge Rodgers had been filed supported by the affidavit executed by Sacco. It was a factually incorrect affidavit which, on this record at least, only two people could explain: Nugent and Sacco. A second affidavit was filed on October 15. Typically, the defendants charge that this was done "without explanation" and as an attempt to "cover up" the first affidavit. Even without comparing the two affidavits, it is obvious from this record that the second affidavit was filed to exclude names incorrectly included in the first. Why some explanation was necessary or how there could be a cover up when both affidavits were before Judge Rodgers the defendants do not bother to explain. In any event, when the motion to recuse was reached for hearing Nugent requested of Judge Rodgers that he be permitted to proceed at two o'clock that afternoon. He informed Judge Rodgers that he intended to call three witnesses on behalf of the motion but did not intend to call Sacco as one of them. [CT: 10/17/86, 15] At the request of counsel for the defendant Gilbane Building Company, Nugent agreed to have Sacco available without the necessity of the defense issuing a subpoena. [Id.] What developed between the time that Nugent appeared before Judge Rodgers that morning and the time that Sacco took the stand that afternoon was testified by Sacco to the inquiry board in this fashion:
 "Q What's the next thing that happened as far as you're concerned with regard to either [sic] those affidavits, did you have any further conversations with either Lee [Blais] or Joe [Nugent] either that day or the next day or the following day?
 A Well, the next day when I got called for trial, I was here [meaning at the attorney general's offices] and they called me and said, `you're going to be put on the stand.'
 Q Who called you and said that?
 A I don't know if it was Lee or Joe. I know when I got over to the Court, Lee was there and Joe was there and Joe said, `they're going to put you on,' and he said, `I'm going to call you to the stand,' and we sat down. I sat down with Joe for probably three minutes. I said, `what about the affidavit.' I asked about Choquette and it went right over his head and they went to lunch.
 Q What?
 A He said, `it was a misunderstanding' — quote — unquote — on Choquette.
 Q Wait a minute now. This was a conversation he [sic] had with Joe before you testified?
 A Yes"
 [11/24/86, 41-42]
From this testimony, one must be persuaded that when Nugent appeared before Judge Rodgers that morning Blais was at the courthouse with Nugent but Sacco was not, that Sacco went to the courthouse before lunch and that Nugent had a change of mind and decided to call Sacco as a witness after all. In response to Sacco's concern that Choquette's name was improperly in the first affidavit Nugent, if one would choose to believe Sacco, told Sacco precisely what he had told him a couple days before in Blais's office: that it was a misunderstanding.
Anticipating his appearance before Judge Rodgers that afternoon, such an explanation — that the inclusion of Choquette's name was a misunderstanding between himself and Nugent — would have been both simple and straightforward. It is not the explanation he gave under oath. Under cross-examination by Joseph Kelly, Esquire, counsel for the defendant Gilbane Building Company, the following was elicited:
 "Q Now in this first investigation, you write in here [the first affidavit] that, 1, a Paul Choquette was a long time member of the Point Judith Country Club. Is that correct?
 A Yes, it is.
 Q You now know that's not true, isn't it, sir.
 A Yes, I do.
 Q You told us on direct examination that the information you received in this telephone call, was that the entire Gilbane family were members of Point Judith Country Club, remember saying that?
 A Yes, I do.
 Q So, I take it that the person whom you talked to did not specifically name Paul Choquette, correct?
 A No.
 Q Oh. That's a little different, huh.
 THE COURT: Well, let me understand the response, Mr. Kelly. You asked if this person who gave him this information, named a gentleman by the name of Paul Choquette, is that correct, and the response was no. No, it's not correct; or no, he was never advised that a Paul Choquette was a member of the Point Judith County Club?
 THE WITNESS: That's correct. I was advised that all members of the Gilbane family, not Paul Choquette by name [sic].
 THE COURT: No one mentioned the name Paul Choquette to you?
 THE WITNESS: No, your Honor.
 THE COURT: Okay.
 Q But you put Paul Choquette in your affidavit.
 A Yes.
 Q So, without anybody naming Paul Choquette as a member of the Point Judith Country Club on October 14th, you raised your hand to God and said he was a member of the Point Judith Country Club?
 A I believe he's a member of the Gilbane family.
 Q Now, you say you believe he is a member of the Gilbane family, is that correct?
 A Yes.
 Q Did you get that information in the telephone call to the unnamed employee prior to October 14, 1986.
 A No, I did not." (Emphases added.)
 [CT: 10/17/86, 34-36]
What Sacco has said here is not that it was Nugent who inserted Choquette's name in the affidavit as a result of a misunderstanding between the two of them in the preparation of the affidavit. What Sacco has said here is that he was told that all members of the Gilbane family belonged to the golf club and that he gave Choquette's name to Nugent for inclusion in the affidavit in the belief that Choquette was a member of the Gilbane family.
Sacco told the inquiry board that it was Nugent who volunteered Choquette's name. See 11/24/86, 15-16. As the following excerpt shows, when Judge Rodgers delved into this point, Sacco gave a much different explanation:
 "THE COURT: Why was the name Robert Gilbane mentioned in the affidavit you filed on October 14th? Why was the name Paul Choquette mentioned in the affidavit you filed under oath on October 14th? Why not Thomas Gilbane, James Gilbane, Peter Gilbane, Catherine Gilbane, Barbara Gilbane or — or any other name? How do the names Robert, Bill and Paul Choquette come to your attention as being members of the Point Judith Country Club when you executed this affidavit? I think that's the issue, sir. Did somebody tell you from the Attorney General's office who they were?
 THE WITNESS: Prior — prior to that, I had known who William and Robert were as — and Paul Choquette as working officers of the Gilbane Company, not as members of the Point Judith Country Club. It was indicated to me, like I said, through the phone call I called, Gilbane family was a member." [sic] (Emphases added.)
 [CT: 10/17/86, 37-38]
Judge Rodgers' question was specific in seeking to determine whether anyone in the attorney general's office told Sacco whose names should be put in the affidavit. If Nugent was the one who did it, this was the time to have said so.
The evidence developed before Judge Rodgers revealed that not only was Choquette improperly included but the name of Robert Gilbane as well. Both of those names were omitted in the second affidavit he filed on October 15. [Id. 48] It is cause for speculation why the defendants accuse Nugent of making up a false affidavit for putting Choquette's name in it but do not similarly accuse him for its inclusion of Robert Gilbane's name. At any rate, eventually Sacco admitted that it was his error that caused those names to show up in the affidavit.
 "THE COURT: So, you made a mistake, is that correct, Mr. Sacco, by filing the affidavit suggesting that a Paul Choquette, from the information you had, a Paul Choquette, a Robert Gilbane and a William Gilbane, Jr. and myself were members for the last five years at the Point Judith Country Club?
 THE WITNESS: I made an error on two of those names, your Honor." (Emphases added.)
 [Id. 52]
In considering whether Sacco was a truthful person in this entire affair, his testimony concerning whether he had read the first affidavit before he swore to its truth should be reviewed. Before the court on October 17, 1986, he swore to this:
 "Q Okay. Now, this first affidavit bears your signature, does it not, sir?
 A Yes, it does.
 Q Wayne Sacco, that correct?
 A That's correct.
 Q And it's notarized by a Patricia Ann Plante, is that correct?
 A Yes, it is.
 Q And that was done after you talked to Attorney Nugent?
 A Yes, it was.
 Q And you read this before you signed it?
 A Briefly.
 Q Briefly. And you knew it was an affidavit?
 A Yes.
 Q And you swore to the truth of that affidavit?
 A Yes, I did."
 [Id. 22-23]
Before the attorney general's board of inquiry on November 24, 1986, he swore to this:
 "Q Now, you said that when you signed this [first] affidavit, you did not read it, is that correct?
 A Yes.
 Q Is it your testimony that you did not read any portion of that affidavit, be it on the first page or second?
 A I did not read any portion of it.
 Q Not even briefly?
 A Not even briefly."
 [11/24/86, 69]
This dismal record of prevarication discredits Sacco, and the defendants fare no better when they rely on it in attempting to persuade the Court of the untruthfulness and misconduct of Nugent in his prosecution of the state's case against them.
 5. Other misconduct.
The defendants bring footnote 8 to an end by seeking additional discovery. They say that former attorney general investigator Anthony Rossi "will testify about other, similar incidents of misconduct by Mr. Nugent." With respect to former attorney general Arlene Violet, the Court is not enlightened as to what she might say. The defendants simply aver that she had an established procedure for the conduct of investigations "with reports and other documents created to insure investigative control" and that she has described "the investigative records and conduct of this case as `very aberrant.'" They further assert that "the files and testimony suggest a recklessly negligent investigation."
The Court has dealt in detail with the spurious charges of misconduct that are found in footnote 8. Although the Court finds those charges to have no substance, they at least had some definition, which is more than can be said about whatever knowledge Rossi may possess. In any event if, by happenstance, the defendants are correct and there are "other, similar incidents of misconduct," they most certainly do not relate to this indictment or, without doubt, the defendants would have said so. It should be plain that if such misconduct is provable perhaps other, but not these, defendants might benefit from their disclosure.
The suggestion of a "recklessly negligent investigation" is not the presentation of newly discovered evidence but catchwords to search for evidence to which the tag "newly discovered" might then be applied. A fortiori, this is true of Violet's appraisal that the condition of the investigative file "is not standard and violates the procedures she had established." It should be sufficient to say that regardless of the file's condition or its violation of procedures and as reckless or negligent as the investigation of this case might have been, there was still sufficient evidence developed for a grand jury to call upon a petit jury and for the latter to convict these defendants.
The Court will not authorize the depositions of Rossi, Blais or Violet.
 F. Nugent's Violation of the Rules of Professional Conductand The Attorney General's Failure to Investigate Complaints ofthat Conduct.
Defendants create new grounds upon which they attempt to rely for a new trial on the purported basis of newly discovered evidence. They import into the traditional formula Nugent's violation of specific rules of professional conduct promulgated by our Supreme Court and the failure of the attorney general's office to pursue complaints filed by the defendants.
The alleged breach of the rules regulating Nugent's professional conduct revolve around his "concealment of Knight's changed story." This argument is both superfluous and irrelevant. It is superfluous in that it has been previously argued to the Court. Its repetition is irrelevant because it serves no purpose. Had the defendants persuaded the Court that Nugent's conduct deprived the defendants of a fair trial, a new trial would have been in order. That same conduct, serving as a basis for discipline, adds nothing to this Court's jurisdiction and is unavailing for any relief from this Court, the disciplinary power being that of our Supreme Court exclusively.
The defendants cavil the office of the attorney general for its alleged failure to probe the wrongdoing of Nugent, Sacco and unnamed "others" contending that "an impartial examination into the conduct of Attorney General's personnel would result in a determination that even more information favorable to the Defendants was witheld [sic] from them prior to trial and is still being witheld." They say that there is a "statutory mandate" to investigate "indications of misconduct by Nugent and his [again anonymous] minions."
Here, again, the defendants are not presenting the Court with newly discovered evidence but with the suggestion that were the attorney general to fulfill his statutory duty, it "would result" in evidence on which the defendants could then rely on the basis of its being newly discovered. Defendants fail to document their basis for this assertion. As it stands, it is pure guesswork; guesswork which cannot be supported even by the statute which they cite: section 42-9-8.1 of our general laws. Recognizing that the statute does not provide for any investigation of Nugent and Sacco, they anchor their demand on this statutory language: "the office [of investigation created by section 42-9-8.1 within the department of attorney general] shall adopt and implement such standards as may be applicable to its scope and purpose as promulgated by the commission for the accreditation of law enforcement agencies."
Among the standards to which the defendants make reference is one requiring the appropriate investigation and prompt adjudication of "all allegations of employee misconduct." Whether the office of investigation has ever adopted this standard has not been disclosed by the defendants to the Court. It is to be noted that the office is required to adopt and implement only those standards "as may be applicable to its scope and purpose." The scope and purpose of the office of investigation is set out succinctly in section 42-9-8.1(2). By its most generous interpretation, that section does not require the office to adopt any standards which relate to the investigation of its employees.
Even if there were such standards in effect today, the defendants have not shown that either Nugent or Sacco are employees of the attorney general. The evidence in this case shows that Nugent had resigned as an assistant attorney general before November 24, 1986. When Sacco testified at his deposition on April 18, 1991 he said he had been employed by the attorney general from 1985 to 1987 and that he was currently employed as "legislative assistant to the speaker" of the Rhode Island House of Representatives. [DT: 4/18/91, 2] It is highly improbable that the incumbent attorney general would be authorized to take disciplinary action — as distinguished from the charging of a crime — against an employee of a predecessor in office but not in his own employ.
These comments by the Court — deemed necessary though in a wholly collateral and diversionary area submitted by the defendants — should not obscure the fact that in 1986, when section 42-9-8.1 was not even in effect, the attorney general did convene a board of investigation to determine whether Nugent's or Sacco's involvement in the presentation of the Choquette affidavit to the superior court constituted any misconduct on their part. The failure of the defendants to present the board's conclusion to the Court speaks eloquently in that regard. And now, as to Nugent, the defendants have not presented even a plausible basis to inquire into the propriety of Nugent's investigation and prosecution of the crimes for which the defendants stand convicted.
As for Sacco, the defendants' position is similarly deficient. They raise the issues of misconduct, deviation from established policy and conflict of interest. None of these charges is related by the defendants to any parts of the record before the Court. They amount to no more than an effort for an opportunity to look further into supposed matters pre-dating the indictment of the defendants in the hope of developing evidence to sustain their motions. To permit such a thing would be to turn the rule applicable to motions for a new trial on the ground of newly discovered evidence on its head. Insofar as the allegation of deviation from established policy is concerned, our criminal rule 16 and the constitutional obligation to reveal exculpatory evidence provided liberal safeguards to these defendants. It matters not whether a policy in the attorney general's office was not adhered to. What matters is whether a defendant seeking a new trial presents the required evidence to support the motion. It would be a strange system of criminal justice indeed if a defendant, after conviction, could begin investigating everyone and everything from the time a defendant's conduct first became of interest to a law enforcement agency.
The defendants deposed Sacco on April 18, 1991. The testimony there elicited does not lend itself to any misconduct or conflict of interest. He testified that he knew Williams, Knight and the defendants before they became involved in this case. He summarized his testimony before the grand jury as two police officers accusing two other police officers of wrongdoing. He had no other hand in the case except to drive investigator Deborah Lister to places with which she was unfamiliar. Irrespective of anything else he may have said before the grand jury or any other participation he may have had in this matter, the information given to the grand jury by Knight and Williams was enough for it to return the true bill. Sacco's attachment to this indictment was minimal at best and the defendants have failed to provide the Court with evidence that whatever Sacco did in this case requires his further deposition or a new trial.
As an example of the "even more information favorable to the Defendants [which the state has] witheld [sic] from them prior to trial and is still being witheld" (and by reason of which they here seek to depose Professor Walter Lieberman), the defendants say:
 "For example, Prosecutor Craven's cursory review of files with Defendants' counsel has now disclosed that Nugent intentionally failed to inform Defendants that it had retained the services of an expert witness (Professor Walter Lieberman of Brown University) to enhance the tape from which a transcript of Molly Raymond's telephone conversation with Bruce Binns was made and subsequently referred to at trial. Moreover, the State neither provided Defendants with a copy of Dr. Lieberman's report nor one of the unenhanced, original tape recordings. Finally, the State never advised this Court that it was presenting not original tape recordings but enhanced duplicates."
Before considering the substance of this statement, it must be understood that no tape recording of the telephone conversation Molly Raymond had with the defendant Binns was ever presented to the Court. And even if one had been, the state would not have been obliged to advise the Court whether the recording was an original or an "enhanced duplicate." If Professor Lieberman did enhance the recording, the state may have been under a duty to provide the defendants, not with his report, but with a recording which accurately reproduced what was said by Raymond and defendant Binns in the course of that telephone call.
The boundaries of the evidence at trial which had to do with the recorded telephone conversation can be found in their broadest context at pages 526 through 554 of volume three of the trial transcript. A reading of that area impresses that the defendants today imbue the recording with an importance which is at once retrospective and unsubstantial. What occurred at trial contrasts sharply with their new-found protestations.
When the testimonial subject of Molly Raymond's tape recording of the conversation was at its freshest, this was said:
 "MR. DIMITRI: Your Honor, your Honor, I'm going to object if there's an attempt by the State to put any tape recording in. Based upon the tape recording I received from the State, I object to any tape recording being played at this time. It's not audible.
 THE COURT: Well, I think your objection might be premature. I haven't heard they wish to have it played. So far the testimony is that the tape recorder is in the building, apparently in the hall, according to her last testimony. So I'll meet the objection when it's appropriate. There is no offer to play the tape recording, or even to bring it into the courtroom."
 [TT: V.3, 527]
The large bulk of the telephone conversation, received by the jury without objection, concerned the disposition of the charges against her husband in return for his release of the town of Glocester from any liability accruing because of his arrest. It was made plain, after counsel's objection as noted above, that a written transcript of the recording had been prepared by the attorney general's office and that she had the transcript before her on the witness stand while she was testifying. She testified extensively about the content of the conversation and, in spite of her statement that she had the transcript before her because she did not "have a clear and present independent recollection" of what was said [Id. 526] there was no indication that she needed it to refresh her memory. [Id. 536] At a later stage of her direct examination, the Court interjected itself:
 [By Mr. Nugent]
 "Q Do you have a clear recollection now as to whether or not [sic], what else he said about signing off?
 A No, I don't.
 Q Do you have to refer to your transcript?
 A Yes, I do.
 Q Will it refresh your recollection?
 A Yes, it's in here.
 THE COURT: Haven't you read the transcript before coming to court?
 THE WITNESS: Yes, I did.
 THE COURT: Did that refresh your recollection?
 THE WITNESS: Yes, but there's a lot in the transcript.
 THE COURT: There's no objection on the part of the defendants to this testimony. What purpose is it designed to serve? We have in evidence already a release signed by Mr. and Mrs. Raymond and by the officials."
 [Id. 538-539]
There followed a colloquy between court and prosecutor which concluded in this way:
 " THE COURT: All right. Go ahead. If the defendants don't object, I'm not going to try their case for them."
 [Id. 539-541]
There is considerable difficulty for the Court to attribute sincerity in the defendants' argument that Nugent's conduct in handling the recording made by Molly Raymond was in any dimension a violation of the state's duty to the defendants to insure a fair trial. The recording was never even offered into evidence. Whether she testified at trial from the transcript itself or from her memory refreshed by it, or an occasional combination of both, the defendants did not make an issue of her testimony as it related to the quality of the recording of her conversation with defendant Binns. As her cross-examination shows, not a single question was asked of her to probe the mechanics of its making, the chain of its custody or the accuracy of reproduction from the oral recording to the written transcript. Before the direct examination got into the meat of the recorded conversation, defense counsel made the objection that the recording was "not audible." Whether the original recording was enhanced or not by Professor Lieberman, neither that recording nor the enhanced recording was ever a part of the trial and it is clear from the conduct of defense counsel that either her testimony about what was contained in the transcribed recording comported with what the defendants were capable of hearing on the recording delivered to them by the state in discovery or that the recordation and the accuracy of the transcription were regarded as insignificant because the subject matter of the conversation — i.e., the events surrounding the execution of a release — could be more effectively pursued in cross-examination. It is also to be observed that, since she testified to some extent from the transcript without defense objection, the recording was not so inaudible that the accuracy of the transcript was in question. And during cross-examination, defense counsel regarded the transcript sufficiently accurate to call Molly Raymond's attention to it to make his point. See page 553 of volume three of the trial transcript.
The defendants heard Molly Raymond testify after they had listened to the tape recording provided by the state. If, as defendants aver, they listened to an enhanced duplicate, that is as it should have been. They would have had cause to complain if the duplicate which they received was from the unenhanced original and thus unintelligible while the state took advantage of a clearer reproduction. They raised no objection to her testimony about what she and Binns said to each other. Such trial conduct necessarily depreciates their present concern about Professor Lieberman's report and the recording's enhancement — if there ever was either or both — to the point of immateriality. In its totality, the tape recorded telephone conversation, having to do with the release of legal liability, ranks with the more insignificant pieces of evidence presented at the trial. The request that Professor Lieberman be deposed is denied.
 G. Conclusion.
The Court finds that Nugent did not engage in any sort of prosecutorial misconduct in this case, and, in particular, finds that he did not withhold any evidence which he anticipated that Knight might give. The defendants have failed to show that they were deprived of any information which they were entitled to have or that he "denied them information which might well have changed the verdict[s] at the original trial." The Court finds that the jury had before them evidence that defendant Binns was at Fogarty Hospital and then at the police station around sunrise, that being the time that Knight said he was with both defendants at the Ronci home. The jury consequently had the evidence which defendants now argue that "given advance notice of Knight's anticipated trial testimony, Defendants could easily have developed documentary evidence which contradicted Knight's testimony in material detail."
VI. Defendants' Additional Arguments for Further Discovery. A. Introduction.
The defendants' petition of May 21, 1991 presents extensive arguments for additional discovery. This part of the Court's decision will consider those arguments, some of which are itemized numerically and some itemized with a descriptive legend. In order that the Court's discussion may be related to each of the items presented, the Court precedes each of its analyses with the petition's page and item number. As the Court has mentioned previously, what the defendants have presented in their petition has been repeated in later filings. The Court identifies where these repetitions may be found as follows: "Attachment A" refers to defendants' attachment to the motion for a new trial filed on November 5, 1991 and "Memo" refers to the memorandum filed by the defendants on November 27, 1991 in support of the motion. Some of the arguments made in the petition are duplicated in the motion and memo under the heading "Background Facts." No additional references are made as to those duplications.
B. Petition Page 4, Item 1; Attachment A Page 10, Item 1a;Memo Page 13, Item 1.
In seeking to depose Leon Blais, former director of investigations in the attorney general's office, defendants say that former Attorney General Violet "has indicated that the investigative file is inconsistent with procedures and standards she established and that tape recordings she believes should have been in the file are missing." See fn. 6. They also say that their "review of the file revealed that entries on the primary control document, the case control sheet, are entered out of chronological sequence, documents and entries are missing, and a substitute page 2 has apparently been created." They want to ask Blais questions "in connection with the condition of this file, the apparently missing documents, and related matters."
These assertions are self-defeating on their face. They speak of "apparently missing documents," and that tape recordings which the former attorney general "believes should have been in the file" are missing. They present no affidavit executed by the former attorney general to inform the Court with specificity what her personal knowledge is with regard to the composition of the file and precisely what is missing and how it affects the rights of the defendants entitling them to a new trial. While such a sworn statement may not amount to more than an additional effort to search for evidence, it would at least lend an aura of credibility to their statements. The solicitation by the defendants of the former attorney general's unofficial notions which they have presented might have carried greater persuasive force had they submitted her affidavit since they seem to have an uncharacteristic reticence about asking to have her deposed.
On the substantive plane, the simple fact is that whether the investigative file was well — or ill-kept is not a matter to be inquired into. The investigation which Blais is purported to have supervised culminated in the judgment of the grand jury after each of these defendants had their say before that body. One can assume in assessing this request to depose Blais that the file was in complete disarray and that documents and recordings which should have been in the file were lacking. Seeking to have Blais testify now in the absence of any charge of wrongdoing prejudicial to the defendants is no more than an aspiration to impeach the grand jury's conclusion of probable cause, to say nothing of the fact that a petit jury have found the defendants guilty beyond a reasonable doubt. See State v. Woodson,551 A.2d 1187 (R.I. 1988)
C. Petition Page 4, Item 2; Attachment A Page 10, Item 1b;Memo Page 13, Item 2.
Assuming that what Molly Raymond told Investigator Lister about police brutality against her mother by defendant Binns was a "completely false accusation," the state was not under an obligation to provide the defendants with the Lister memorandum of June 23, 1986. The defendants' discovery request under criminal rule 16 sought Mrs. Raymond's "written or recorded verbatim statements, signed or unsigned." On June 23, 1986 the state complied by turning over her statement. What she said to Lister while she was signing her statement was not her written or recorded verbatim statement, but Lister's memorialization of Mrs. Raymond's comments which, quite clearly, are extraneous to any issue raised by the indictment. By no stretch of the imagination do her additional remarks constitute exculpatory evidence.
The comments noted by Lister and forwarded by her to the prosecutor on June 23, 1986 are entirely collateral material. Besides, even if the defendants had the June 23 memorandum in hand at the trial, the law as it stood in 1986 would have foreclosed its use to impeach Mrs. Raymond. See State v. Bowden,439 A.2d 263 (R.I. 1982).
Molly Raymond told Lister on June 23, 1986 that there was no reason for her husband to break into the Ronci home because "when they needed money she was able to obtain it from her mother." Defendants say that this statement contradicts testimony given by the Raymonds at trial. The defendants misrepresent Molly Raymond's trial testimony and misinterpret Richard Raymond's. She said nothing about her husband loaning the car because they needed money. Her references to the loan of the car were two. "[Her husband] had loaned the car out to some kids." [TT: V.2, 512] "* * * I didn't know exactly who the kids are. They were friends of my husband." [Id. V.3, 555]
Richard Raymond mentioned the loan in three instances. "I lent my car out, I loaned my car out." [Id. V.2, 397] "[The juveniles] asked me to loan them the car so they could take their girlfriends to the movies; and at the same time they offered to pay me $20, $25, and I needed the money and I agreed to it." [Id.
435] Lastly, he testified about the reasons he loaned them the automobile. "One was to let the kids try the car because they were interested in it, and the other one was for money." [Id.
476] Molly Raymond's statement that her mother would provide her with money if she and her husband needed it does not impeach Richard Raymond because there is no evidence that his individual need for money would be relieved by his mother-in-law. Nor does it impeach Molly Raymond. Nothing in the evidence permits the inference that she was aware before or after the fact that the car had been loaned for money. In any event, if a broad view of Mrs. Raymond's statement is taken, its impeaching effect against her husband is cumulative.
No evidence has been presented to the Court that any time trials were run, whether exculpatory or not. The defendants do not even inform the Court the points of reference or destinations of the supposed runs and in what manner they are exculpatory. All the Court has before it is the unsupported statement of the defendants.
The Court is left to speculate that the time runs relate to the defendant Binns's journey to Judge George Beaudet's home to obtain the warrant to arrest Raymond. It does so because Lister was asked at her deposition "whether [she] made a run from the Glocester police station to Judge Beaudet's house and timed how long it would take to get there and back?" Lister responded, "There was something done on the timing, but I'm not sure if it was the actual run or an estimation, but I do remember discussion of the timing." [DT: 4/12/91, 24] This is certainly not evidence that time trial runs were conducted. She sought to explain that the scope of her assignment in this matter was limited to obtaining statements from designated individuals. [Id. 39] When Sacco was similarly asked at his deposition if Lister had ever asked him to drive her from the Glocester police station to Judge Beaudet's to correlate the elapsed time and the mileage of the trip, his answer was that he could not recall. [DT: 4/18/91]
It is cause to wonder why the defendants litter this serious proceeding with sham issues such as this one. What is curious about this needlessly time consuming issue is that there was no evidence at trial pertaining to time and distance which incriminated either of the defendants. Defendant Binns told the trial jury, by way of his testimony before the grand jury, that it was a short ride to Judge Beaudet's house and that he guessed it took him 35 to 40 minutes to go from the station to the judge's house and return. [Ex. 25, 18] Judge Beaudet testified that the distance between the station and his house was 12 to 14 miles. [TT: V.4, 825] Their testimony stood without contradiction.
Given the circumstance that there was nothing incriminating about time and distance presented by the prosecution against defendant Binns on the charge that he filed a false document, one would be hard pressed to credit defendants' representation that the state possessed exculpatory evidence of time and trial runs which should have been but were not turned over to him. The main thrust of the state's case against him on that count in the indictment was presented through Williams. As to count 8, his evidence was that he and defendant Binns were in each other's presence from the time defendant Binns arrived at the scene of the Ronci break until Raymond was arrested, and that defendant Binns told him later that the warrant was obtained from Judge Beaudet after Raymond was arrested.
In the final analysis, even if it were true that the state failed to turn over exculpatory evidence of time trial runs, it would constitute no basis for the Court to grant defendant Binns a new trial if such evidence has been seasonably discovered post-trial. Defendant Binns is in no need of a new trial on count 8. He was acquitted by the Court.
The defendants have failed to show how such evidence has otherwise affected them or might affect them.
The Court finds that the state did not violate the defendants' rights to exculpatory evidence or other evidence which they had a right to request.
D. Petition Page 4, Item 3; Attachment Page 11, Item 1c; MemoPage 13, Item 3.
The former attorney general's belief that all interviews were recorded or her puzzlement at the absence of such recordings in the investigative file are not germane to this proceeding. In this proceeding, the defendants are obliged to present the Court with facts, not impressions or opinions.
The fact of the matter is that when Molly Raymond gave a statement to Lister on May 17, 1986, it was recorded electronically as Violet expected. The Court has listened to the tape which the defendants have submitted. What the defendants describe as "unexplained gaps" are no more than rare momentary pauses by the interrogator and the respondent. The continuity of question and answer reflects a normalcy which satisfies any need for explanation or concern about the integrity of the product.
The defendants' discovery request was that the state give them "written or recorded verbatim statements" of those who were to be called as witnesses. (Emphasis added.) The state had the option, consequently, of turning over the tape recording of the interview or of providing a written verbatim statement. On June 19, 1986 the state chose the latter method when in its supplemental answer it said, "Mrs. Raymond is expected to testify as to the events surrounding the arrest of her husband, Richard Raymond, on June 30, 1984 and conversations she had with Lt. Bruce Binns, and Chief Tooher. A written statement of Mrs. Raymond will be forwarded within a day or two." Her "expected" testimony is the content exactly of both the recording and its transcription.
On June 23, 1986 the defendants were provided with "a copy ofthe statement of Molly Raymond" (Emphasis added) which evidently was not signed by her because on June 24, 1986 there was mailed to the defendants "[a] signed and corrected statement of Molly Raymond. . . ." (Emphases in the original.) Pages five and six of her statement reflect the corrections which she initialed.
In supplying the defendants with what they sought, the state fulfilled its duty to them.
E. Petition Page 4, Item 4; Attachment A Page 11, Item 1d;Memo Page 13, Item 4.
The allegations made here are intertwined with the defendants' accusations that Nugent intentionally violated the defendants' rights to a fair trial. The Court's decision in respect to these allegations is at section V.F., supra.
 F. Petition Page 4, Item 5; Attachment A Page 11, Item 1e;Memo Page 13, Item 5.
What must be said immediately is that there was no duty on the state's part to advise defendants that Sacco had brought the defendants' conduct to the attention of the attorney general's department, had Sacco in fact did that. Even so, what evidence which the defendants themselves have submitted reveals that Sacco neither brought it to the department's attention nor was he "responsible for initiating the investigation." Sacco testified about his involvement in this case during his deposition of April 18, 1991 and the defendants have not provided the Court with anything which would support their argument except their own mischaracterization of his testimony. Sacco testified that during the time that he was the state president of the Fraternal Order of Police and a member of the attorney general's department, Williams and Knight, having been suspended as Glocester police officers, attended a meeting of the state organization seeking assistance in getting their jobs back. After that occurrence, Lieutenant Mark O'Connor of the Scituate police department asked Sacco to arrange an appointment for him to meet with the director of investigations, Leon Blais. [DT: 4/18/91, 12-13] Such a meeting was arranged.
There is no doubt from Sacco's testimony that Williams and O'Connor, not Sacco, were the moving forces in the investigation of defendants' criminal activity. It was Sacco's understanding that Williams and O'Connor had presented Williams' allegations to the state police before they sought a meeting with Blais. [Id.
19] His understanding of the course of events is corroborated by the defendant Tooher's statement to the state police given on February 5, 1985. In his statement, defendant Tooher acknowledged Williams as the person who made the allegations which initiated the state police investigation.
Even if the defendants had known before trial that Sacco "had worked on this investigation" and even if "in fact, [he had] been responsible for initiating the investigation," the defendants have not shown to the Court that Sacco would have been a competent witness. He knew nothing personally whatsoever of the facts which related to the charges made against each defendant. The tenor of the defendants' argument is that Sacco might be shown as favoring Williams and Knight, because they were FOP brothers, at the expense of the defendants. Assuming the worst of Sacco's motives and purposes, the grand jury's finding of probable cause of the commission of the crimes with which they charged the defendants foreclosed the relevancy of such evidence. For sure, while Knight and Williams, who were fact witnesses incriminating the defendants, were properly subject to scrutiny for their motives, biases and prejudices in testifying as they did, Sacco's motives in pushing for an indictment, as the defendants assume, were rendered immaterial once the grand jury decided it had heard sufficient evidence, from the defendants as well, to hand down this indictment. This applies, too, to Sacco's testimony before the grand jury. Had he been called before the trial jury by the defendants, what he told the grand jury about the absence of inducements for Williams to give a statement was a matter collateral to the indictment. It was not Sacco's credibility with which the trial jury had to be concerned but Williams'. The unalterable fact is that the defendants were very much aware of the Court's grant of immunity to Williams. The same is true of the attorney general's agreement of September 5, 1985 with Williams. These weapons were supplied to the defendants to attack Williams' truthfulness. Sacco's truthfulness was not a matter for the trial jury.
One would hope that the FOP had an interest in the plight of their brothers Williams and Knight, who had been suspended or terminated, and in their financial condition, but those are hardly the jury's business. The jury had enough serious questions with which to contend without becoming sidetracked by the humane concerns of a collective bargaining organization. But the argument that Sacco would have been examined "about the role and financial interest of the FOP in conviction [sic] of Defendants" is simply fatuous. The defendants do not say that the FOP played any role or had any financial interest in their conviction. What they say is that they would have called Sacco during the trial to find out whether they did or not. What the defendants in effect urge here is that had the FOP adopted a pre-trial resolution calling for the conviction of the defendants, the trial jury was entitled to know about it by permitting them to question Sacco in the jury's presence. The inanity of such a proposition should be self-evident.
In looking to the defendants' request to depose Poore, the Court considers first their reliance upon Sacco's deposition of April 18, 1991. If his deposition suggests that Poore's and Kuh's positions are in parallel status, the defendants fail to point out where that testimony is to be found. Their failure is understandable. There is no such testimony.
There is but a single reference to Poore in Sacco's deposition and it is this:
 "Q So, you would have no way of knowing, for example, whether or not Mr. Knight had an attorney present when his statement was taken similar to the situation that was shown on the witness statement of Jimmy Williams where it indicates that his attorney, William Poore, was present?
 A I don't recall. Again, I don't recall Billy [Poore] being here, but apparently he was, and I was, but you have to understand something, I'm friends with Mr. Poore; I was friends with Mr. O'Connor. It wasn't uncommon to see the three of us anyway." (Emphasis added.)
 [DT: 4/18/91, 38-39]
The Court has underscored a portion of the question because, in putting the question, the examiner asserted as fact that Williams' statement of September 5, 1985 indicates that Poore was present at the taking of the statement in his capacity as attorney for Williams. The statement indicates no such thing. It indicates nothing more than Poore's presence. Poore may have been present as attorney for Williams or as attorney for Mark O'Connor, who was also present and who had arranged for the meeting, or as attorney for the Fraternal Order of Police as the defendants themselves suggest when they describe him as "FOP attorney William Poore." It might be well to recall that at a certain point in this trial Williams, while testifying, had by his side at the witness box a Mister Gonnella — not Poore — as his attorney. See trial transcript volume 1, pages 156-157. Poore's role in this case, therefore, has not been factually set out by the defendants through Sacco's deposition.
As now presented by the defendants, if Poore's role in this case is "indistinguishable from" or "identical to" Kuh's role inState v. von Bulow, 475 A.2d 995 (R.I. 1984) the coincidence is not established by any interaction between himself and Williams, Knight, Sacco or the attorney general's department. Nor is that identity conceded by the state simply because Nugent provided the defendants with a communication from Williams to Poore. Kuh's conduct in von Bulow and Nugent's conduct here are so dissimilar that it would distort the factual context of von Bulow beyond any recognition for this Court to fit Poore into Kuh's shoes on the basis that a note written by Williams and given to Poore was then provided to the defendants by the state prosecutor.
Nor does Poore fit the Kuh mold even if the defendants' belief that Poore was instrumental in gaining immunity for Knight is a fact. How or why or by whom Knight obtained immunity is beside the point. If, as the defendants assert, Poore was representing the FOP and in so doing protected any kind of interests of Williams and Knight because of their membership in the organization, such an activity is not the equivalent of the private investigation overseen by Kuh. It goes without saying that the shield given to Knight against prosecution could not exist without the affirmative action of the attorney general. Although the defendants do not go so far as to state as fact that Poore was instrumental in having Knight immunized so that defendant Tooher might be prosecuted, if that were the fact it would not have been ground for Poore's examination before the trial jury. There is nothing disreputable or illicit about Poore's conduct if he prevailed upon the attorney general to permit Knight to tell his story before the trial jury, without fear of legal retribution, so that a corrupt police official might be brought to justice. To follow defendants' argument to its logical conclusion, it would not have been Poore whom they would have called to the stand at their trial but the attorney general. She more than anyone else knew the reasons why she sought immunity on Knight's behalf. The defendants did not do so for the obvious reason that the factors and persons involved contributing to her decision to enter into her agreement immunizing Knight were as irrelevant then as they are now.
Even a cursory examination of the defendants' proposition reveals not that Poore's and Kuh's roles are "indistinguishable," but that they do not know what Poore's role "in the instant case" may have been. They say that "investigative files" show him to be like Kuh, and if they had that information beforehand they would have examined him at trial. But it is obvious from the things they say they would have asked him about, and because they hold only a belief and not knowledge "that there was linkage," that the requested deposition is their endeavor to mine for facts which they do not now have. In short, the defendants have sought to re-incarnate Kuh into Poore in order to engage in discovery in the hope that something worthwhile will turn up. The function of a motion for a new trial on the ground of newly discovered evidence is the production of qualified evidence which may change the verdict and not a means to pursue discovery to seek such evidence which may or may not exist.
At this stage, it is of no consequence what part Poore — and even O'Connor — played in the defendants' prosecution. The defendants had ample time before trial to learn to what extent Poore and O'Connor were involved in this case. The defendants were told on April 28, 1986, almost two and a half months before the trial began, that both were present when Williams gave his statement to the attorney general's investigators. The time to have looked into their respective roles was then and not now.
The request to depose Poore is denied.
G. Petition Page 5, Item 6; Attachment A Page 12, Item 1f;Memo Page 14, Item 6.
The defendants accurately point out that the state's response to discovery dated April 28, 1986 was not correct as to Williams. The response was not incorrect as to Knight, however, because on that date Knight had not yet been given immunity. The response as to Williams was corrected weeks before trial on June 19, 1986 when the defendants were given both Williams' agreement with the attorney general of September 5, 1985 and Knight's agreement with the attorney general of May 6, 1986.
It is a gross misstatement for the defendants to say that Williams's immunity agreement provided him "with immunity on all pending charges in exchange for his testimony." He was indicted in January 1985. [TT: V.1, 173] At trial, outside the presence of the jury, he related that the indictment charged him in four counts with assault with a dangerous weapon. [Id. 159] The immunity agreement of September 5, 1985 did not shield him from prosecution of those four crimes but limited itself as follows:
 "1. No charges shall be brought against James Williams for any activity which in any way relates to: James Williams [sic] failure to report or act upon violations of law related to statement [sic] he gives.
 2. No statement given by James Williams during said interview nor any information or evidence derived as a result of said interview, either directly or indirectly, shall be used against James Williams in any criminal case, related to (1) above.
 3. Before James Williams testifies before any grand jury or petite [sic] jury, he shall be brought before the Presiding Justice for immunity in accordance with the provisions of R.I.G.L. 12-17-15, related to (1) above." (Emphases added.)
When this agreement was executed, Williams was already under indictment on the weapon charges. There is nothing in this agreement that prevented his prosecution on those charges. It is most evident that the protection afforded by the agreement looked prospectively to additional prosecution resulting from new disclosures on his part. For example, he was to be immune from prosecution for disclosing in that statement that he had filed a false report stating that Richard Raymond had fallen down stairs at the police station. His statement also revealed that he was a police officer who possessed knowledge, which he failed to report, that fellow officers were engaging in vindictive criminal activity consisting of slashing tires with an ice pick. It also prevented him from being prosecuted for obstructing justice in not having earlier reported that defendant Tooher had committed the crimes which came to light in his statement.
As the Court has emphasized above, this agreement and the immunity which it foreshadowed were restricted by the words "related to (1) above." Such language protected him not only from becoming a defendant in a case charging him with the crimes his September 5 statement was about to uncover but also such added protection he might conceivably need "in any criminal case" in which any person became a defendant because of what he was about to disclose. The best example of that kind of situation is this very case. His statement accuses defendant Binns of "strike[ing] Mr. Raymond in the back with a nightstick." When he testified to this fact at the trial, he also admitted that he too had assaulted Richard Raymond. [TT: V.1, 165] That was an occurrence which he did not divulge in his September 5 statement. His agreement with the attorney general shielded him in that respect also and his cognizance of that fact came out at the trial. [TT: V.2, 234]
The arguments advanced concerning Knight's immunity agreement of May 6, 1986 are of no effect. The lack of documentation in the investigative file is meaningless. Whether it was Knight who asked for immunity or whether the attorney general was the moving party does not change the facts that immunity was granted and that the defendants were so informed. Lister's lack of knowledge of the grant did not affect Knight's statement. Her assignment, as she so deposed, was to take his statement. It was no concern of hers why he gave it and whether immunity was a factor. Those were matters properly of the jury's concern.
The defendants knew, while Knight was testifying, both that he had been immunized and had made a written representation contrary to fact that no promises were given to him in return for his May 6 statement. The state is not to be faulted that the defendants did not make the jury aware of those facts. The trial record demonstrates a conscious choice on the part of the defendants to let the jury know about the immunity given to Williams but to keep secret the fact that immunity had been given to Knight too. They ought not to be complaining now about their choice. Undoubtedly, had they been acquitted about the Ronci affair they would be congratulating themselves that their tactic succeeded.
Assuredly, Knight could have been impeached yet again by the defendants showing the jury that he made his May 6 disclosures while misstating the fact that no promises or inducements had been given to him in return. Their failure to further undercut his credibility by this means demonstrates their hypersensitivity, as dangerous ground, to his assertion on May 6 that he followed the defendants to the Ronci home at the time when they said they went there; i.e., when his shift ended at two o'clock. It is transparent that they chose to give Knight's immunity a wide berth in favor of leaving it with the jury that he was at Ronci's around sunrise, a time which they could argue from the evidence that each of them was elsewhere.
H. Petition Page 6, Item 7; Attachment A Page 12, Item 1g;Memo Page 15, Item 7, paragraph 1.
In their discussion of the grant of immunity, the defendants contradict themselves. On the one hand they advert to the lack of "documentation concerning Knight's request for immunity" — incidentally saying nothing at all about Williams — and on the other hand stating the unsupported fact it was "the decision of the investigators or prosecutors to offer immunity" and that the investigative file has nothing related to it. If the file left the defendants in a quandary, they had the means of resolving it. They learned from former attorney general Violet that "the investigative file is inconsistent with the procedures and standards she established" and "puzzling." It would have been a simple matter for the defendants, and of assistance to the Court in the instant proceeding, to have Violet speak for herself through a detailed affidavit rather than for the Court to have received the defendants' interpretations of her recollections and reflections. Since she was the one who had to say "yes" or "no" to the request for immunity, no matter who broached the subject, the defendants' acute interest in this phantom issue would have been gratified. The important question for the defendants at trial was not why Violet granted immunity but to bring out before the jury what benefits Williams and Knight derived from it, and as a result may have colored their testimony.
Documentation in support of a decision to immunize, polygraph tests and independent confirmation of what immunized witnesses say may be ideal prosecutorial procedures but their absence is no ground to grant discovery or a motion for a new trial. In this case, the lack of those procedures may or may not support "the inference that the prosecutor and investigator responsible for this matter were less interested in the truth than they were in the conviction of Defendants." Where the defendants see an inference others may see a suspicion and still others may see nothing at all. If the investigation in this case was less than letter perfect as it wended its way to the grand jury, confidence must nevertheless be reposed in the objectivity of the grand jurors. They listened to and sized up Williams, Knight and both of the defendants and decided that the defendants should stand trial. Considering the fact that, as our Supreme Court has said so often that the proposition needs no citation, our criminal rule 16 is the most liberal in the nation, what may have been the interest of the prosecutor and the investigator is really of no moment. To pursue the point is as useless as the argument itself. Of importance in this post-trial proceeding is what transpired after, not before, jeopardy attached. It was the jury's interest in the truth that was paramount, and on that score the jury determined the truth and convicted.
One of the more vacuous of the defendants' arguments propounded in this proceeding is the last sentence of the paragraph: "Moreover, the deviation from policy further supports the inference that the prosecution of Defendants was undertaken and continued for constitutionally-impermissible reasons." This unembellished statement leaves unspoken what constitutional rights were denied the defendants in their prosecution by means of the abrogation of policies established by the former attorney general. The defendants seem to forget that the former attorney general upon whom they rely to establish a disarray in the investigative file and the deviation from policy is the same attorney general who bears the responsibility in prosecuting the defendants "for constitutionally-impermissible reasons."
I. Petition Page 6, Item 8.
The arguments made by the defendants here are not new and have consequently been covered by the Court. This is particularly the case in respect to Knight's testimony that he spent time at the Chepachet barracks after the Raymond car was towed there under his supervision. In its 1991 decision the Court discusses this entire issue extensively especially insofar as rejecting the claim that "six state troopers would contradict" Knight. See decision pages 19-23. The Court then considered, at pages 25 through 28, the evidence and the time available to the defendants while the trial was in progress to present the jury with evidence to impeach him. The Court found then and says now that the present argument does not entail newly discovered or newly available evidence.
The defendants say, "James Williams told the grand jury that he saw Defendants Tooher and Binns leave the police station together at approximately 3:30 a.m. (Williams Gr. Jury Tr.)" The defendants do not elaborate on this assertion or develop its thrust except to say that Williams had stated on September 5, 1985 that he and defendant Tooher were together at a later and not inconsistent time period.
The grand jury testimony alluded to was not revealed at the trial and has not been presented to the Court in these post-trial matters. If it is of significance to the defendants that Williams saw them leave together at a certain time, they fail to explain why Williams was not called in the course of the defense case to testify to that fact.
It is difficult for the Court to comprehend the references they make to Prendergast in footnote 10. The evidence at the trial rendered it totally unnecessary for Prendergast to confirm anything about defendant Binns being at Fogarty Hospital. Both the Court and the jury were aware from the entries on the Glocester day sheets, in evidence as exhibit A, that defendant Binns was recorded as being at the hospital with Raymond from 3:21 a.m. to 5:16 a.m. And the fact that Prendergast has "obtained a sworn statement from Annette Hopkins, R.N. confirming the information in hospital records" seems both quite tardy and pointless. If the defendants felt that the day sheet entries needed confirmation, they could have obtained that confirmation during the trial by calling Hopkins as a witness and the attending physician as well. The Fogarty Hospital record came into evidence as exhibit 1. As plain as day it recites: "Name and Title of Others Attending Patient: A. Hopkins Rn and L. Goldstein phys. [sic]" It is a conundrum that references of this kind are submitted when it cannot possibly be said that they constitute evidence which could not have been diligently pursued before verdict.
Prendergast's investigation prompted him to say in one of his two reports dated March 22, 1991, "[I]t is very apparent that Sgt. Knight's testimony that he accompanied Chief Tooher and Lt. Binns to the Ronci residence in the darkness just prior to sunrise, appears to be false; . . ." The difficulty with Prendergast's conclusion is that the jury, the body in whom the assessment of Knight's credibility was reposed, looked at the same evidence Prendergast relied upon and convicted nonetheless. And they had a sound basis on which to do so.
The jury were well aware that the defendants were at the Ronci home between 2:00 a.m. and 2:40 a.m. with a third police officer whom they identified as Williams. Williams told the jury that it was not he. Knight told the jury that he was the officer who made up the trio. As to the time he was with the defendants, his testimony was not so cut and dried that only one conclusion could be drawn. This is what he said:
 "Q And what time was it to your best recollection?
 A It was early in the morning.
 Q Well, how early was it.
 A It was around sunrise. Would have been around 5:00, 5:30, sometime around there.
 Q So when you say it was around sunrise, I assume you mean the sun was coming up?
 A Well, it came up some time after that time.
 Q Well, was it daylight or was it dark?
 A It was dark when we got to the house.
 Q Why do you say it was sunrise?
 A It was around that time of the morning.
 Q Do you know what time sunrise was on July 1 of 1984?
 A Not exactly.
 Q Well, you used the term sunrise, Mr. Knight. What do you mean by that? As of July 1, 1984?
 A Sunrise is the time the sun gets up and it starts getting bright out in the morning.
 Q Was it after 3 o'clock?
 A Yes.
 Q Was it after 4 o'clock?
 A I believe so.
 Q Was it after 5 o'clock?
 A I couldn't say."
 [TT: V.2, 276-278]
In their deliberations, the jury did not evaluate that testimony in a vacuum. They had testimony impeaching his credibility including that of defendant Tooher and dispatcher Piccirillo in telling the jury that Knight was nowhere to be seen on the morning of July 1, 1984 directly contradicting Knight's testimony that he followed the defendants to the Ronci house from the police station. From Knight's testimony quoted above, the jury had the choice of discrediting Knight completely because of its uncertainty and contradictions with other facts or accepting his testimony that it was "early in the morning" and "it was dark when we got to the house." Plain common sense permitted the jury to know that "it was early in the morning" and that "it was dark" when the defendants said they were in the Ronci house. They did not require a meteorological chart to tell them that it is dark in Rhode Island between two and two-forty in the morning.
While defendants understandably stress that Knight said he was with the defendants around sunrise — Knight himself asserting it was "around 5:00, 5:30, sometime around there" — it was the jury's prerogative to ignore his various responses and accept as true that he was with the defendants when they said they were at Ronci's — early in the morning when it was dark. It is a fair assumption that this is what the jury decided beyond a reasonable doubt.
J. Petition Page 9, Item III B; Attachment A Page 12, Item 2;Memo Page 15, Item 7, paragraphs 2, 3, and 4.
Before responding substantively to these arguments, the point must be made that from a procedural standpoint the defendants have failed to go beyond their bald and equivocal statements which might otherwise entitle them to depose Williams and the victim. It appears that the defendants are reluctant to take the Court into their confidence. They withhold the "information," which they do not say proves or, as they are in the habit of saying, "supports the inference," but merely "suggests" that Poore, and if not Poore, members of the department, "may" have known about this alleged incident. These obscure intimations certainly do not support their request for the depositions.
Since the victim "is willing to press a complaint in this matter," the Court was entitled to have been supplied with, not the unsupported statement of the defendants, but, at the very least, her statement under oath. The humiliation which prevented her from exposing the incident is now a thing of the past because she has told the defendants and their counsel about it. The Court must necessarily look askance at this call for depositions when the putative victim of crimes reveals their commission to the defendants and their counsel, who for all that appears are strangers to her, but not to any agency authorized to prosecute those crimes against Williams. Had the defendants provided the Court with her sworn affidavit, they would have placed the Court in a better position to assess whether there was a sound basis to authorize the requested depositions. It would appear that the woman is as reluctant to provide the Court with an affidavit as she is to filing a sworn criminal complaint with the police.
Procedural considerations aside, the defendants' request to take their depositions is not to be granted. Discovery is sought in the hope that it will portray Williams as one whose character is such that what he says cannot be relied upon as being the truth. Even if the victim's testimony were admissible to impeach Williams under our rule of evidence 608, which it is not, seeState v. Tutt, 622 A.2d 459 (R.I. 1993) its basic purpose would still be impeachment. Seeking nuggets of additional impeachment by way of post-trial depositions from one who has testified and been impeached at the trial provides no basis for that discovery because the degree of accretive impeachment is not a reason to grant a new trial.
K. Petition Pages 9 and 10, Item III C and Item III D;Attachment A Page 13, Item 3 and Item 4; Memo Pages 15 and 16,Item 7, paragraphs 5 through 10.
Here again the defendants submit "information developed" which evokes a "suggestion" of fraudulent conduct on the part of Molly Raymond and that the prosecutor "may have" known about this information pre-trial. They assert that the issuance of subpoenas "will document this information," but the defendants tell the Court only what the information "suggests," and not what the information is or what information will be documented by the subpoenas.
The Court's decision above pertaining to the request to depose Williams and the alleged victim is repeated by reference and incorporated here.
Defendants concede, as they must, that they are seeking the Court's approbation to develop impeaching evidence. Attempting to avoid the effects of that concession, they add the gloss that the testimony of the Raymonds in this case represents "yet another opportunity for a fraudulent insurance settlement."
When the defendants argued their 1988 motion for a new trial on the ground of newly discovered evidence, they raised this issue of fraudulent conduct on the theory that they had a right to present Molly and Richard's fraudulent predilections at a new trial as an affirmative defense. As far as the Court can determine, the argument is now that another jury should hear the Raymonds' testimony in order that the "scams," as the defendants are wont to call them, may be used to impeach that testimony. In other words, a new trial ought to be granted so that the second jury may listen to the Raymonds and then hear their impeachment through the post-verdict accumulation of evidence together with the impeachment evidence of the first trial.
The Court concluded in its 1991 decision that the defendants had available at the trial evidence from which the jury could have found that the testimony of the Raymonds should be rejected because their motivation for saying what they did was money. There is no point in repeating the decision here. The defendants' argument has less validity today because they rely on "information" which is not particularized. In any event, the Court's analysis of the extant record to the date of its 1991 decision is equally applicable now and is repeated here by reference. That portion of the Court's decision is at pages 129 to 145.
In shifting their position that they wish to use evidence against both Raymonds for impeachment purposes rather than for an affirmative defense as they contended prior to the Court's 1991 decision, the defendants either ignore or refuse to acknowledge the fact that the defendant Tooher has no basis on which to offer such testimony. None of Molly Raymond's testimony implicated him in the commission of any crime. Her testimony as to him had to do entirely with the release of Glocester's potential liability because of her husband's arrest. Defendant Tooher testified at length about the release and its eventual execution. No issues of criminal activity on his part had to be resolved by the jury as the result of her testimony.
By and large the same is true of her testimony about her conversations with defendant Binns. One area of her testimony dealt with his telling her that he had a warrant for her husband's arrest, but did not show the warrant to her. This evidence may be directed to the charge of filing a false document. It is not subject to impeachment, however, because the Court directed a verdict of acquittal on that charge. She made a single statement which could be said to go to the assault count.See III A. 1. b. supra. But even if defendant Binns were granted a new trial on the count charging him with assaulting Richard Raymond and Molly Raymond repeated that statement and was then impeached as the defendants suggest, the likelihood of his being acquitted is extremely remote. Other factors besides the impeachment of her testimony must be considered. Williams, who was present, described how both he and defendant Binns engaged in striking the prisoner. Defendant Binns told the jury that Raymond was injured in a fall down the stairs. [Ex. 25, 7-8] He was corroborated in that version by dispatcher Piccirillo. [TT: V.3, 671-673, 707-710] It seems apparent that in finding defendant Binns guilty of assault, they disbelieved what he and Piccirillo said. Assuming that Richard Raymond's version of how the assault occurred was rejected at a new trial, the defendant Binns has not suggested why the jury would believe him and Piccirillo and reject Williams' testimony. In its 1991 decision, the Court considered the jury's potential view of Williams' testimony incriminating both himself and defendant Binns in their assault upon Raymond. See id. page 35.
The request that Richard Raymond be deposed and that Molly Raymond be deposed again are denied.
L. Petition Page 10, Item III E; Attachment A Page 14, Item5; Memo Page 16, Item 7, paragraphs 11, 12 and 13.
If any of the requests by the defendants, so pervasive in this post-trial matter, more graphically illustrates their quest for evidence they do not have, but hope to unearth and brand as "newly discovered evidence," it is the quest to depose Eleanor Potter. Unlike Blais, Sacco and Lister — and even Sheila Haworth who professes for justice for the defendants — Potter has not been shown to have any connection whatsoever with the prosecution of the defendants, unless one would make such a connection because of her presumed animus toward the defendant Binns or because she is the mother of Molly Raymond.
As the Court has said in its 1991 decision and has repeated today, the defendants had evidence at their disposal during the trial to show the jury what was Molly and Richard Raymond's "intent in dealing with the defendants."
In its decision the Court interpreted our rule of evidence 404(b) at pages 125 to 129. It may also be observed that in discussing rule 404(b), the Advisory Committee's Note speaks in terms of the "accused."
With regard to rule 608, the defendants also had evidence, previously referred to in the decision as well as heretofore, which would have permitted the jury to reject the Raymonds' testimony on the ground that they were using the trial of the defendants to lay the groundwork for Richard Raymond's recovery of damages in the federal civil rights suit.
Assuming Eleanor Potter's deposition to be very beneficial to the defendants, it could eventually result in no more than showing what the defendants were capable of showing at the trial: that the Raymonds' testimony was a fraudulent attempt to obtain a money judgment. Being cumulative in nature, the request that she be deposed is denied.
M. Petition Page 11, Item III F; Attachment A Page 14, Item6; Memo Pages 16 and 17, Item 7, paragraphs 14, 15 and 16.
The defendants recognize that rule 608 does not generally permit the introduction of the sort of extrinsic evidence they seek to utilize to show specific instances of Knight's conduct. They should not expect the evidence to be admitted on the basis of their statement that "Knight led the jury to believe that he was a model police officer," In the light of their general approach to the recitation of facts in these post-trial proceedings, it is not at all surprising that they would make such an assertion which has no support in the trial record at all. Having the verdicts in mind, if Knight led the jury to believe anything it was that he was telling the truth and that the defendants were not. The present contention, therefore, of necessity becomes one which is offered to demonstrate his prevarications.
This issue too has been dealt with by the Court. It has pointed out that Knight was impeached at trial by his two different accounts of his conduct after his tour of duty ended in July 1, 1984. By accepting either of those versions, it was sufficient for the jury to say he was not with the defendants when they were in the Ronci home. It is an indicium of the confidence of the defendants that Knight had been sufficiently discredited to raise a reasonable doubt that they abstained from impeaching him further.
Pre-trial, on May 6, 1986, and during the trial, on July 11, 1986, Knight was asked precisely the same question: "What did you do after the vehicle was towed to the [Chepachet] State Police Chepachet barracks?" Knight's responses were inconsistent. Cf.
Knight's statement of May 6, 1986 and trial transcript volume 2, page 293, lines 16-21.
It can be argued that the defendants' decision to withhold those inconsistent answers from the jury was a prudent, strategic one. It is also another indication supporting the Court's view, expressed in its 1991 decision, that the defendants' trial strategy was to confront the jury with the choice of the credibility of a police chief and his deputy against that of two vindictive witnesses who had been Glocester police officers until acted against to their economic and professional detriment by defendant Tooher.
Knight answered the May 6 question in four sentences. As the Court has said, the first sentence is unquestionably at odds with his answer at trial. The reason the sentence was not used for impeachment purposes becomes clear in the light of the next three sentences which, though wholly gratuitous, place Knight and the defendants in the Ronci home about 2 a.m. and has the defendant Binns admitting he assaulted Richard Raymond with his nightstick. Although the first sentence was certainly admissible to impeach Knight once again, it is a plausible assumption that it was foregone to avoid the risk of the Court's ruling were the prosecution to seek to present the jury with the three sentences which followed.
Even if the defendants representations are true and were admissible under rule 608, the request that Knight, Lloyd Clark, Gerald Cobleigh and Larry Comtois must be denied. Such impeachment is cumulative.
For the Court's previous treatment of this issue, see section I of its 1991 decision.
N. Petition Page 12, Item IV.
The defendants here maintain that the additional discovery sought through their petition will demonstrate a denial of the effective assistance of their trial counsel. They assert "that the court may consider evidence of the ineffectiveness of their counsel as a basis for a motion for a new trial." They submit further "that the apparent failure of their experienced and respected trial counsel to conduct a pre-trial investigation of the facts and other conduct may have deprived them of the effective assistance of counsel and, further, that the post-trial discovery of facts or evidence which should have become known to counsel or reasonably should have been used at trial are grounds for the grant of their motion for a new trial [,]" citingStrickland v. Washington, 466 U.S. 668 (1984) and Tarvis v.Moran, 551 A.2d 699 (R.I. 1988).
The defendants cite a variety of omissions and failures on the part of their trial counsel allegedly to their prejudice. In abbreviated form, they are:
1. Reasonable pre-trial investigation would have disclosed that the Raymonds, individually and together, engaged in fraudulent, cheating and perjurious conduct. Information contained in the records of the Family Court and the Department of Children and Their Families was available to show unfounded allegations which Richard and Molly Raymond lodged against each other.
2. Had counsel interviewed known members of the state police and introduced the state police day sheets (which were produced through a state witness in the jury's presence but not marked for any purpose), Knight's testimony that he stayed at the Chepachet barracks for a period of time after overseeing the towing of the Raymond vehicle would have been refuted.
3. Defense counsel should have introduced into evidence the Glocester police department payroll records from which the jury could have inferred that Knight did not work past the end of his shift. [The Court notes that the evidence at the trial was not that Knight worked beyond the time his shift came to an end but that he accompanied the defendants to the Ronci house when his shift ended.]
4. The jury should have been made aware that he gave a statement to the attorney general in return for an agreement of immunity against prosecution. The statement would have shown Knight's bias and prejudice and that "as a sworn statement, it was false." [The Court notes that Knight did not swear to the statement.]
5. Knight's testimony that he accompanied the defendants to the Ronci scene at around sunrise was unexpected. Defense counsel failed to ask for a continuance so that Nurse Hopkins and Doctor Goldstein could be called to testify that defendant Binns was with them at the hospital around sunrise.
6. Knight's credibility was also subject to attack through the findings of fact of the hearing panel convened under the Law Enforcement Officers' Bill of Rights and other, separate misconduct on his part.
7. Defense counsel failed to call Wayne Sacco as a witness and examine him on his potential bias in the investigation of the defendants and the presentation of the case to the grand jury; to utilize the legal file of Attorney Neil Philbin, Williams' statement of September 5, 1985 and his testimony before the grand jury.
8. Since there was no evidence of the time which would have elapsed for defendant Binns to go from the Ronci home to the police station thence to Judge Beaudet's home and back, an objection ought to have been interposed during the state's closing argument on this subject.
9. A time trial run ought to have been made between those destinations.
The Court was not long into its decision of March 14, 1991 when it set out, at page 5, its understanding of defendants' obligations as enunciated in State v. Carsetti, 111 R.I. 642,306 A.2d 166 (1973):
 "To prevail on these motions, the defendants have the burden of proving that the evidence they wish to have introduced at a second trial is newly discovered since their convictions; that they were diligent in attempting to discover the evidence for use at their 1986 trial; that the evidence is not merely cumulative or impeaching but material to the issue and be of a kind that would probably change the verdict of another jury. If they are successful to that extent, this Court is obliged to decide whether the evidence they are now relying upon is credible enough to warrant a new trial. In undertaking that exercise, the Court does so by calling upon its independent judgment to assess the credibility of the putative witnesses and the weight to be attributed to what they are expected to tell that other jury."
By their allegations of trial counsel's derelictions, the defendants admit that the evidence which they have been labelling "newly discovered" throughout these post-trial proceedings is evidence which in fact they had available for use in their defense during their trial or could have discovered during the trial had they exercised a reasonable amount of diligence. In that respect, they fail Carsetti's first two prerequisites. Their recitation of counsel's ineffectiveness reveals that the evidence which has formed the basis of their original and renewed motions for a new trial is evidence which they could have put before the jury.
At this stage of their presentation, the defendants citeStrickland v. Washington, 466 U.S. 668 (1984) and Tarvis v.Moran, 551 A.2d 699 (R.I. 1988) in support of their proposition that counsel's ineffectiveness "are grounds for the grant of their motion for a new trial."
Neither of those cases was a motion for a new trial on the ground of newly discovered evidence. Strickland was a federal habeas corpus petition in which one of the grounds for relief was that the petitioner had been denied the effective assistance of his counsel. Tarvis was an application for postconviction relief filed pursuant to G.L. 1956 (1985 Reenactment) chapter 9.1 of title 10 premised on the same claim of ineffective assistance.
Before Strickland was decided, our Supreme Court held that the postconviction relief statute is "the exclusive remedy to be utilized for appropriate collateral attack upon a criminal conviction on any ground of alleged error heretofore available under our common-law or statutory postconviction remedies. Section 10-9.1-1(b)." Mastracchio v. Houle, R.I., 416 A.2d 116, 117 (1980). Our Supreme Court has told the instant defendants directly that their attack upon their convictions on the claim of defense counsel's actual ineffectiveness in providing them with assistance is appropriately made under the provisions of the foregoing statute. In State v. Tooher, 542 A.2d 1084 (1988) the court commented at 1088:
 "The defendants also argue that their trial counsel provided ineffective assistance of counsel by failing to introduce the immunity agreement between the state and Knight, to cross-examine Knight effectively, to move for admission of the State Police day sheet, to investigate fully before trial, and to request specific jury instructions concerning the immunity agreements of Knight and Williams.
 "This court has stated that postconviction relief is the more appropriate avenue to take to raise a claim of ineffective assistance of counsel. (Citations omitted.)"
Compliance with sections 3 and 4 of chapter 10-9.1 is both necessary and important for a proper disposition of defendants' present claim. The former calls for a verified application rendering null the lack of accountability inherent in the defendants' present assertions. The latter requires that the application "specifically set forth the grounds upon which the application is based, . . ." The representations made in this Item IV of the petition for discovery is deficient in both respects. In refining the latter condition, the Strickland court said at 690: "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions that are allegednot to have been the result of reasonable professional judgment.
(Emphasis added.) Although defendants' present argument provides the Court with a litany of errors, they fail to say whether any or all of them were not "the result of [trial counsel's] reasonable professional judgment."
Since, as the court added at 693, the defendants must affirmatively prove prejudice, their application also must allege specifically the prejudice which resulted from the various acts of ineffectiveness.
Our Legislature has made it plain in what manner this collateral attack must be considered by the Court. Our Supreme Court has given a specific direction on the method which these defendants should pursue in this very case. This Court has no authority to ignore either of those mandates.
VII. Defendants' Filing of May 23, 1995.
On May 23, 1995 the defendants filed with the Court "Defendants' Supplemental Memorandum Transmitting Slip Opinion inKyles v. Whitley, ___ U.S. ___, No. 93-7927 (April 19, 1995)" Except in one respect, which the Court will treat separately in the concluding section of this decision, the factual assertions presented in this supplemental memorandum are repetitions of what has been presented in prior filings. This decision has considered and disposes all of those presentations.
This new filing urges that Kyles v. Whitley, supra, requires vacation of the defendants' convictions and the grant of a new trial. In the light of what the Court has said in this decision, this contention may be put to rest by quoting in full the second sentence of the Kyles opinion:
 "On habeas review, we follow the established rule that the state's obligation under Brady v. Maryland, 373 U.S. 83 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government, and we hold that the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention. Because the net effect of the evidence withheld by the State in this case raises a reasonable probability that its disclosure would have produced a different result, Kyles is entitled to a new trial."
If this Court's decision has not made its position clear thus far, it does so now. The Court finds on the entire record before it that the defendants have failed to make the least minimal showing that any evidence favorable to them for their defense was suppressed or withheld by the state. Without limiting the generality of that finding in any degree, the Court specifically observes that the defendants' proposition that exculpatory evidence in the nature of a purported conflict in Knight's "around sunrise" testimony and Williams' car fire testimony should have been disclosed is without foundation, the Court finding as a fact that Nugent had no knowledge at all that Knight would testify that he was with the defendants at the Ronci home "around sunrise."
In view of the Court's decision, Kyles has no applicability to this case.
VIII. Conclusion.
It is by no means remarkable that the defendants, having failed to overturn their convictions upon direct appeal, have continued their efforts in this tribunal. The penchant of their approach prompted the Court to comment at the threshold of its 1991 decision, "In pursuit of their cause, the defendants have been somewhat less than careful in their representations of the facts." [5] In the course of that decision, a number of such instances were pointed out.
Unfortunately, that reproach did nothing to curtail their propensity. On the contrary, serious charges of misconduct have been leveled against the prosecutor with a style which can most charitably be described as rash. He has been accused that in the prosecution of this indictment he has obstructed justice, lied to the Court and intentionally withheld evidence helpful to the defendants. In none of those instances have the defendants presented any proof. Instead, they point to events of alleged misconduct in unrelated matters paramount of which was his drafting of a materially false affidavit for which he was discharged from his position as an assistant attorney general. As the record which they themselves provided disclosed, neither of those charges is true. Indeed, in the view of the very person who signed the affidavit, the affidavit was not false but incorrect. While the right of the defendants to question the legitimacy of their convictions is unquestioned, their unsupported and unjustified accusations exceed the bounds of proper advocacy.
In a perverse way, one might look upon the filing of May 23, 1995 as a fitting close to the defendants' apparently ungovernable predisposition, so ubiquitous throughout their submissions, to misrepresent facts. Among the statements which they make in that filing is this:
 "Moreover, as in Kyles, the prosecution failed to provide Defendants with many statements, documents, and other materials which contained exculpatory or impeaching material evidence. These included:
 The witness statement or notes of Robert Knight's interview with Nugent, an interview in which Knight contradicted not only all of his previous statements but also the prior statements and grand jury testimony of James Williams . . ."
Of course, no "witness statement or notes of Robert Knight's interview with Nugent" exist. Nor is there any evidence, written or spoken, that there was ever an interview in which "Knight contradicted not only all of his previous statements but also the prior statements and grand jury testimony of James Williams, . . ." Assistant Attorney General Craven took the unprecedented step of giving the defendants the prosecution's complete investigative file in this case. It is beyond all doubt that if that file contained the "witness statement or notes." the Court would have been told about them, just as it was told of the Lister memorandum of June 23, 1986 and Lister's tape recorded interview of Molly Raymond which was "punctuated by unexplained gaps," both of which items the defendants found in the file and of which they had not been previously aware.
Not until the Kyles opinion has there been any mention whatsoever of Nugent making notes of an interview he may have had with Knight or his taking a witness statement from Knight. It is not difficult to divine how this misrepresentation lately saw the light of day. In a recitation of the facts, the Kyles opinion states: "After the mistrial, the chief trial prosecutor, Cliff Strider, interviewed Beanie. See App. 258-262 (notes of interview). Strider's notes show that Beanie again changed important elements of his story." [slip op. 5] If one simply changes Strider's name to Nugent and Beanie's name to Knight, it produces the defendants unwarranted argument. The difficulty faced by the defendants is that in Kyles the existence of notes was a fact while in this case the existence of notes is a misrepresentation of fact.
The defendants' petition for discovery and for the issuance of subpoenas and subpoenas duces tecum are each severally denied and dismissed.
The defendants' motions for a new trial are each severally denied and dismissed.